Victor A. Sahn (CA Bar No. 97299)
  vsahn@sulmeyerlaw.com
David J. Richardson (CA Bar No. 168592)
  drichardson@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Carolyn A. Dye (CA Bar No. 97527)
Law Offices of Carolyn A. Dye
3435 Wilshire Boulevard, Ste 990
Los Angeles, CA 90010
Telephone: 213-368-5000
Facsimile: 213-368-5009

Attorneys for Sam S. Leslie, Plan Agent

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>ART & ARCHITECTURE BOOKS OF THE 21st CENTURY,<br><br>        Debtors.<br>_____<br>SAM LESLIE, PLAN AGENT FOR ART & ARCHITECTURE BOOKS OF THE 21st CENTURY,<br><br>        Plaintiff,<br><br>    vs.<br><br>ACE GALLERY NEW YORK CORPORATION, a California corporation; et al.<br><br>        Defendants.<br><br><br>And Related Counterclaims and Crossclaims | Case No. 2:13-bk-14135-RK<br><br>Chapter 11<br><br>Adv No. 2:15-ap-01679-RK<br><br>Consolidated with Adv. Proc. No. 2:14-ap-01771-RK<br><br>**DECLARATION OF VICTOR A. SAHN IN SUPPORT OF PLAINTIFF'S MOTION: (1) TO INTERPRET CONFIRMATION ORDER AND CONFIRMED PLAN; AND (2) TO VACATE ORDER APPROVING STIPULATION WITH ACE MUSEUM, AND STRIKE STIPULATION FROM THE DOCKET, PURSUANT TO F.R.B.P. 9024, AND F.R.C.P. 60(d)(3)**<br><br>**[MOTION AND SUPPORTING DECLARATIONS FILED HEREWITH]**<br><br>**Hearing Date:**<br>Date:     April 16, 2019<br>Time:     2:30 p.m.<br>Courtroom: 1675<br>          255 E. Temple St.<br>          Los Angeles, CA 90012 |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

### DECLARATION OF VICTOR A. SAHN

I, Victor A. Sahn, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am a member of the law firm SulmeyerKupetz, a Professional Corporation ("SulmeyerKupetz"), special litigation counsel to Sam S. Leslie (the "Plan Agent"), Plan Agent for the chapter 11 estate of Art & Architecture Books of the 21st Century, dba Ace Gallery (the "Debtor") in the above-entitled bankruptcy case (the "Bankruptcy Case").

3.    I am an attorney licensed to practice law in the State of California, in the United States District Court and the Bankruptcy Courts for the Southern, Central, Northern and Eastern Districts of California, and in the United States Court of Appeals for the Ninth Circuit, and have been practicing law since 1980.

4.    I submit this Declaration in support of the Plan Agent's Motion to Vacate Order Approving Stipulation with Ace Museum, and Strike Stipulation from the Docket, Pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(d)(3) (the "Motion") filed herewith, which seeks entry of an order: (A) vacating this Court's Order Approving Stipulation Authorizing: (1) Leave to Amend Complaint; and (2) Appointment of Responsible Officer for ACE Museum, entered February 18, 2015 [Dkt. No. 28] (the "Stipulation Order"), in Adversary Proceeding 2:14-ap-01771-RK (the "Museum Adversary"), which has been consolidated into the above-captioned adversary proceeding; and (B) vacating the Stipulation Authorizing: (1) Leave to Amend Complaint; and (2) Appointment of Responsible Officer for ACE Museum [Dkt. No. 27] (the "Stipulation") between the Debtor, its principal Douglas Chrismas ("Mr. Chrismas"), Ace Museum, and the Official Committee of Unsecured Creditors (the "Committee").

### Appointment of the Committee

5.    On March 28, 2013, the Committee was appointed in the Debtor's Bankruptcy Case by the U.S. Trustee's office. SulmeyerKupetz was retained by the Committee on April 1, 2013, to serve as its counsel in the Bankruptcy Case. On May 8, 2013, this Court entered its Order Granting Application of Official Committee of Unsecured Creditors for Order Authorizing SulmeyerKupetz, a

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1 Professional Corporation, as General Bankruptcy Counsel, approving SulmeyerKupetz' engagement

2 by the Committee *nunc pro tunc* to the original date of its engagement.  I served as the lead attorney

3 in this matter from the outset of the engagement through to April 6, 2016 (the "Effective Date"), when

4 the position of the Plan Agent became effective, and the Committee was dissolved, pursuant to the

5 Modified Second Amended Plan of Reorganization of Official Committee of Unsecured Creditors (the

6 "Confirmed Plan"), confirmed by this Court on March 18, 2016.

7 **Summary of Stipulation and Relief Requested**

8       6.     The Plan Agent has filed the Motion pursuant to Fed. R. Civ. P. 60(d)(3) on the

9 grounds that the Stipulation and Stipulation Order were procured by substantial fraud upon this Court

10 by Mr. Chrismas, in his capacity as principal of both the Debtor and Ace Museum, which is described

11 in more detail below, in the Motion, and in the accompanying declarations filed herewith.  The

12 Stipulation is a fairly simple document that was negotiated to address two competing concerns.  In

13 January 2015, the Debtor engaged CBRE to market the real property located at 9430 Wilshire Blvd.,

14 Beverly Hills, California (the "BH Property"), which was leased by the Debtor pursuant to a lease that

15 contained a purchase option for purchase of the BH Property.  I believed at that time that a sale of the

16 BH Property was necessary to the Debtor's ability to reorganize, and was likely the asset of the estate

17 with the greatest value.  However, I had grave doubts about Mr. Chrismas' sincerity in attempting to

18 sell the BH Property, and sought to incentivize him to pursue a quick sale at a fair price.  This concern

19 was particularly focused upon the intention of Mr. Chrismas to list the BH Property at a price of $80

20 Million.  I knew from information supplied to me by multiple third party sources that this was as much

21 as 100% in excess of the Property's actual value and that there was no chance that such a price would

22 ever be obtained or approached.

23       7.     One day after the Debtor obtained authorization to engage CBRE, the Committee filed

24 a motion for leave to amend its complaint in the Museum Adversary.  By that motion, the Committee

25 sought leave to add claims for the appointment of a receiver or responsible officer for Ace Museum, in

26 order to preserve and monetize a similar purchase option that Ace Museum had in the lease for its

27 premises on South La Brea Boulevard, as it appeared certain that a sale of Ace Museum's real

28 property would be the only means by which Ace Museum would ever repay a prepetition loan that

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  Ace Museum owed to the Debtor (the "Museum Loan") which had a petition-date balance of $4.4

2  million. By the Stipulation, the Committee agreed to delay the appointment of a responsible officer

3  for Ace Museum if Mr. Chrismas, Ace Museum, and the Debtor, satisfied certain benchmarks. The

4  first of these benchmarks required a signed extension of Ace Museum's purchase option by a set date,

5  thereby protecting the Committee's and Debtor's interest in future repayment of the Museum Loan.

6  The second benchmark required a bona fide offer for purchase of the BH Property for at least $40

7  million, received by a set date. In other words, the Committee was willing to postpone or even forego

8  the appointment of a responsible officer for Ace Museum as long as the Ace Museum purchase option

9  was preserved by a set date, and the BH Property was subject to a bona fide offer by a set date. Mr.

10  Chrismas, Ace Museum and the Debtor missed each of these benchmarks, and as a result I lodged an

11  order appointing the responsible officer for Ace Museum, which this Court approved. Mr. Chrismas

12  failed to meet each of the benchmarks provided for in the Stipulation. He breached the Stipulation.

13  Therefore, he lost the purported benefits of the Stipulation by virtue of the fact that he breached them.

14  The Stipulation had no further force or effect once the responsible officer had been appointed.

15  However, as certain parties and individuals in this adversary proceeding have argued that the

16  Stipulation remains relevant and enforceable, the history and meaning of the Stipulation have become

17  relevant.[1],[2]

18  **Negotiations With Mr. Chrismas and Ace Museum's Counsel**

19  8.    Between January 26, 2015, and February 16, 2015, I engaged in extensive discussions

20  with Mr. Chrismas, and then with Howard Weg ("Mr. Weg") and David Shemano ("Mr. Shemano"),

21  the attorneys at Robins Kaplan LLP ("Robins Kaplan"), who were engaged by Mr. Chrismas and Ace

22

---

23  [1] The Court could easily apply the Parole Evidence Rule to this matter and hold that the Stipulation is clear on

24  its face—first that it was breached, and second, even if it was not breached, a purchase offer for the BH
Property was not obtained by the March 31 deadline. CCP *Section 1856; Masterson v. Sine (1968) 68 Cal.2d
222, 225.; EPA Real Estate Partnership v. Kang* (1992) 12 Cal.App.4th 171, 176-177(Addressing the question

25  of whether the Agreement was integrated); *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912-
913 (Addressing the question of whether the Agreement was ambiguous).

26  [2] Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of

27  the parties *as it existed at the time of contracting*. *Civil Code* section 1636 and *City of Atascadero v. Merrill
Lynch, Pierce Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 474. When a contract is reduced to writing,

28  this intent "*is to be ascertained from the writing alone* . . . ." *Civil Code* Section 1639.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   Museum.  While I believe that many of the details of the negotiations were confidential settlement

2   communications, the negotiations led to the Stipulation, an incorporated Term Sheet for support of the

3   Committee's draft plan of reorganization (the "Plan Term Sheet"), and certain transactional

4   documents that protected the Debtor's interests under the Stipulation, including a Promissory Note,

5   and two Deeds of Trust for Ace Museum's leasehold interests in the La Brea Property.  These

6   documents were originally filed under seal, but Mr. Shemano and Ace Museum have since taken the

7   position in documents filed in this Court that the documents should no longer be deemed "under seal,"

8   and have filed copies in a public pleading.  Therefore, I have attached true and correct copies of the

9   Stipulation, including each of its incorporated exhibits 1-7, as Exhibit A hereto.

10       9.      On October 17, 2017, Mr. Shemano filed a declaration (the "Shemano Decl.") in this

11   Court in opposition to the Plan Agent's motion for summary judgment, in which Mr. Shemano

12   attached the Stipulation—but not the Plan Term Sheet that is an incorporated part of the Stipulation—

13   and argued that a single phrase in Paragraph 9 of the Stipulation means that if Mr. Chrismas ever sold

14   the BH Property, the Museum Adversary would be dismissed with prejudice even though the multi-

15   million dollar Museum Loan had not been repaid.  This interpretation proposed by Mr. Shemano is

16   wrong, particularly when the incorporated Plan Term Sheet is included as part of the analysis, as it

17   must be.  The following description of the Stipulation and its exhibits, their respective terms, and the

18   events of 2015 and 2016, addresses my understanding of the meaning of the Stipulation, and its lack

19   of continuing relevance in these proceedings.

20       10.     The negotiations that resulted in the Stipulation were driven by Mr. Chrismas' stated

21   goal to prevent the appointment, or effectiveness, of a receiver or responsible officer for Ace Museum,

22   and by the Committee's goal to obtain a quick and profitable sale of the BH Property by a fixed

23   deadline.  I did not trust that Mr. Chrismas would successfully and promptly obtain a sale of the BH

24   Property without active pressure from the Committee, and therefore the discussions that arose from

25   the filing of the Receiver Motion presented an opportunity.  The Stipulation that was the result of

26   these discussions is a fairly simple document, as it is an agreement to delay the appointment of a

27   responsible officer for Ace Museum by two particular dates, if the Debtor and Ace Museum were able

28   to satisfy certain benchmarks required by each such date.  See Stipulation at ¶ 3 (Page Exhibit A – 32).

The benchmarks in the Stipulation, in chronological order, are: (i) that by February 17, 2015, Ace Museum or Mr. Chrismas would have obtained a written extension of the La Brea Lease purchase option (the "La Brea Extension") for at least 120 days after the pending expiration date, signed by 400 S. La Brea (see Stipulation at ¶ 4, Page Exhibit A – 32); (ii) that by March 15, 2015, the Debtor, Ace Museum or Mr. Chrismas would have obtained either: (a) a bona fide offer for the sale of the BH Property for no less than $40 million (the "BH Offer"); or (b) an offer to purchase or refinance the La Brea Property for no less than $35 million (the "La Brea Offer") (see Stipulation at ¶ 5, Pages Exhibit A – 32-33) (collectively, the "Benchmarks"). If Mr. Chrismas or his entities were able to obtain the La Brea Extension and produce it to the Committee by February 17, 2015, then the Committee would not lodge its order appointing the responsible officer on that date. Id. at ¶ 4. And if Mr. Chrismas or his entities could obtain, and produce to the Committee, either the BH Offer or the La Brea Offer by March 15, 2015, then the Committee would not lodge its order appointing the responsible officer on that date. Id. at ¶ 5. By structuring the Stipulation in this manner, the Committee exchanged a delay in its Museum Adversary for an immediate potential sale of the BH Property.

11.    But Mr. Chrismas, the Debtor, and Ace Museum, failed on each occasion to meet any of these Benchmarks. I did not receive a La Brea Extension by February 17, 2015. Instead, I received a series of promises that it would be forthcoming, an unsigned draft, and eventually, on February 25, 2015, a signed extension of the La Brea Purchase Option, eight days after the deadline. This breach ended the beneficial impacts of the Stipulation, but without waiving its rights, the Committee continued to see if the March 15, 2015 deadline would be met (continued to March 16, 2015, as the original date was a Sunday). However, the Debtor did not provide such an offer by this date, and therefore, on March 26, 2015, I filed my Declaration of Victor A. Sahn re: Lodging and Entry of Order Appointing Responsible Officer for Ace Museum [Dkt No. 35]. On March 27, 2015, this Court entered the Order Appointing Responsible Office for Ace Museum [Dkt. No. 36], appointing Mr. Haberbush as Responsible Officer for Ace Museum. This was the end of the Stipulation's beneficial impacts for Mr. Chrismas and Ace Museum. That is why the Responsible Officer was appointed. The Stipulation was breached and Mr. Chrismas and Ace Museum do not get to come back to this Court,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    two years later and say that because a sale long after the passing of the March 16, 2015, took place,

2    that they are entitled to the alleged benefits of the Stipulation.

3          12.    Mr. Haberbush's appointment as Responsible Officer turned out to be a temporary

4    appointment, and he resigned shortly thereafter when he was unable to hire counsel, and when Ace

5    Museum took the position in this Court that Mr. Haberbush would work for Ace Museum rather than

6    for the Committee.    A few months later, Mr. Chrismas allowed the La Brea Purchase Option to

7    terminate, thereby destroying the only potential means that the Debtor had to obtain a full or

8    substantial repayment of the Museum Loan.

9          13.    Because the purpose of the Stipulation was to encourage Mr. Chrismas to preserve Ace

10   Museum's purchase option and to speed up his efforts to sell the BH Property by delaying the

11   appointment of the Responsible Officer pending satisfaction of these Benchmarks, and because those

12   Benchmarks were never met, the Stipulation had no further force or effect after the each of the

13   Benchmarks were missed, starting with his failure to obtain an extension of the purchase option on the

14   La Brea Property by the February 17, 2015 deadline.    Paragraph 9 of the Stipulation states:

15           In connection with the closing of any sale or refinance of the La Brea
             and Sycamore Parcels which satisfies the March 31 Condition, the
16           Committee will fully cooperate. If the Beverly Hills property is sold,
             the March 31 Condition is satisfied, or the Loan is otherwise satisfied,
17           the Committee will dismiss this adversary proceeding with prejudice
             and if the Order is entered, it shall be vacated. Further, this will operate
18           to extinguish the Promissory Note.

19   See Stipulation at Para. 9 (Page Exhibit A – 35).  As noted above, Mr. Shemano reads this paragraph

20   in isolation to mean that, because Mr. Chrismas eventually caused the Debtor to sell the BH Property,

21   on his own schedule, more than two months after the last Benchmark had expired, the Committee was

22   supposed to dismiss an adversary proceeding to collect a debt owed by a third party.    This

23   interpretation is absurd.  Had this been presented to the Court at the time that the Stipulation was

24   approved, it would not have been approved by this Court, as it would have improperly incentivized

25   Mr. Chrismas to obtain a sale of the Debtor's interest in the BH Property at any time, for any price, in

26   order to erase a third-party debt in which Mr. Chrismas had a personal interest.  What if Mr. Chrismas

27   obtained the sale of the Beverly Hills property in 2017 or 2018?    Would the Ace Museum

28   indebtedness have been forgiven?  Such an interpretation of the Stipulation illustrates the absurdity of

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    this position.  This interpretation cannot sustain an analysis of the entirety of the Stipulation, including

2    the Plan Term Sheet, which specifically contemplates preservation and repayment of the Museum

3    Loan after a sale of the BH Property.  It is, instead, a desperate attempt (propagated long after the fact)

4    by one of Mr. Chrismas' bankruptcy acolytes, to upend the Plan Agent's efforts to hold responsible all

5    parties who participated in the massive fraud committed in this case, and to recover funds that were

6    converted outside of the reach of creditors.  Multiple contrary positions throughout the bankruptcy

7    case thereafter were taken, and the Committee in concert with Mr. Chrismas, Ace Museum and the

8    other parties in this case worked actively to ensure that the Museum Adversary would be preserved by

9    the Confirmed Plan for prosecution by the Plan Agent.  This is demonstrated by the following filings

10   and the following positions taken before this Court:

11       14.    Pursuant to Paragraph 7 of the Stipulation, the Plan Term Sheet is a "part" of the

12   Stipulation.  See Stipulation at ¶ 7 (Page Exhibit A – 34).  The Plan Term Sheet appears as Exhibit 6

13   to the Stipulation, at pages Exhibit A – 139-150.  Paragraph 5 of the Plan Term Sheet provides terms

14   for the sale of the BH Property.  Paragraph 5.b sets out the procedure that will be followed if the

15   Debtor/Chrismas are able to obtain a Benchmark offer for the BH Property of at least $40 million by

16   March 15, 2015, including specific terms for what will constitute a "bona fide offer," and what

17   contingencies would be permitted.  See Plan Term Sheet at ¶ 5.b, page Exhibit A – 142.

18       15.    Paragraph 5.c of the Plan Term Sheet then sets out the procedure for plan negotiations

19   if, and only if, the Debtor/Chrismas not only obtained the required offer on the BH Property, but also

20   caused Ace Museum to repay the Museum Loan in full:

> c. If the Debtor and Chrismas meet the criteria provided for in this
> paragraph 5 **and** also meets the criteria and requirements of paying the
> Debtor's bankruptcy estate **the full amount** owed to it under the terms
> of the Ace Museum Stipulation (payment of approximately **$3,308,533.33** to
> the Debtor's bankruptcy estate), the Debtor, Chrismas and the Committee
> agree to attempt and negotiate over the terms and conditions of a
> consensual plan, in good faith, in order to address payment of the balance
> of the indebtedness, if any, remaining due and owing to creditors. If they
> are unsuccessful in negotiating over the terms and conditions of a
> consensual plan, Chrismas and the Debtor will be free at that point to object
> to the Committee's Plan or propose their own Plan to the Bankruptcy Court.

27   See Plan Term Sheet, at ¶ 5, page Exhibit A - 143 (emphasis added).

28

16.     The Stipulation and its exhibits demonstrate that at Paragraph 5 of the Stipulation, and Paragraph 5.b of the Plan Term Sheet, both contemplate that the Debtor/Chrismas will only obtain relief (withholding of responsible officer order, and release from plan support obligations) if they obtain a bona fide offer for the BH Property for "not less than $40,000,000," received no later than March 15, 2015. See Stipulation, ¶ 5 (Pages Exhibit A – 32-33), and Plan Term Sheet, ¶ 5.b (Page Exhibit A – 142). And Paragraph 5.c of the Plan Term Sheet **also** requires that Mr. Chrismas and the Debtor would only be released from their Plan support obligations if the BH Property was sold by the Debtor for more than $40 million, pursuant to an offer received no later than March 15, 2015, **and** the Museum Loan was repaid by Ace Museum. Id., at ¶ 5.c (Page Exhibit A – 143). Why would Mr. Chrismas and Ace Museum agree to such a provision under the confirmed Plan of Reorganization in this case and then state that the Ace Museum indebtedness was now satisfied?

17.     While Mr. Shemano claims that the Stipulation was drafted to erase the Museum Loan if Mr. Chrismas could sell the BH Property, the Plan Term Sheet specifically contemplates the survival of the Museum Loan even after a timely $40 million sale of the BH Property, as it requires repayment of the Museum Loan in addition to any Benchmark sale of the BH Property in order to release the Debtor/Chrismas from their plan support obligations. Mr. Shemano's interpretation of a phrase extracted from Paragraph 9 of the Stipulation directly conflicts with the clearly-worded and specific terms of Paragraph 5 of the Plan Term Sheet, and effectively renders Paragraph 5 of the Plan Term Sheet meaningless. Paragraph 9 of the Stipulation as interpreted by Mr. Shemano cannot be reconciled with Paragraph 5 of the Plan Term Sheet, either with respect to intent or specific terms, as it requires that Paragraph 5 be ignored or omitted. But as the Plan Term Sheet is incorporated into the Stipulation, the two paragraphs must be read in harmony. The Plan Term Sheet was signed by Chrismas in his personal capacity, in his capacity as principal of the Debtor, and in his capacity as principal of Ace Museum, and was approved as to form by Mr. Shemano.

18.     The purpose of Paragraph 9 of the Stipulation is that it was to erase the Committee's efforts to amend its complaint to have a responsible officer appointed, but was not intended to erase the underlying Museum Loan obligation. The reference in Paragraph 9 to an extinguished Promissory Note is a reference to the secured Promissory Note that was drafted as an exhibit to the Stipulation,

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  not a reference to the original, unsecured and underlying Museum Loan, for which no promissory note

2  had ever been drafted.  Consistent with this understanding, and after the BH Property had been sold,

3  the Plan Agent amended the Committee's complaint in January 2017, when the Museum Adversary

4  was consolidated into the above-captioned adversary, and removed the claims for relief that sought the

5  appointment of a responsible officer for Ace Museum.  The Plan Agent's interpretation of Paragraph 9

6  of the Stipulation allows for the Stipulation and Plan Term Sheet to be read in harmony, as they must

7  be as incorporated documents.  There are no outstanding obligations to be performed or enforced by

8  any party to the Stipulation.

9       19.    There is one other critical term of the Stipulation that requires analysis.  Paragraph 11

10  of the Stipulation provides:

11          **No Third Party Beneficiaries**. This Stipulation is made by and between
            Defendant, Chrismas and the Creditors Committee on behalf of the
12          Debtor's estate. **There are no third party beneficiaries to this
            Stipulation and no releases or settlements provided for in this
13          Stipulation shall be used or alleged to be in favor of any other party,
            other than the parties to this Stipulation**. Any deadlines for
14          performances set forth in this Stipulation are for the sole benefit of the
            Creditors' Committee, which shall have the absolute right to extend such
15          deadlines without further order of the Bankruptcy Court.

16  See Stipulation at ¶ 11, page Exhibit A - 35 (emphasis added).  The plain meaning of this paragraph, is

17  that parties to this litigation such as 400 S. La Brea, LLC, who are not parties to the Stipulation, have

18  no rights to seek to enforce or rely upon the Stipulation in any manner.

19  **Actions of Ace Museum and Mr. Shemano That Confirm the Committee's Interpretation**

20       20.    On May 14, 2015, two months after the Debtor missed the last of the Benchmarks

21  under the Stipulation, the Debtor filed its Motion for Order Authorizing Debtor to Exercise Purchase

22  Option and Enter into Agreement with Los Angeles County Metropolitan Transportation Authority for

23  Purchase and Sale of Real Property Located at 9430 Wilshire Boulevard, Beverly Hills, California

24  90212 and to Enter into Related Transactions Pursuant to 11 U.S.C. §363; and Granting Related

25  Relief, filed in the Bankruptcy Case [Dkt. No. 1119] (the "Sale Motion"), for a gross sale price of $40

26  million.  The Sale Motion included a declaration of Mr. Chrismas in support of the sale.  A true and

27  correct copy of the Debtor's Sale Motion, including the Declaration of Mr. Chrismas, is attached

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   hereto as <u>Exhibit B</u>.  In his Declaration to the Sale Motion, Mr. Chrismas described the benefit that the

2   Debtor's estate would receive from the sale as follows:

> The sale to the LACMTA of the Beverly Hills Property is scheduled to close
> by June 15, 2015, or as soon as practical thereafter, but in no event later than
> June 30, 2015 and will provide the Debtor with the sum of approximately
> $21,000,000 (the "Sale Proceeds") after the Debtor exercises the Purchase
> Option which will enable the Debtor to (A) pay, among other things, (i)
> administrative claims, (ii) the Loan Balance owing to the Landlord's
> affiliates due at the closing of the Transactions pursuant to the Beverly Hills
> Settlement Agreement, and (iii) any potential award to AERC Desmond
> Towers ("AERC"); and also (B) propose and fund a chapter 11 plan.

8   <u>See</u> <u>Exhibit B</u>, Sale Motion, Pages Exhibit B – 180-181, ¶ 5.  <u>Nowhere</u> in either the Sale Motion or the

9   Chrismas declaration was any statement made to even suggest that the Debtor's benefit from the sale

10  would be offset by the loss of a $3.3-$4.4 million loan owed by Ace Museum pursuant to the

11  Stipulation.  As counsel to the Committee, I would have considered an offset to the sale's value equal

12  to about one-sixth of the net proceeds to be a material omission that would have had material

13  consequences if it had been addressed at the time of the Sale Motion.  If Mr. Chrismas and the Debtor

14  believed that the Stipulation—to which both were parties—obligated the Debtor to give up the

15  significant asset of the Museum Loan upon closing a sale of the BH Property (beyond the Benchmark

16  deadline), this position should have been disclosed to creditors, and disclosed to this Court.  Mr.

17  Chrismas, in his dual and conflicted role as the principal of both the Debtor and Ace Museum could

18  not remain silent if he believed that the true benefit to the estate from a sale of the BH Property was

19  only $17 million instead of the $21 million claimed in his declaration, because of a phantom released

20  obligation of Ace Museum to the estate.

21          21.     Just days before the Sale Motion was filed, Mr. Shemano sent me an email on May 8,

22  2015, a true and correct copy of which is attached hereto as <u>Exhibit C</u> (Page Exhibit C – 193), in

23  which he confirmed that it was his understanding that the agreement in the Stipulation/Term Sheet

24  was that the Debtor would sell the BH Property <u>and</u> Ace Museum would repay the Museum loan.

25          22.     On May 26, 2015, the Debtor filed the Supplemental Declaration of David M. Agler in

26  Support of Debtor's Motion for Order Authorizing Debtor to Exercise Purchase Option and Enter into

27  Agreement with Los Angeles County Metropolitan Transportation Authority for Purchase and Sale of

28  Real Property Located at 9430 Wilshire Boulevard, Beverly Hills, California 90212 and to Enter into

1   Related Transactions Pursuant to 11 U.S.C. §363; and Granting Related Relief, filed in the

2   Bankruptcy Case on May 26, 2015 [Dkt. No. 1153], a true and correct copy of which is attached

3   hereto as Exhibit D (Page Exhibit D – 197), in which Mr. Agler provided a detailed breakdown of the

4   tax implications of the sale of the BH Property, and how the Debtor's taxable operating income would

5   be determined. It is my understanding of how net taxable income is calculated that, if a sale of the BH

6   Property would have cost the Debtor the loss of a $3.3-$4.4 million asset, this would have affected the

7   amount of net taxable income. But nowhere in his calculations did Mr. Agler make any suggestion

8   that the Debtor's income from the sale would be reduced by the loss of a $3.3-$4.4 million loan debt

9   owed by Ace Museum.

10   23.   Mr. Shemano appeared at the hearing on the Sale Motion held on May 28, 2015. A

11   true and correct copy of the Transcript of Proceedings for May 28, 2015, in Case No. 2:13-bk-14135-

12   RK, filed in the Bankruptcy Case on June 5, 2015 [Dkt. No. 1178], is attached hereto as Exhibit E

13   (Page Exhibit E – 213). When the Court discussed Mr. Agler's declaration, Mr. Shemano did not

14   address the Court to explain that there was a $3.3-$4.4 million oversight in the calculations. See

15   Exhibit E at pages Exhibit E – 218-221. When the Court continued with the hearing on the Sale

16   Motion, Mr. Shemano did not address the Court to explain that the value to the estate to be obtained

17   from the sale would be reduced by an undisclosed loss of a $3.3-$4.4 million asset. Id. at pages

18   Exhibit E – 226-284. Instead, Mr. Shemano remained silent about his alleged settlement, and the sale

19   of the BH Property was approved. They have actively mislead this Court if the position that they now

20   take is sustained.   The Plan Agent reserves all rights in connection with these active

21   misrepresentations.

22   **Ace Museum and Mr. Shemano Preserve the Debtor's Claim to Recover the Museum Loan in**

23   **the Plan**

24   24.   The Committee filed its first Plan of Reorganization of Official Committee of

25   Unsecured Creditors [Dkt. No. 863] on January 30, 2015 (the "Original Plan"), a true and correct copy

26   of which is attached hereto as Exhibit F (Page Exhibit F – 286). The Committee filed its Second

27   Amended Plan of Reorganization on December 21, 2015, (the "Second Amended Plan"), a true and

28   correct copy of which is attached hereto as Exhibit G (Page Exhibit G – 349), which was confirmed by

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

this Court in modified form on March 18, 2016 (the "Confirmed Plan"), a true and correct copy of

which is attached to the Motion as <u>Exhibit 1</u>.  The Original Plan, the Second Amended Plan, and the

Confirmed Plan all include terms to preserve the Museum Adversary and to ensure collection of the

Museum Loan for the benefit of the Debtor's creditors.  Both define the claims asserted in the

Museum Adversary as the "Creditors Committee's Reserved Claims."  This definition in the

Confirmed Plan reads as follows:

> 1.36    Creditors Committee's Reserved Claims.  All rights conferred on the Creditors Committee pursuant to that certain "Order Approving Stipulation to Confer Standing and Authority on Official Committee of Unsecured Creditors to Enforce and Pursue Collection of Payment Obligation From Ace Museum On Behalf and for the Benefit of the Bankruptcy Estate" entered by the Bankruptcy Court on October 23, 2014 [Docket No. 697] pursuant to which, among other things, the Creditors Committee was vested with the requisite standing on behalf of the Estate to commence an action against Ace Museum, as well as any other rights conferred on the Creditors Committee to prosecute, resolve, or otherwise pursue any claims or claims for relief.

<u>See</u> Confirmed Plan, at Section 1.36 (<u>Exhibit 1</u> to Motion, at Section 1.36).  The same definition

appears in the Original Plan, minus only the last twenty-three words of the definition (page Exhibit F

– 293, Section 1.30), and in the Second Amended plan (page Exhibit G – 357, Section 1.35).

25.    Section 5.4.2 of the Confirmed Plan provides that, among other things, the Plan

Agent's powers and duties will include the power to "settle, adjust, retain, enforce, commence, or

abandon any of the Reserved Claims or the Creditors Committee's Reserved Claims, or any

Administrative Expenses or other Claims asserted against the Debtor or the Post-Confirmation

Debtor." <u>See</u> Exhibit 1 to Motion at Section 5.4.2.  Section 5.6 of the Confirmed Plan provides that,

among the potential sources of funding for the plan, will be "the net proceeds received on account of

the Creditors Committee's Reserved Claims." <u>Id.</u> at Section 5.6.  Section 5.14 of the Confirmed Plan

provides that the right to pursue the Creditors Committee's Reserved Claims "is deemed automatically

transferred on the Effective Date to the Post-Confirmation Debtor on behalf of the Estate," and that

the Plan Agent may "retain counsel and other professionals to assist it in the settlement or litigation of

the Reserved Claims, including the Creditors Committee's Reserved Claims." <u>Id.</u> at Section 5.14.

The Confirmed Plan says nothing about the Stipulation, nor any agreement to dismiss the Committee's

1  Museum Adversary, or that the Museum indebtedness was satisfied, but instead specifically and

2  expressly preserves the claims for the benefit of creditors, to be pursued by the Plan Agent.

3        26.    Mr. Shemano participated in plan confirmation proceedings. Mr. Shemano filed the

4  Response of Douglas Chrismas to Committee's Status Report and Supplement to Status Report

5  Regarding Committee First Amended Plan, in the Bankruptcy Case on December 15, 2015 [Dkt. No.

6  1500], on behalf of Mr. Chrismas, a true and correct copy of which is attached hereto as Exhibit H, in

7  which he addressed the earlier sale of the BH Property, but did not raise the claim that the Museum

8  Adversary should be dismissed, and did not suggest in any manner that current Plan terms conflicted

9  with any obligation to dismiss the Museum Adversary.

10        27.    Similarly, on January 28, 2016, Mr. Shemano filed the Objection of Douglas Chrismas

11  and Jennifer Kellen to Second Amended Plan of Reorganization of Official Committee of Unsecured

12  Creditors [Dkt. No. 1707], a true and correct copy of which is attached hereto as Exhibit I, which says

13  nothing about the Plan's terms preserving the Museum Adversary, says nothing about the Stipulation,

14  and makes no claims about any obligation to dismiss the Museum Adversary. They have actively

15  mislead this Court if the position that they now take is sustained. The Plan Agent reserves all rights in

16  connection with these active misrepresentations.

17        28.    On February 16, 2016, Mr. Shemano and the Debtor's counsel co-filed the Debtor's and

18  Chrismas's Filing of (1) Proposed Findings of Fact and Conclusions of Law, (2) Proposed Plan

19  Revisions, (3) Proposed Confirmation Order Revisions, and (4) Proposed Plan Trust Agreement

20  Revisions Re: Committee's Second Amended Plan of Reorganization [Dkt. No. 1787 in main case], a

21  true and correct copy of which is attached hereto as Exhibit J, in which Mr. Shemano submitted

22  proposed redlines to the soon-to-be Confirmed Plan, findings of fact and confirmation order. Mr.

23  Shemano's redline changes did **not** remove or alter the terms of the Confirmed Plan that preserve and

24  assign the Museum Adversary to the Plan Agent for prosecution and recovery. See Exhibit J at pp.

25  631 (lines 18-20), 634 (lines 19-20), and 637 (lines 9-13). They have actively mislead this Court if the

26  position that they now take is sustained. The Plan Agent reserves all rights in connection with these

27  active misrepresentations.

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

29.     The Committee was not alone in proposing a plan that would preserve the Museum Adversary.  On January 12, 2016, the Debtor filed a competing plan, the Debtor's Third Amended Plan of Reorganization Dated January 12, 2016 (the "Third Debtor Plan") [Dkt. No. 1606], a true and correct copy of which is attached hereto as Exhibit K.  The Third Debtor Plan was remarkably similar to the Committee's Confirmed Plan, such as defining the Museum Adversary claims with the same definition for Creditor Committee's Reserved Claims.  See page Exhibit K - 716 at Section 1.35.  **Like the Committee's Confirmed Plan, the Third Debtor Plan proposed that the Museum Adversary be assigned to, and prosecuted by the Plan Agent [Section 5.14], and serve as a source of funding for consummation of the plan [Sections 1.85 and 5.5].**  Id. at Sections 1.85 (pages 722-23), 5.5 (pages 738-39), and 5.14 (page 739, lines 10-14).  How could Mr. Shemano, who purports to be an officer of this Court, submit the Declaration that was filed in support of the Opposition to the Plan Agent's extraordinarily meritorious Summary Judgment/Summary Adjudication Motion in consideration of this record?

30.     The final Order Confirming Second Amended Plan of Reorganization of Official Committee of Unsecured Creditors (the "Confirmation Order") [Dkt. No. 1873], was a product of negotiation between the parties, and in recognition of this, counsel for each of the participating parties signed their consent to the terms of the lodged version of the Confirmation Order, including Mr. Shemano.  A true and correct copy of the Notice of Submission of Signatures of Counsel for Douglas Chrismas and Counsel for AERC Desmond's Tower, LLC to "Order Confirming Second Amended Plan of Reorganization of Official Committee of Unsecured Creditors," filed on March 15, 2016 [Dkt. No. 1862], which bears Mr. Shemano's signature, is attached hereto as Exhibit L.

31.     After the sale of the BH Property closed, and prior to plan confirmation, Ace Museum made a further fraudulent payment to reduce the balance of the Museum Loan, demonstrating its own belief that the loan remained outstanding.  In its MOR for October 2015 [Dkt. No. 1475], a true and correct copy of which is attached hereto as Exhibit M, the Debtor listed a payment of $3,500 having been received from Ace Museum, and the attached balance sheet which reduced the balance of the Museum Loan from the amount claimed the prior month by $3,500, reducing it from the September total of $3,168,859.80 by $3,500 to the October total of $3,165,359.80.  See Exhibit M at pp. 1 and 34,

1 and Exhibit N, which is a true and correct copy of the Debtor's MOR for September 2015, at p. 31.

2 This Monthly Operating Report, of course, is signed by Mr. Chrismas.

3      32.     On March 28, 2016, ten days after Plan confirmation, Mr. Shemano signed a status

4 report in the Museum Adversary [Dkt. No. 104 in the Museum Adversary], a true and correct copy of

5 which is attached hereto as Exhibit O, in which the parties jointly stated that further prosecution of the

6 adversary would depend upon whether or not Mr. Chrismas could effect a Monetization Event, and

7 that therefore the matter should be continued sixty days.

8      33.     On October 3, 2016, Ace Museum and Chrismas filed their joint Defendants' Answer

9 to First Amended Complaint of Official Committee of Unsecured Creditors for Appointment of a

10 Receiver, etc. [Docket No. 114 in the Museum Adversary] (the "Museum Answer"), a true and correct

11 copy of which is attached hereto as Exhibit P.  The Museum Answer pleads only three affirmative

12 defenses to the First Amended Complaint: (i) that the Debtor was solvent at the time of the avoidable

13 transfers; (ii) that the Committee lacked standing; and (iii) that Ace Museum gave new value for the

14 transfers.  Nowhere in the Museum Answer did Ace Museum or Chrismas plead that the claims had

15 been released more than a year earlier, or that the Museum Adversary was supposed to be dismissed.

16      34.     On February 29, 2019, Daryoush Dayan produced documents to the Plan Agent in the

17 instant litigation.  One of the documents produced by Mr. Dayan is an email from Mr. Chrismas to

18 Mr. Dayan, dated November 2, 2016, a true and correct copy of which is attached hereto as Exhibit Q,

19 in which Mr. Chrismas attaches a letter from his counsel, Marc Lieberman, Esq., outlining the nature

20 and value of assets of the Debtor's estate, including the Museum Loan which Mr. Lieberman describes

21 as having "unknown value because the Museum's timing of its ability to pay their loan off has yet to

22 be established."  Thus, Mr. Chrismas was actively telling third parties that the Museum loan remained

23 a valuable asset of the estate shortly before Mr. Shemano began to claim that it had been erased by the

24 Stipulation.

25      35.     But on October 17, 2017, in response to a motion for summary judgment filed by the

26 Plan Agent in this adversary, Mr. Shemano filed his Declaration of David B. Shemano in Support of

27 Defendant's Opposition to Motion for Partial Summary Judgment Against Ace Museum, filed in the

28

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  above-captioned Adversary Proceeding [Dkt. No. 207], a true and correct copy of which is attached

2  hereto as <u>Exhibit R</u>, stating under penalty of perjury that:

> I negotiated Section 9 [of the Stipulation] so that in the event that the
> Chrismas could successfully close a sale of the Beverly Hills Property or
> Ace Museum Property, whether before or after the Haberbush Order was
> entered, that satisfied the minimum amounts set forth in Section 5 of the
> Stipulation (i.e., $40 million for the Beverly Hills Property and $35
> million for the Ace Museum Property), then all of the claims in
> adversary No. 1 would be dismissed with prejudice.

7  <u>See</u> Page Exhibit R - 874, ¶ 12.

8      36.    Mr. Shemano's interpretation of the Stipulation cannot be sustained, and should no

9  longer be considered.  The Plan Agent has had to expend tens of thousands of dollars to respond to

10  Mr. Shemano's declaration just as the Creditor's Committee and the bankruptcy estate expended

11  hundreds of thousands of dollars to defeat the absurd competing reorganization plan that Mr. Chrismas

12  filed.  Given contradictory wording in the Plan Term Sheet, given Mr. Shemano's silence throughout

13  the sale of the BH Property and the plan confirmation hearings would estop his position, and given the

14  terms of the Confirmed Plan that specifically preserve the Museum Adversary for prosecution by the

15  Plan Agent.  But by filing his Shemano Decl., Mr. Shemano created a disputed issue of fact that

16  prevented the Plan Agent from obtaining summary judgment on his state law claims to collect the

17  balance of the Museum Loan.  Therefore, the Plan Agent has filed his Motion requesting that the

18  Stipulation and Stipulation Order be vacated for fraud upon the court—its elimination will facilitate

19  summary judgment against Ace Museum once and for all (if this Court decides to deny the Plan

20  Agent's motion for terminating sanctions).

21  **The Debtor's Fraudulent Operations**

22      37.    The summary of the Debtor's fraudulent operations that I describe in the following

23  paragraphs is not offered as evidence that such fraud existed.  The testimony of Jennifer Ziegler, and

24  other declarants in support of the Motion, address the evidence demonstrating fraud.  Instead, I have

25  described the fraud to demonstrate the knowledge that I now have pertaining to the fraud that Mr.

26  Chrismas perpetrated upon this Court, upon the Committee, and upon creditors of the Debtor's estate,

27  which is necessary foundation to my explanation below for why I maintain that the Stipulation and

28  Stipulation Order were procured by such fraud.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

38.    In fulfillment of the Committee's duties, I routinely requested documents from the Debtor and its counsel, reviewed all pleadings, participated in discovery and depositions, and otherwise monitored the Bankruptcy Case to obtain and maintain an understanding of the Debtor's financial condition and prospects for reorganization.  The documents that were most critical to this analysis were the Debtor's original and amended Schedules and Statement of Financial Affairs (the "Schedules"), and the Monthly Operating Reports (the "MORs") that were filed each month by the Debtor.  The Schedules and the MORs were signed by the Debtor's principal, Mr. Chrismas, attesting to their truthfulness and accuracy under penalty of perjury.  Further, but for a few exceptions at the outset of the Bankruptcy Case, the MORs attached copies of the Debtor's bank statements for its general operating account, tax account, payroll account, and rent account, thereby providing apparent verification for the transactions listed in the MORs.

39.    The information that Mr. Chrismas reported in the MORs each month revealed a Debtor with a limited ability to reorganize.  The Debtor's sales each month were often insufficient to meet expenses, and often left an overdraft in the Debtor's general operating account balance at the end of each month, or a very small positive balance.  The Debtor never maintained a positive balance of cash of any amount that would suggest an ability to make any payments to creditors from the Debtor's operations.

40.    The Debtor's amended Schedules filed on April 4, 2013 [Dkt. No. 74] claimed that the Debtor's primary assets were its art inventory of both owned and consigned artworks, and the Museum Loan.  The Schedules stated that the balance of the Museum Loan as of the petition date of February 19, 2013 (the "Petition Date") was **$4,482.856.00** (the "Petition Date Loan Balance").  While the Schedules claimed that the value of the Debtor's inventory was $7,472.660.00, the Debtor's MORs demonstrated that this value was illusory for purposes of considering a future plan of reorganization, as the Debtor's sales that were reported each month showed that this potential inventory value was not being realized from current sales, and was not generating any mounting profits that could be used to pay creditors under a plan of reorganization.  Further, I understood that the value of this inventory assumed sales in the ordinary course of business, and that a liquidation value would have been substantially smaller given the nature of art sales.

**Fraudulent Diversion of the Debtors' Assets through Ace NY and Ace Museum:**

41.    Although I relied on the Schedules and MORs for their accuracy throughout the Bankruptcy Case, including during the negotiations over the Stipulation discussed herein, and believe that the Committee and this Court did as well, it has since become apparent that they were the product of substantial fraud.  The Plan Agent's investigation of the Debtor's books and records, and the analysis and expert witness testimony of Jennifer Ziegler ("Ms. Ziegler"), whose declaration is filed herewith, that within a day of the Petition Date, Mr. Chrismas began diverting sales proceeds that belonged to the Debtor into bank accounts of non-debtor entities that he controlled, primarily the account of an entity that he incorporated only five days before the Petition Date, called Ace Gallery New York Corporation ("Ace NYC").  I have reviewed financial records of Ace NYC, along with the testimony of Ms. Ziegler, and the Ace NYC's financial records and tax returns reveal that it was incorporated without any capitalization, without any assets or art inventory of its own, and without any functioning business.  It had no contract rights with the Debtor's artists, but was simply a bank account that was used by Mr. Chrismas to embezzle the Debtor's sale proceeds.  Over the course of the Bankruptcy Case, Mr. Chrismas routinely caused the wire transfer instructions for Ace NYC's account to be sent to purchasers of artworks that were owned outright by the Debtor, or were subject to the Debtor's consignment rights under prepetition and/or post-petition Artist Contracts between the Debtor and the artists.  Mr. Chrismas also caused wire transfer instructions for the Ace NYC account and the Ace Museum account to be sent to Mr. Eric Wilson, who provided the Debtor with a series of post-petition loans for payment of its rent for its two art gallery locations thereby causing such proceeds to be diverted to Ace NYC when, in fact, they were made and for the exclusive benefit of the Debtor.  By providing wire instructions for accounts other than the Debtor's accounts to purchasers and lenders who owed funds to the Debtor, Mr. Chrismas diverted approximately **$17 million** from the Debtor's accounts between the Petition Date and the Effective Date, none of which was reported on the MORs or any other documents filed in the Bankruptcy Case.  While much of those funds would have been owed to artists, or paid in taxes, the Debtor's net profits from such sales would have ensured that several million dollars would have been available in the Debtor's general operating account to fund payments to creditors under a plan of reorganization.  Instead, Mr. Chrismas **diverted**

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  **more than $5 million of those post-petition funds** through the Ace NYC and Ace Museum accounts

2  to make Ace Museum's monthly rent payments to its landlord, 400 S. La Brea, LLC ("400 S. La

3  Brea") pursuant to a real property lease between Ace Museum and 400 S. La Brea (the "La Brea

4  Lease"). I have reviewed corporate records of Ace Museum and its La Brea Lease. Ace Museum is a

5  separate legal entity from the Debtor, and its obligations to pay monthly rent under its La Brea Lease

6  were not obligations of the Debtor's estate. As a result, every MOR filed by the Debtor, signed by

7  Mr. Chrismas under **penalty of perjury**, was false, in that each MOR asserted that the Debtor's post-

8  petition business was a marginal business that had no ability to fund payments to creditors, when in

9  fact there were several million dollars of potential net profits that should have been deposited into the

10  Debtor's general operating account, and should have been reported on each MOR. Had I and the

11  Committee known and understood that each MOR falsely underreported the Debtor's cash position by

12  several million dollars, the Committee would have sought the appointment of a chapter 11 trustee,

13  which would have materially changed the outcome of the case. Further, but for Mr. Chrismas'

14  fraudulent actions and his concealment of that fraud, our actions in the Debtor's Bankruptcy Case, and

15  the terms of any Plan that we would have proposed, would have been materially different simply

16  because unsecured creditors could likely have been guaranteed initial and ongoing payments from a

17  profitable art business. Surely and very obviously, had this information been made known to the

18  Committee, the Stipulation never would have been negotiated, and never would have been finalized

19  and approved by this Court thereby depriving Mr. Shemano of his attempt to mislead the Court as he

20  has now done with this Declaration.

21  **False and Misleading Accounting Receivable Information Including the Musuem Loan Balance:**

22        42.    The Plan Agent's investigation, confirmed by Ms. Ziegler's testimony, has also

23  revealed that the amount of accounts receivable ("A/R") reported in each MOR filed in this case, and

24  signed under penalty of perjury, was false. The Debtor's Schedules did not list any existing Petition

25  Date A/R other than the Museum Loan. This is because the Debtor alleged that it had a prepetition

26  practice of recognizing sales upon the receipt of the sale proceeds. However, within two months of

27  the Petition Date, the Debtor began to report growing A/R in each MOR beginning with the MOR for

28  April 2013, through to the last MOR filed for January 2016. The A/R was first listed on the April

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   2013 MOR as being $318,990.61 in value, and then the A/R grew thereafter until it was claimed to be

2   an asset worth $6,039,444.40 in January 2016, during which time the Committee's and the Debtor's

3   competing plans of reorganization were facing confirmation in this Court, and the assertion that the

4   Debtor had such an allegedly collectible asset could have supported confirmation of the Debtor's

5   proposed plan.  Surely and very obviously, had this information been made known to the Committee,

6   the Stipulation never would have been negotiated, and never would have been finalized and approved

7   by this Court thereby depriving Mr. Shemano of his attempt to mislead the Court as he has now done

8   with this Declaration.The Plan Agent's investigation, confirmed by Ms. Ziegler's testimony, has

9   revealed that the Debtor created a series of false invoices that allegedly documented the A/R.  Many

10  of these invoices purported to show sales by the Debtor of particular artworks that had already been

11  sold to a purchaser under a separate invoice in the name of Ace NYC, and the sale proceeds owed to

12  the Debtor had already been wired into the Ace NYC bank account pursuant to wire instructions

13  forwarded by Mr. Chrismas or one of his employees to the purchaser.  I have reviewed bank records

14  for the Ace NYC account and the Debtor's general operating account, and have reviewed Ms.

15  Ziegler's testimony.  Mr. Chrismas would cause Ace NYC to transfer some of the Debtor's stolen sale

16  proceeds back into the Debtor's general operating account on occasions when the Debtor had an

17  immediate need for cash, such as to cover a check for rent on its gallery spaces or to meet payroll or

18  tax obligations.  The Debtor would then credit such a payment to one of the outstanding A/R invoices,

19  even though the payment had no connection to the artwork listed in the invoice.  This fraud was

20  constant and, as is the nature of all fraud, was actively concealed from the Creditors' Committee.

21  **Fraud Committed Through Fraudulent Reporting of Reduced Loan Balances on the Ace**

22  **Museum Loan:**

23      43.    A third substantial category of fraud that was carried out by Mr. Chrismas through

24  documents filed in this Court was his assertion in the MORs that Ace Museum was making ongoing

25  payments to the Debtor during the Bankruptcy Case to reduce the balance of the Museum Loan.  As

26  noted above, the Schedules filed shortly after the Petition Date stated that the Petition Date Loan

27  Balance of the Museum Loan was $4,482.856.00.  The April 2013 MOR included the first entry

28  showing that the Debtor had received funds from Ace Museum in purported repayment of the

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   Museum Loan.  The April 2013 MOR stated that Ace Museum had paid the Debtor $245,000 that

2   month for "Repayment of Loan-Ace Museum", and the Balance Sheet attached to the April 2013

3   MOR reduced the balance of the Museum Loan by approximately the same amount.  A true and

4   correct copy of the April 2013 MOR is attached hereto as <u>Exhibit S</u>.  Most of the MORs filed

5   thereafter included a statement claiming that Ace Museum had paid funds to the Debtor that month as

6   repayment of the Museum Loan, and reduced the balance of the Museum Loan on the attached

7   Balance Sheet to reflect such alleged repayments.  However, from my review of bank records of Ace

8   NYC and Ace Museum, and my review of Ms. Ziegler's testimony, the purported repayments of the

9   Museum Loan were made with funds belonging to the Debtor, either sale proceeds that were paid into

10  the Ace NYC account and then transferred through the Ace Museum account to the Debtor, or loan

11  proceeds obtained from Mr. Wilson for payment of the Debtor's rent that were first deposited into the

12  Ace Museum account, pursuant to Mr. Chrismas' instructions, and then transferred to the Debtor.  In

13  short, the Ace Museum loan balance was fraudulently reported as being reduced in the Monthly

14  Operating Reports when, in fact, these loan reduction payments were made with the Debtor's own

15  money.  The latter transactions were particularly damaging, as they not only increased the Debtor's

16  post-petition administrative liability to Mr. Wilson, but allegedly reduced the value of the Museum

17  Loan using the Debtor's own funds.  Surely and very obviously, had this information been made

18  known to the Committee, the Stipulation never would have been negotiated, and never would have

19  been finalized and approved by this Court thereby depriving Mr. Shemano of his attempt to mislead

20  the Court as he has now done with this Declaration.

21  **<u>The Committee's Reliance on False Documents Concealing Mr. Chrismas' Fraud</u>**

22        44.    **<u>Formal Discovery and Informal Discovery Efforts:</u>**  Throughout the Bankruptcy

23  Case, I and my colleagues repeatedly attempted to obtain financial records, inventory records, and

24  other material information from Mr. Chrismas, in order to ascertain the truthfulness of his disclosures,

25  and to better understand the Debtor's ability to reorganize in chapter 11.  Mr. Chrismas thwarted every

26  attempt to obtain such information.  Even when this Court entered orders compelling Mr. Chrismas to

27  comply, and produce documents to the Committee, the documents produced were false, late, redacted,

28  or misleading, such as his production to the Committee in 2015 of invoices purporting to document

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   the Debtor's A/R, but which have since been shown by the Plan Agent's investigation and Ms.

2   Ziegler's testimony to be fraudulent documents that served to help conceal Mr. Chrismas' fraud. This

3   Court granted orders permitting a document inspection and production at the Debtors' former facility

4   in Mid-Wilshire, however, upon showing up at the Debtors' facility, the Committee's accountants were

5   actively thwarted in their attempts to discover and obtain documents.   Counsel at Robins Kaplan

6   actively prevented the Committee from engaging in this discovery.   Further, Mr. Chrismas'

7   accountant, Shirley Holst, actively prevented the Committee's financial professionals from accessing

8   information that would have uncovered and revealed the pervasive and unprecedented fraud that was

9   committed during the course of this bankruptcy case and which was uncovered by the Plan Agent

10  within less than one month when Mr. Chrismas was no longer around and available to actively prevent

11  the discovery of this information.

12      45.     The information described in the foregoing paragraphs, that was listed on each MOR

13  filed by the Debtor, and signed by Mr. Chrismas under penalty of perjury, was critical information to

14  the Committee's analysis of the Debtor's ability to reorganize, and the nature of the assets that could

15  fund a reorganization.  This false information demonstrated that the Debtor's ongoing business was

16  incapable of generating any cash to fund a plan, that its Museum Loan asset was being reduced by

17  payments from Ace Museum and would provide less value for plan consummation, and that the

18  Debtor claimed a sizeable A/R asset, though collectability was questionable given the manner by

19  which it grew substantially each month.  It was not until the Plan Agent was appointed and began his

20  investigation that it became clear that all of this critical information was intentionally and materially

21  false.  The balance on the Ace Museum loan owed by the Debtor as of the date of the Stipulation was

22  shown to be $3,308,533.33.  This information was fraudulent.  Had the Committee been aware of the

23  actual amount of the Ace Museum loan, and had the Committee been aware that the purported Ace

24  Museum payments on this loan after the filing of this Chapter 11 case had been made by recycling the

25  Debtor's own funds through Ace NYC, the Committee never would have entered into any Stipulation

26  that would have afforded Mr. Chrismas and Mr. Shemano to make the patently absurd argument that

27  they are now attempting to advance before this Court.

28

46.     Shortly before negotiations over the Stipulation commenced, the Committee had filed its Disclosure Statement in Respect of Plan of Reorganization of Official Committee of Unsecured Creditors (the "Disclosure Statement") on January 30, 2015, a true and correct copy of which is attached hereto as Exhibit T.  In the Disclosure Statement, the Committee explained the Debtor's financial circumstances and noted that: "As indicated in the Monthly Operating Reports filed with the Bankruptcy Court, the Debtor has, *at times*, operated at a profit post-petition." See Page Exhibit T - 934, lines 17-18 (emphasis added).  The Disclosure Statement also explained that the balance of the Museum Loan had been "paid down to approximately $3,300,000, *according to the Debtor's books and records*." Id., Page Exhibit T - p. 950, lines 3-4 (emphasis added).  Each of these statements was based upon false information disclosed to this Court in each of the MORs filed by the Debtor.

47.     The Stipulation between the Committee, on the one hand, and Mr. Chrismas, Ace Museum, and the Debtor, on the other hand, is an example of how Mr. Chrismas' fraud upon this Court and upon the Committee materially altered the outcome of not only this case, but of discrete transactions and orders arising during the case.  The negotiations over the Stipulation require the context of the events that preceded them.  When the Committee began to prepare the first version of its Plan in late 2014 and early 2015, the Debtor was reporting financial information in its MORs that was materially fraudulent.  For example, the November 2014 MOR, a true and correct copy of which is attached hereto as Exhibit U, was filed with this Court shortly before the Committee filed its Original Plan and began negotiating the Stipulation with Mr. Chrismas' counsel, and provided me with the most recent financial information about the Debtor, signed by Mr. Chrismas under penalty of perjury.  According to the first page of the November MOR, the Debtor started the month showing a negative general account balance of -$25,975.73, and completed the month with a negative balance of -$3,753.66, despite having received an alleged Museum Loan repayment of $199,800.  In other words, the November 2014 MOR states that, but for a cash infusion of $199,800 from Ace Museum, the Debtor would have ended the month with a negative general account balance of more than -$200,000. The balance sheet that forms part of the November 2014 MOR claims this alleged repayment by Ace Museum contributed to a reduction of the Prepetition Museum Loan Balance by over a million dollars since the Petition Date to $3,306,959.80 (see Page Exhibit U - 1049).  Testimony from Mr. Wilson

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

which I have reviewed, and the bank records of Ace Museum and the Debtor that I have reviewed, reveal that, of this $199,800 transfer, $176,000 was advanced by Mr. Wilson as a loan to the Debtor for the agreed purpose of helping the Debtor meet its rent obligation on the main art gallery, and which Mr. Chrismas diverted through the Ace Museum account so that he could claim it was a "repayment" of the Museum Loan, thereby reducing this asset of the Debtor. But at the time of negotiations over the Stipulation, I did not have information that could have revealed the fraudulent nature of Mr. Chrismas' disclosure in the November 2014 MOR. Moreover, the November 2014 MOR was not unique, but reflected an accumulation of data that had been reported in each MOR from the Petition Date. A true and correct copy of the Debtor's MOR for October 2014 is attached hereto as Exhibit V. The Debtor's inability to maintain a positive bank balance of any substantial amount was a pattern that had continued from the Petition Date throughout the period of negotiations over the Stipulation. In addition to the false information that was reported in the November 2014 MOR, and each MOR before it, none of the Debtor's MORs reported any of the post-petition sales that had been diverted into the Ace NYC account, whether on a monthly or cumulative basis. The result was that parties such as the Committee who relied on the MORs for accurate financial information were unaware that Mr. Chrismas was closing substantial sales of the Debtor's artworks that were being diverted away from the Debtor's estate, thereby depriving the estate of millions of dollars of proceeds that could have helped to fund a reorganization. Because of the false information that was contained in the November 2014 MOR, and each MOR before it, I entered negotiations with counsel for Ace Museum with a materially false understanding of the Debtor's financial condition and ability to reorganize. Surely and very obviously, had this information been made known to the Committee, the Stipulation never would have been negotiated, and never would have been finalized and approved by this Court thereby depriving Mr. Shemano of his attempt to mislead the Court as he has now done with this Declaration.

48.    On the basis of the Debtor's MORs, the Debtor did not appear to me in early 2015 to be a business that had any means or ability to reorganize in chapter 11 on the basis of art sales alone. However, the Debtor also had two other significant assets in the form of two purchase options to acquire the real property that it had leased for its two gallery locations; (i) a purchase option (the

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

"Mid-Wilshire Purchase Option") for the real property at 5514 Wilshire Blvd., Los Angeles, CA (the "Mid-Wilshire Property"), and (ii) a purchase option (the "BH Purchase Option") for the BH Property. Both the Mid-Wilshire Purchase Option and the BH Purchase Option held the potential for a significant recovery if the Debtor could find a buyer for the underlying real property at a price that exceeded the strike price for the option. However, in the case of the Mid-Wilshire Purchase Option, the Debtor was embroiled in litigation related to its failed attempt to assume the lease for the Mid-Wilshire Property, and therefore I did not believe it was likely that the potential value of the Mid-Wilshire Purchase Option could be realized for the benefit of the estate. But in the case of the BH Purchase Option, I understood from my review of relevant documents and discussions with brokers that there was a substantial likelihood that the Debtor would be able to sell the BH Property pursuant to the BH Purchase Option for a price that could provide the Debtor's estate with net proceeds in the range of at least $15-20 million.

49.    On January 21, 2015, this Court entered an order [Dkt. No. 857 in main case] approving the Debtor's engagement of CBRE as its broker to market the BH Property. However, my experience with Mr. Chrismas, and my understanding of the process at the time, convinced me that Mr. Chrismas was not approaching a sale of the BH Property with a sufficient sense of urgency. As a result, the Committee's primary goal at this time was to incentivize Mr. Chrismas and the Debtor to follow through on this plan and advance a sale of the BH Property as quickly as possible.

50.    The following day, on January 22, 2015, the Committee filed its Motion of Plaintiff for (1) Leave to Amend Complaint; (2) Appointment of Receiver; and (3) Issuance of Temporary Restraining Order in Aid of Receiver (the "Receiver Motion") [Dkt. No. 6 in Museum Adversary]. The original complaint had been filed on November 26, 2014, initiating the Museum Adversary, asserting various claims under California law and the bankruptcy code to recover the balance of the Museum Loan from Ace Museum.

51.    As he had done with the Debtor's real property leases, Mr. Chrismas had negotiated a purchase option in Ace Museum's La Brea Lease, which I believed at the time could provide Ace Museum with its only potential means to repay the Museum Loan. But as this purchase option was set to expire on April 1, 2015, the Committee filed its Receiver Motion to obtain the appointment of a

1   receiver, or responsible officer, who would act to preserve and monetize the purchase option.  I

2   understood that Mr. Chrismas opposed the appointment of a responsible officer, and his opposition to

3   the Committee's litigation strategy, along with the Committee's desire to incentivize Mr. Chrismas to

4   sell the BH Property quickly, provided the two competing goals that led counsel for the Committee

5   and counsel for Ace Museum/Chrismas to enter into negotiations.

6   **The Stipulation Was Procured By Fraud**

7          52.    The extensive fraud that was committed by Mr. Chrismas, and is described in more

8   detail in the declaration of Jennifer Ziegler, procured the Stipulation by creating a climate of

9   misinformation on both a macro level concerning the Debtor's ability/inability to reorganize, and on a

10  micro level with respect to specific terms of the Stipulation and Plan Term Sheet.  The fraudulent

11  MORs filed each month created the impression that the Debtor's business of selling art was losing

12  money on a monthly basis, and that the Debtor's general account balance was remaining close to zero

13  (rather than showing a more significant negative balance) only because Ace Museum had repaid over

14  $1 million of the Museum Loan.  As a result, it appeared that any reorganization of the Debtor's

15  business could not rely on net profit payments to satisfy the claims of creditors, and that any plan of

16  reorganization would have to be funded by other assets such as the monetization of the Debtor's real

17  property purchase options.  I have learned from Ms. Ziegler's testimony that, but for Mr. Chrismas'

18  fraud, another $17 million in gross sale proceeds would have been deposited into the Debtor's

19  accounts during Mr. Chrismas' tenure, which would have translated into several million dollars of net

20  profits that could have funded payments to creditors.  The MORs were signed by Mr. Chrismas under

21  penalty of perjury and, but for the initial MORs, attached bank statements that provided verification of

22  the numbers listed in the MORs.  However, given the nature of the fraud, even the attached bank

23  statements could not reveal Mr. Chrismas' diversion of $17 million of sale and loan proceeds.

24         53.    If I had been aware of the fraud that is described in the declaration of Ms. Ziegler, the

25  Committee would have immediately moved for the appointment of a Chapter 11 Trustee, and there

26  never would have been negotiations leading to a Stipulation and Plan Term Sheet.  Instead, the

27  Committee and I—and, I believe, this Court—were misled by the false information presented by Mr.

28  Chrismas in MORs and other documents filed in this Court, or produced to the Committee in

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   discovery.  Mr. Chrismas has already profited by his thievery.  That he would seek to augment that

2   through the Declaration of Mr. Shemano is shameful advocacy that this Court must not permit.

3       54.    The impact of Mr. Chrismas' fraud affected specific terms of the Stipulation and Plan

4   Term Sheet.  For example, the Stipulation provides in its Recitals that the balance of the Museum

5   Loan had been reduced to "no less than $3,308,533.33" and that Mr. Chrismas was "the person most

6   knowledgeable for both the Debtor and Defendant regarding the Loan described below and

7   Defendant's outstanding debt obligation to the Debtor."  See Exhibit A at Recitals D and E.  As has

8   been outlined above, this claim was false, but I relied upon Mr. Chrismas and the MORs for its

9   accuracy.  Similarly, I negotiated a term in the Plan Term Sheet that required the Debtor to meet four

10  monthly benchmarks for art sales, of $25,000 each month, for March 15 through June 15, 2015.  See

11  Page Exhibit A – 143, ¶ 6.  The Committee only sought $25,000 in four monthly benchmarks because

12  the ongoing and fraudulent representations in each of the MORs filed in the Bankruptcy Case falsely

13  represented the Debtor's business as being incapable of generating ongoing net profits.  As a result,

14  four monthly net profits of $25,000 would have appeared to represent a substantial improvement.  But

15  I have since learned from the Plan Agent's investigation and the analysis carried out by Ms. Ziegler

16  that the sale proceeds derived from sales of the Debtor's artworks (owned or consigned) that were

17  diverted by Mr. Chrismas into the Ace NYC account during that same four-month period exceeded

18  $1 million.  The delta between the paltry improvement in sales that the Committee demanded in the

19  Plan Term Sheet, and the reality of Mr. Chrismas' diversion of funds over that same period of time,

20  demonstrates the extent to which his fraud poisoned these proceedings.

21      55.    Paragraph 11 of the Stipulation provides that the agreement has no third party

22  beneficiaries to its terms.  See Page Exhibit A – 35.  Despite this language, counsel for 400 S. La

23  Brea, LLC has argued on several occasions that 400 S. La Brea, LLC might somehow benefit from the

24  Stipulation in this litigation.  Aside from all of the issues discussed above, which explain why there

25  are no benefits for anyone to claim from the Stipulation, it would be a violation of law and a complete

26  misreading of the Stipulation if 400 S. La Brea, LLC could somehow claim third-party beneficiary

27  status under the Stipulation.  Among the documents produced to the Plan Agent by Mr. Dayan on

28  February 29, 2019, is an email dated March 6, 2013, a true and correct copy of which is attached

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    hereto as <u>Exhibit W</u>, in which Mr. Dayan was informed that an Ace entity had filed bankruptcy.  In

2    spite of unambiguous documents that told 400 S. La Brea that the Debtor was paying their rent

3    prepetition and post-petition, and in spite of documents showing that they knew about the Debtor's

4    bankruptcy petition, they persist in their denial that they were aware of this case.  But as <u>Exhibit W</u>

5    shows, after having just received more than $2 million directly from the Debtor over the preceding

6    two years, Mr. Dayan merely responded that the person who had brought this information to his

7    attention should carry out a particular expletive on himself.  At the very least, this email demonstrates

8    that 400 S. La Brea cannot claim a good faith defense to the Plan Agent's avoidance claims, as it

9    cannot claim that it was not aware of the Debtor's bankruptcy case within two and a half weeks of the

10   Petition Date.  This document supports numerous other documents that demonstrate that 400 S. La

11   Brea knew of the Debtor's financial difficulties before the bankruptcy petition was even filed, when

12   the Debtor was making direct payments to 400 S. La Brea.  While the Committee negotiated the

13   Stipulation in 2015 in a climate of fraudulent information filed by Mr. Chrismas under penalty of

14   perjury, 400 S. La Brea had already received several million dollars of the Debtor's funds while fully

15   aware of the Debtor's bankruptcy case..

16        56.    On or about June 12, 2018, this firm received production of documents from Fortuna

17   Asset Management ("Fortuna"), 400 S. La Brea, LLC's property management firm, in response to a

18   subpoena served by this firm in this litigation.  Attached hereto as <u>Exhibits X and Y</u> are true and

19   correct copies of two documents that were produced by Fortuna.

20        I declare under penalty of perjury under the laws of the United States of America that the

21   foregoing is true and correct.  Executed this 21st day of March, 2019, at Los Angeles, California

22

23                           _____*/s/ Victor A. Sahn*_____
                             VICTOR A. SAHN
24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071-1406.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF VICTOR A. SAHN IN SUPPORT OF PLAINTIFF'S MOTION: (1) TO INTERPRET CONFIRMATION ORDER AND CONFIRMED PLAN; AND (2) TO VACATE ORDER APPROVING STIPULATION WITH ACE MUSEUM, AND STRIKE STIPULATION FROM THE DOCKET, PURSUANT TO F.R.B.P. 9024, AND F.R.C.P. 60(d)(3)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 21, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Simon Aron on behalf of Interested Party Courtesy NEF - saron@wrslawyers.com
- Jason Balitzer on behalf of Plaintiff, Cross/Counter-Defendant Sam Leslie as Trustee of the Plan Trust for Art & Architecture Books of the 21st Century - jbalitzer@sulmeyerlaw.com, jbalitzer@ecf.inforuptcy.com; dwalker@ecf.inforuptcy.com; kmccamey@sulmeyerlaw.com
- Keith Patrick Banner on behalf of Defendant 400 S La Brea, LLC a California limited liability company - kbanner@greenbergglusker.com, sharper@greenbergglusker.com; calendar@greenbergglusker.com
- Brian L Davidoff on behalf of Defendant, Cross-Claimant 400 S La Brea, LLC a California limited liability company - bdavidoff@greenbergglusker.com, calendar@greenbergglusker.com; jking@greenbergglusker.com
- Carolyn A Dye on behalf of Plaintiff Sam Leslie - trustee@cadye.com
- Fahim Farivar on behalf of Defendant, Cross-Claimant 400 S La Brea, LLC a California limited liability company -ffarivar@foley.com, amcdow@foley.com;scvasquez@foley.com
- Alan W Forsley on behalf of Defendants Ace Museum, a California corporation; Ace Gallery New York Corporation, a California corporation; Ace Gallery New York, Inc., a dissolved New York corporation; Douglas Chrismas - alan.forsley@flpllp.com, awf@fkllawfirm.com, awf@fl-lawyers.net,addy.flores@flpllp.com
- J. Bennett Friedman on behalf of Defendant Jennifer Kellen - jfriedman@flg-law.com, msobkowiak@flg-law.com; jmartinez@flg-law.com
- Asa S Hami on behalf of Plaintiff, Cross/Counter-Defendant Sam Leslie as Trustee of the Plan Trust for Art & Architecture Books of the 21st Century - ahami@sulmeyerlaw.com, agonzalez@sulmeyerlaw.com; agonzalez@ecf.inforuptcy.com; ahami@ecf.inforuptcy.com
- Matthew P Kelly on behalf of Interested Party Courtesy NEF - mkelly@sulmeyerlaw.com
- Daniel A Lev on behalf of Plaintiff, Cross/Counter-Defendant Sam Leslie as Trustee of the Plan Trust for Art & Architecture Books of the 21st Century - dlev@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com; dlev@ecf.inforuptcy.com; dwalker@sulmeyerlaw.com
- Ashley M McDow on behalf of Defendant, Cross/Counter-Claimant 400 S La Brea, LLC a California limited liability company - amcdow@foley.com, scvasquez@foley.com; Ffarivar@foley.com
- Krikor J Meshefejian on behalf of Interested Party Courtesy NEF - kjm@lnbrb.com
- Susan I Montgomery on behalf of Interested Party Susan I. Montgomery - susan@simontgomerylaw.com, assistant@simontgomerylaw.com; simontgomerylawecf.com@gmail.com; montgomerysr71631@notify.bestcase.com
- Kurt Ramlo on behalf of Interested Party Courtesy NEF - kr@lnbyb.com, kr@ecf.inforuptcy.com
- David J Richardson on behalf of Plaintiff, Cross-Defendant Sam Leslie - drichardson@sulmeyerlaw.com, drichardson@ecf.inforuptcy.com
- Ronald Rus on behalf of Defendant 400 S La Brea, LLC a California limited liability company - rrus@brownrudnick.com, tlangford@brownrudnick.com
- Victor A Sahn on behalf of Plaintiff, Cross-Defendant Sam Leslie as Trustee of the Plan Trust for Art & Architecture Books of the 21st Century - vsahn@sulmeyerlaw.com, agonzalez@sulmeyerlaw.com; agonzalez@ecf.inforuptcy.com; asokolowski@sulmeyerlaw.com; vsahn@ecf.inforuptcy.com
- Michael C Schneidereit on behalf of Interested Party AERC Desmond's Tower, LLC - mschneidereit@jonesday.com, scollymore@jonesday.com; tckowalski@jonesday.com
- David B Shemano on behalf of Defendants Ace Museum, a California corporation/Douglas Chrismas - dshemano@shemanolaw.com
- Jonathan Shenson on behalf of Interested Party Jonathan Seligmann Shenson - jshenson@shensonlawgroup.com
- Mark Shinderman on behalf of Mediator Mark Shinderman - mshinderman@milbank.com, dmuhrez@milbank.com
- Michael D Sobkowiak on behalf of Defendant Jennifer Kellen - msobkowiak@flg-law.com, jmartinez@flg-law.com;jfriedman@flg-law.com
- United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov
- Michael W Vivoli on behalf of Defendant, Cross-Claimant 400 S La Brea, LLC a California limited liability company/Witness Fortuna Asset Management/Witness Kamran Gharibian - auzcategui@vivolilaw.com, sbrown@vivolilaw.com
- Jessica Vogel on behalf of Interested Party Courtesy NEF - Jvogel@sulmeyerlaw.com, jvogel@ecf.inforuptcy.com; mviramontes@sulmeyerlaw.com
- Reed S Waddell on behalf of Defendant Cathay Bank, a California corporation - rwaddell@frandzel.com, sking@frandzel.com
- Howard J Weg on behalf of Defendant Ace Museum, a California corporation - hweg@robinskaplan.com
- Beth Ann R Young on behalf of Interested Party Courtesy NEF - bry@lnbyb.com

☐ Service information continued on attached page.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                            **F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) March 21, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Office of the United States Trustee
Alvin Mar, Esq.
915 Wilshire Blvd., Suite 1850
Los Angeles, California 90017

☐ Service information continued on attached page.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  March 21, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Robert Kwan – **VIA PERSONAL DELIVERY**
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Los Angeles, CA 90012 - Bin outside of Suite 1682

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 21, 2019 | Andrea Gonzalez | /s/ Andrea Gonzalez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                       **F 9013-3.1.PROOF.SERVICE**