Victor A. Sahn (CA Bar No. 97299)
    vsahn@sulmeyerlaw.com
Steven F. Werth (CA Bar No. 205434)
    swerth@sulmeyerlaw.com
David V. Sack (CA Bar No. 304528)
    dsack@sulmeyerlaw.com
**SulmeyerKupetz**
A Professional Corporation
333 South Grand Ave., Suite 3400
Los Angeles, California 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Sam S. Leslie, Plan Agent

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:13-bk-14135-RK |
| ART AND ARCHITECTURE BOOKS OF THE 21ST CENTURY, | Adv No. 2:15-ap-01679-RK |
| Debtor. | Chapter 11 |
| | Consolidated with Adv. No. 2:14-ap-01771-RK and Adv. No. 2:15-ap-01680-RK |
| SAM LESLIE, as Plan Agent for Art & Architecture Books of the 21st Century, | **PLAN AGENT'S RESPONSE TO BRIEF FILED BY 400 S. LA BREA ADDRESSING ISSUES RAISED IN JANUARY 21, 2022 SCHEDULING ORDER** |
| Plaintiff, | |
| vs. | **Evidentiary Hearing**: |
| ACE GALLERY NEW YORK CORPORATION, et al., | Date:      December 16-17, 2021 |
| Defendants. | January 13-14, 2022 |
| | Time:      9:00 a.m. |
| 400 S. LA BREA, LLC, | Place:      Courtroom 1675 |
| Cross-Complainant, | 255 East Temple Street |
| vs. | Los Angeles, CA 90012 |
| SAM LESLIE, et al., | ZoomGov |
| Cross-Defendants. | |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SFW 2733280

In its supplemental post-trial brief, 400 SLB admits that Mr. Chrismas could have destroyed the Banksy at any time:

> "Similarly here, Mr. Chrismas testified that graffiti was dealt with on a near daily basis, and Mr. Hernandez testified that he often remediated graffiti by painting over it.  There was nothing prohibiting Mr. Chrismas from doing the same to the Banksy had he considered it an act of vandalism and not a "wonderful artwork."

SLB Brief, 16:15-18.[1]  The parties agree:  nothing prohibited Ace Museum from destroying the Banksy.  The Lease did not prohibit it.  The term "Alteration" did not prohibit it.  The parties' conduct over the prior four years, during which graffiti appeared regularly and tenant removed it, did not prohibit it.  Ace Museum could remove graffiti, even if it appeared on an Alteration.  It did not need further consent.  Section 7.1 of the Lease required the tenant to remove graffiti when it appeared.  400 SLB's assertion that removal of the Banksy was a breach of the Lease is revealed, by this admission, to be specious.

The parties largely agree on the relevant law regarding accession in California.  Both Briefs analyze CC 1013 and urge the Court to apply it.  Both Briefs agree that CC 1019 can be applied to this dispute.  Both Briefs acknowledge that CC 1000 provides that accession is one way that persons can own property in California.  Neither disputes that the Lease accurately reflects the agreement of the landlord and tenant.  Both Briefs discuss *Dreamland*.

The dispute between the parties, instead, is how these laws should be applied here.  As to that, Plan Agent responds to certain statements made in the SLB Brief, below.

---

[1] The supplemental brief filed by 400 SLB is the "400 S. La Brea, LLC's Supplemental Post-Trial Brief Regarding The "Banksy" Contested Matter," filed on February 3, 2022 (Docket No. 1236, the "SLB Brief").  Capitalized terms in this response brief have the meaning given them in the "Plan Agent's Brief Addressing Issues Raised In January 21, 2022 Scheduling Order," filed by the Plan Agent on February 3, 2022 (Docket No. 1236, the "PA Brief", and together with the SLB Brief, the "Briefs").

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**A.**  <u>**CC 1013**</u>

The Briefs discuss CC 1013, which states:

> **§1013.  Fixtures**
>
> When a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed, except as otherwise provided in this chapter, belongs to the owner of the land, unless he chooses to require the former to remove it or the former elects to exercise the right of removal provided for in Section 1013.5 of this chapter.

CC 1013 does *not* state, as 400 SLB suggests, "When a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed … belongs to the owner of the land".  SLB Brief, 2:24.  An additional phrase exists that modifies the quoted language—the exception contained in CC 1013.5.

The PA Brief analyzes the implications of CC 1013, including applicability of CC 1013.5.  The SLB Brief does not discuss whether CC 1013.5 is applicable here.  As such, there is nothing in the SLB Brief on that issue to which Plan Agent must reply.  To the extent CC 1013 applies to this dispute, then CC 1013.5 applies for the reasons stated in the PA Brief.

Both parties agree that CC 1013 *could* apply.  400 SLB's position is that "land" (as that term is used in CC 1013) *is* involved, thus CC 1013 *does* apply.  Plan Agent's position is that land *may* be involved, and if so then *one* of the conditions is met for CC 1013 to apply.  The second condition--that there not be "an agreement permitting him to remove it"--is not met here.  The Lease contains multiple provisions allowing tenant to remove the Drywall, including (1) Section 7.1 (graffiti removal), and (2) other sections permitting removal of Utility Installations and Trade Fixtures without consent, and Alterations with consent—consent which occurred here including through the 400 SLB-approved architectural plans which showed the Drywall being removed from the Premises.

A further clause allowed removal of the Drywall, thus preventing CC 1013 from being applicable:  Section 7.4(c) which requires the tenant to remove all hazardous substances.  Section 6.2(a) defines a hazardous substance as any product whose presence is either potentially injurious

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    to the public health, safety, or welfare of the premises, or a basis for potential liability of the

2    Lessor.   Mr. Chrismas testified at the Hearing that the Banksy, when it appeared, attracted

3    criminal attention almost immediately.   Mr. Chrismas stated that a guard was accosted while

4    remaining at the Premises overnight to guard the Banksy, by people who wanted to tie him up and

5    offered him money.[2]   Thankfully that did not happen, but if any guard was hurt, or the public hurt,

6    in connection with someone seeking to cut out the Banksy, that would have created legal exposure

7    for 400 SLB.   The increased hazard to the Premises, or at least to any security guard posted to

8    keep the Banksy safe, is plain.   While it may be unusual for graffiti to be considered a hazardous

9    substance, it is also unusual for graffiti to be worth potentially hundreds of thousands of dollars.

10    Banksy may be the only artist in the world who, when he makes art, simultaneously creates a

11    public health hazard.

12        **B.    CC 1019**

13        400 SLB's analysis regarding CC 1019 consists of the following statement:  "as the Court

14    observed during the Evidentiary Hearing, the pilaster was not a trade fixture.   It had become an

15    integral part of the Property."  SLB Brief, 4:3-5.

16        400 SLB misreads CC 1019.   That statute nowhere contains the term "trade fixture".

17    Instead, it states:

18        **§1019.  Removal of fixtures by tenant**

19        A tenant may remove from the demised premises, any time during the
         continuance of his term, anything affixed thereto for purposes of trade,
20        manufacture, ornament, or domestic use, if the removal can be effected
         without injury to the premises, unless the thing has, by the manner in
21        which it is affixed, become an integral part of the premises.

22

23    _____

24

25    [2] This testimony occurred on Day 4 of the Hearing, on January 14, 2022.   A written transcript of
    this day of the Hearing is on the docket in this adversary proceeding at Docket No. 1238.  Further
26    references to this transcript are identified as "Day 4 Transcript", followed by a page number and
    line number of where the cited language can be found on that day's transcript.  The language
27    referenced by this footnote occurred at page 67, line 1 of the Day 4 Transcript.  Attached as
    **Exhibit 1** is the relevant page of the Day 4 Transcript.

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**A.** <u>**CC 1013**</u>

The Briefs discuss CC 1013, which states:

> **§1013.  Fixtures**
>
> When a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed, except as otherwise provided in this chapter, belongs to the owner of the land, unless he chooses to require the former to remove it or the former elects to exercise the right of removal provided for in Section 1013.5 of this chapter.

CC 1013 does *not* state, as 400 SLB suggests, "When a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed … belongs to the owner of the land".  SLB Brief, 2:24.  An additional phrase exists that modifies the quoted language—the exception contained in CC 1013.5.

The PA Brief analyzes the implications of CC 1013, including applicability of CC 1013.5.  The SLB Brief does not discuss whether CC 1013.5 is applicable here.  As such, there is nothing in the SLB Brief on that issue to which Plan Agent must reply.  To the extent CC 1013 applies to this dispute, then CC 1013.5 applies for the reasons stated in the PA Brief.

Both parties agree that CC 1013 *could* apply.  400 SLB's position is that "land" (as that term is used in CC 1013) *is* involved, thus CC 1013 *does* apply.  Plan Agent's position is that land *may* be involved, and if so then *one* of the conditions is met for CC 1013 to apply.  The second condition--that there not be "an agreement permitting him to remove it"--is not met here.  The Lease contains multiple provisions allowing tenant to remove the Drywall, including (1) Section 7.1 (graffiti removal), and (2) other sections permitting removal of Utility Installations and Trade Fixtures without consent, and Alterations with consent—consent which occurred here including through the 400 SLB-approved architectural plans which showed the Drywall being removed from the Premises.

A further clause allowed removal of the Drywall, thus preventing CC 1013 from being applicable to the Drywall's removal:  Section 7.4(c) which requires the tenant to removal all hazardous substances.  Section 6.2(a) defines a hazardous substance as any product whose

2

presence is either potentially injurious to the public health, safety, or welfare of the premises, or a basis for potential liability of the Lessor.  Mr. Chrismas testified at the Hearing that the Banksy, when it appeared, attracted criminal attention almost immediately.  Mr. Chrismas stated that a guard was accosted while remaining at the Premises overnight to guard the Banksy, by people who wanted to tie him up and offered him money.[2]  Thankfully that did not happen, but if any guard was hurt, or the public hurt, in connection with someone seeking to cut out the Banksy, that would have created legal exposure for 400 SLB.  The increased hazard to the Premises, or at least to any security guard posted to keep the Banksy safe, is plain.  While it may be unusual for graffiti to be considered a hazardous substance, it is also unusual for graffiti to be worth potentially hundreds of thousands of dollars.  Banksy may be the only artist in the world who, when he makes art, simultaneously creates a public health hazard.

**B.    CC 1019**

400 SLB's analysis regarding CC 1019 consists of the following statement:  "as the Court observed during the Evidentiary Hearing, the pilaster was not a trade fixture.  It had become an integral part of the Property."  SLB Brief, 4:3-5.

400 SLB misreads CC 1019.  That statute nowhere contains the term "trade fixture".  Instead, it states:

> **§1019.  Removal of fixtures by tenant**
>
> A tenant may remove from the demised premises, any time during the continuance of his term, anything affixed thereto for purposes of trade, manufacture, ornament, or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises.

---

[2] This testimony occurred on Day 4 of the Hearing, on January 14, 2022.  A written transcript of this day of the Hearing is on the docket in this adversary proceeding at Docket No. 1238.  Further references to this transcript are identified as "Day 4 Transcript", followed by a page number and line number of where the cited language can be found on that day's transcript.  The language referenced by this footnote occurred at page 67, line 1 of the Day 4 Transcript.  Attached as **Exhibit 1** is the relevant page of the Day 4 Transcript.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

At the Hearing, the Court *did* indicate that it was not inclined to view the Drywall as a Trade Fixture. However, the Court was referring to the use of that term as it is defined in the Lease. Section 7.3 defines a Trade Fixture as "Lessee's machinery and equipment that can be removed without doing material damage to the Premises." That is not the language used in CC 1019, which instead applies to things affixed "for purposes of trade, manufacture, ornament, or domestic use …"

The SLB Brief does not address whether the Drywall was an object affixed "for purposes of trade, manufacture, ornament, or domestic use," and thus falls within the scope of CC 1019. For the reasons stated in the PA Brief, the Drywall does fall within the scope of that statute.

400 SLB suggests that the Court agreed that the Drywall was an integral part of the property. SLB Brief, 4:5. That is not correct. During closing arguments on January 20, 2022, the Court did discuss whether the property was integral to the Premises, but not in the way 400 SLB states.[3] Further, 400 SLB misstates that the Drywall was built to "support, and encase a glass wall". SLB Brief, 8:6. Mr. Chrismas instead stated that "the glass wall was supported by the original building."[4] Mr. Chrismas testified that the Drywall was to be inside the glass wall.[5] It was to be located in between the plate glass window and the Robert Irwin sculpture.[6] The light sculpture would not have run into the Drywall, but into the stone wall next to it, so that it was

---

[3] The relevant portion of this closing argument is attached as **Exhibit 2** (a portion of Docket No. 1240, specifically on page 58, lines 15-20). As the Court's comments were made in the spirit of open discussion of the issues, those comments cannot be characterized as a decision one way or the other, and Plan Agent will not further characterize them.

[4] This testimony occurred on Day 3 of the Hearing, on January 13, 2022. A written transcript of this day of the Hearing is on the docket in this adversary proceeding at Docket No. 1237. Further references to this transcript are identified as "Day 3 Transcript", followed by a page number and line number of where the cited language can be found on that day's transcript. The language referenced by this footnote occurred at page 211, line 15 of the Day 3 Transcript. Attached as **Exhibit 3** is the relevant page of the Day 3 Transcript.

[5] Day 3 Transcript, pages 207, 208, and 211. These pages are attached hereto as **Exhibit 4**.

[6] Day 4 Transcript, 58:22. This page is attached hereto as **Exhibit 5**.

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  touching the inside edge of the Drywall.[7]  Mr. Chrismas also stated that the Drywall would have a

2  lot of electricity in it, to light the sculpture.[8]

3      The Drywall, once it went up, was the end of the development of the Premises in this

4  corner of the property.  No plate glass window ever went up along La Brea Avenue.  No light

5  sculpture was ever built parallel to that plate glass window.  No electrical cords ever went into the

6  Drywall to power anything.  The Drywall never held weight, other than its own.  For these

7  reasons, and those stated in the PA Brief, the Drywall never became integral to the Property and

8  thus falls within the scope of CC 1019.

9      **C.**    **CC 1025**

10     The SLB Brief does not address the applicability of California's accession statute relating

11  to attaching property to the *personal* property of another--CC 1025.  For the reasons stated in the

12  PA Brief, CC 1025 also supports that the Drywall (1) remained property of the tenant when it was

13  constructed, and (2) graffiti, when it was sprayed on the Drywall, became owned by the owner of

14  the Drywall.

15     **D.**    **Value Of The Banksy—Does It Matter?**

16     The SLB Brief asserts that the Banksy is valuable, and for that reason, it must be

17  considered "property" that falls under CC 1013.  SLB Brief, 6:9.  Plan Agent testified at the

18  Hearing that an auction house informed him that the Banksy could be worth anywhere from

19  $10,000 to $250,000.  That the Banksy has value is thus not in dispute.

20     Does this matter?  As to the application of CC 1000, 1013, 1019, and 1025, no.  Those

21  doctrines apply regardless of the value of the personal property that is being attached.  Neither

22  party argues that because the Drywall had little value prior to being spraypainted, CC 1013, 1019,

23  and 1025 cannot apply.  Likewise, the relevant terms of the Lease are silent regarding value.  The

24  terms "Utility Installation," "Trade Fixture," and "Alteration" in Section 7.3(a) do not require an

25

26  _____

27  [7] Day 4 Transcript, 81:23.  This page is attached hereto as **Exhibit 6**.

28  [8] Day 3 Transcript, 214:9; Day 4 Transcript, 19:15.  These pages are attached hereto as **Exhibit 7**.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

analysis of value.  The two sections of the Lease which require tenant to remove property located at the Premises, Sections 6.2 and 7.1 do not require the Court to determine value.

Value *may* be relevant to the following issue:  the reasonableness of Ace Museum removing the Banksy instead of destroying it.  400 SLB states that nothing prevented Ace Museum from destroying the Banksy, and "a single coat of paint would have been the most reasonable means to do so."  SLB Brief, 16:15-18.  If it would have been *reasonable* to destroy the Banksy, was it therefore *unreasonable* to preserve it from destruction?  400 SLB is of two minds as to this.  First, it notes Mr. Pagliassotti as stating that removal was unreasonable (SLB Brief, 16:20).  Second, 400 SLB praises Mr. Chrismas for protecting it, as a "wonderful artwork" (SLB Brief, 5:23), notes that Plan Agent has also protected the Banksy (SLB Brief, 6:5), and cites *Castillo v. G&M L.P.*, 950 F.3d 155, 166-167 (2d. Cir. 2020) for a passage stating that Banksy's art is "of significant artistic merit and cultural importance."  SLB Brief, 5:4.  The article, "The Law of Banksy; Who Owns Street Art?," 82 U. Chi. L. Rev. 2293 (2015) by Mr. Salib--referred to by the Court in its tentative for the February 14, 2022 hearing, contains a lengthy discussion of doctrines that can be applied to the ownership of street art.  In that article, Mr. Salib argues the merits of each doctrine based, in part, on whether or not the doctrine achieves the goal of preserving culturally important art.  Ace Museum's actions in removing the Banksy were consistent with that goal.

400 SLB suggests that it would have been reasonable to destroy the Banksy.  That is wrong.  It was reasonable for Ace Museum to protect it.

**C.    *Dreamland***

The Briefs discuss *Dreamland*, and each attach a copy of the ruling.  Plan Agent responds to the following statements made in the SLB Brief regarding the purported similarity between *Dreamland* and this case.

**Statement**:  "Notably, the wall on which the Mural was painted "had attracted graffiti on at least one occasion…" SLB Brief, 11:17.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Response**:  True in *Dreamland*, but not here.  Mr. Chrismas testified that the Drywall had not been subject to graffiti prior to the Banksy appearing on it.[9]

**Statement:**  "Shortly after the Banksy Mural appeared, "Dreamland caused a section of the wall of the Building on which the Mural had been painted to be severed from the Building and removed, and thereafter for the wall to be made good."  SLB Brief, 11:23.

**Response**:  The *Dreamland* Banksy remained on the wall for approximately one month. Dreamland, ¶¶8, 14.  Here, Mr. Chrismas removed the Banksy approximately four days after it appeared.  Also here, Mr. Chrismas did not repair the Drywall after removing the Banksy.  Instead, approximately 10 months after it was removed, he had the remaining Drywall completely removed.

**Statement**:  Dreamland's covenants to keep fixtures in repair are similar to section 7.1 of the Lease.  SLB Brief, 12:24.

**Response**:  The language of these two provisions is:

*Dreamland*:

(b)  To keep the whole of the demised premises including all glass of the windows locks latches and fasteners all boundary fences (if any) and all fixtures and additions thereto in good and substantial repair and condition.[10]

*Lease Section 7.1*:

(a)    In General.    Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (Intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair

---

[9] Day 4 Transcript, 23:2.  This page is attached hereto as **Exhibit 8**.

[10] *Dreamland*, ¶15.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

(whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g., graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

Both provisions require the tenant to keep the leased property in "good and substantial repair and condition" (*Dreamland*) and "good order, condition and repair" (Lease).  The Lease, however, contains two additional sentences that describe what that obligation entails.  That obligation includes "replacements" and specifically requires "graffiti removal".  This obligation also specifically extends to "Alterations" and "walls (interior and exterior)".

As such, the maintenance requirement in the Lease is substantially different than that contained in *Dreamland*.  Further in *Dreamland*, the tenant owned none of the alterations made to the property, whereas the Lease states that Lessee-Owned Alterations, Trade Fixtures, and Utility Installations made by the tenant are property of the tenant.

**Statement**:  The *Dreamland* tenant's covenants in Section 2(h) (to not make alterations) is similar to that of Section 7.3 of the Lease.  SLB Brief, 13:6.

**Response**:  The language of these two provisions is:

*Dreamland*:

"(h)    Not without the consent in writing of the Lessor to cut maim or injure any of the walls or timbers of the demised premises or make any alteration in or addition to the demised premises and not to erect or place

8

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

on the demised premises or any part thereof any temporary erection or shed of any kind whatsoever and not to dig any sand gravel or earth thereout.    And also not to impose or place or allow to be imposed or placed upon any of the floors or to suspend or allow to be suspended from the ceilings or roofs of the demised premises anything which may cause undue stress to the floors or timbers of the building.[11]

*Lease, Section 7.3(b):*

"(b)    Consent.    Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent…."

Both leases contain a consent requirement, but the Lease applies only to Alterations and Utility Installations, not Trade Fixtures.    Further, the Lease contains exceptions to the consent requirement of Section 7.3(b) that are embodied elsewhere in the Lease, including Section 7.1 and Section 6.2.

Additionally, the Lease's consent requirement was itself amended on August 28, 2009, in the "Assignment Of And First Amendment To Standard Industrial/Commercial Single-Tenant Lease—Net,"[12] which states:

3.    Construction Approval & Procedures

(a)    Subject to satisfaction of all of the terms and conditions of Paragraph 7.3 of the Form Lease (as modified by Paragraph 3 of the Addendum), including Lessor's prior written approval of construction plans and specifications therefor (which approval Lessor shall provide within five (5) business days after request an which Lessor shall not unreasonably withhold, condition or delay), Lessor hereby agrees that Lessee shall have the right to perform Alterations and/or Utility Installations to the Premises as currently contemplated by Lessee, including but not limited to, certain structural improvements and improvements affecting the building systems (the "Remises Improvements").

Thus as of August 28, 2009, the Lease's consent requirement diverged significantly from that in *Dreamland*.    400 SLB now had to provide consent within five business days after request. 400 SLB was no longer allowed to "unreasonably withhold, condition or delay" that consent.    400

---

[11] *Dreamland*, ¶15.

[12] This document was admitted as Exhibit D-11 at the Hearing.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  SLB expressly consented to Ace Museum making Alterations and Utility Installations "as

2  contemplated by Lessee," conditioned only upon 400 SLB's approval of construction plans and

3  specifications.  Mr. Dayan testified that 400 SLB *did* consent to those plans.  Those plans did not,

4  however, identify the Drywall as a feature of the Premises.  Ace Museum thus had consent to

5  remove the Drywall, even without application of Section 7.1 or 6.2.

6      **Statement**:  Just as the English court found, the potential significant value of the Banksy

7          is, indeed, a relevant consideration.  SLB Brief, 15:27.

8      **Response**:  400 SLB misunderstands the reason that the *Dreamland* court analyzed the

9  value of the Banksy.  It did so because the *Dreamland* lease gave tenant *no* right to remove a wall,

10  and the *only* way tenant could argue it possessed the wall was to cite to precedent involving cases

11  where the value of the removed object was minimal—for example, dirt.  The *Dreamland* court

12  rejected extending that exception to objects with significant value.  Here, Plan Agent is not

13  asserting that Ace Museum had the right to remove the Banksy because it had little value.  Ace

14  Museum had the right to do so because the Lease permitted it to do so, and because of California's

15  accession statutes contained in CC 1013, 1019, and 1025.

16      **Statement**:  Much like in California, once detached from the premises, the English court

17          found the Banksy Mural became chattel.  SLB Brief, 16:27.

18      **Response**:  In *Dreamland*, the wall upon which the Banksy appeared was owned by the

19  landlord, and the *Dreamland* court ruled that when the wall was removed by tenant, the wall

20  became personal property of the landlord.  Here, the Drywall was property of the tenant,

21  regardless of whether it was a Utility Installation, Trade Fixture, or Alteration.  Its ownership did

22  not change upon its removal.

23

24      At the conclusion of the Hearing on January 14, 2022, the Court stated that in order to

25  resolve this matter, it needed a rationale for which party owned the asset based on the evidence

26

27

28

1   and appropriate law.[13]  Plan Agent has provided that rationale.  The Drywall, built of materials

2   owned by Mr. Chrismas, remained property of Mr. Chrismas when it was constructed.  Later it

3   became the property of Ace Museum by succession, and when Ace Museum removed it, it was the

4   property of Ace Museum at the moment it was removed.  It remained property of Ace Museum

5   thereafter.  The California doctrines of accession indicate that the Drywall remained property of

6   the tenant at all relevant times.

7        400 SLB cites no case or statute in support of its assertion that the Banksy changed

8   ownership on September 2, 2016 (PA Brief, 10:22).  The ownership-shifting provisions in the

9   Lease to which 400 SLB cites apply only to Lessee-Owned Alterations.  Upon the Banksy's

10  removal, it was no longer a Lessee-Owned Alteration as it no longer met the definition of

11  "Alteration" at all.  Instead, as the *Dreamland* case indicates, it became personal property.

12  Dated:  February 17, 2022                  **Sulmeyer**Kupetz
                                               A Professional Corporation

13

14

15                                             By: _____

16                                                 Steven F. Werth
                                                   David V. Sack
17                                                 Attorneys for Sam S. Leslie

18

19

20

21

22

23

24

25

26   _____

27   [13] Day 4 Transcript, 218:25-219:9.  These pages are attached hereto as **Exhibit 9**.

28

# EXHIBIT 1

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        --oOo--

4  In Re:                      )  Case No. 2:13-bk-14135-RK
                               )
5  ART AND ARCHITECTURE BOOKS  )  Chapter 11
   OF THE 21ST CENTURY,        )
6                              )  Los Angeles, California
              Debtor.          )  Friday, January 14, 2022
7  _____)  9:00 a.m.
                               )
8  THE OFFICIAL COMMITTEE OF   )  Adv. No. 2:15-ap-01679-RK
   UNSECURED CREDITORS OF THE  )
9  BANKRUPTCY ESTATE OF ART AND)
   ARCHITECTURE BOOKS OF THE   )
10 21st CENTURY,               )
                               )
11            Plaintiff,       )
                               )
12      vs.                    )
                               )
13 ACE GALLERY NEW YORK        )
   CORPORATION,                )
14                             )
              Defendant.       )
15 _____)

16                             CONT'D TRIAL RE: APPLICATION
                               OF SAM S. LESLIE, PLAN AGENT,
17                             FOR ISSUANCE OF ORDER
                               APPROVING THE ISSUANCE OF WRIT
18                             OF EXECUTION AND APPOINTMENT
                               OF PLAINTIFF AS SUBSTITUTE
19                             CUSTODIAN FOR U.S. MARSHAL IN
                               FURTHERANCE OF EXECUTION OF
20                             WRIT AND NOTICE OF LEVY; AND
                               FOR ORDER APPROVING SALE OF
21                             ARTWORKS FREE AND CLEAR OF ANY
                               CLAIM OF LIEN OR INTEREST

22

23

24
   Proceedings produced by electronic sound recording;
25 transcript produced by transcription service.

ii

1           CONT'D HEARING RE: PLAN
            AGENT'S MOTION TO LIMINE TO
2           EXCLUDE THE EXPERT REPORT
            SUBMITTED BY 400 S. LA BREA
3
            CONT'D HEARING RE: PLAN
4           AGENT'S MOTION IN LIMINE TO
            EXCLUDE THE TESTIMONY OF
5           DOUGLAS CHRISMAS

6              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT KWAN
7            UNITED STATES BANKRUPTCY JUDGE

8  APPEARANCES:

9  For Plan Agent Sam Leslie:    STEVEN F. WERTH, ESQ.
                                 DAVID V. SACK, ESQ.
10                               SulmeyerKupetz
                                 333 South Grand Avenue
11                               Suite 3400
                                 Los Angeles, California 90071
12                               (213) 626-231

13 For Defendant 400 South       BRIAN L. DAVIDOFF, ESQ.
     La Brea:                    KEITH P. BANNER, ESQ.
14                               Greenberg, Glusker, Fields,
                                   Claman & Machtinger
15                               2049 Century Park East
                                 Suite 2600
16                               Los Angeles, California 90067
                                 (310) 201-7530
17

18 Court Recorder:              Wanda Toliver
                                United States Bankruptcy Court
19                              Edward R. Roybal Federal
                                   Building
20                              255 East Temple Street
                                Los Angeles, California 90012
21

22 Transcriber:                Briggs Reporting Company, Inc.
                                9711 Cactus Street
23                              Suite B
                                Lakeside, California 92040
24                              (310) 410-4151

25

iii

$I\ N\ D\ E\ X$

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Douglas Chrismas | -- | 2 | 46 | 73 |
| John Pagliassotti | 87 | 105 | -- | -- |
| Alberto Hernandez | -- | 118 | 121 | -- |
| John Pagliassotti | -- | 135 | 165 | 198 |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Plaintiff's: | | |
| P- 9 Press release | 35 | -- |
| P-20 Picture of entrance to museum | 61 | -- |
| P-21 Picture of second floor of museum taken in May 2013 | 61 | -- |
| P-19 Pictures of museum taken in thru May 2013 P-20 | 129 | -- |
| P-21 Picture of second floor of museum taken in May 2013 | 129 | -- |
| P-22 Pictures of museum taken in May 2013 | 129 | -- |
| P-23 Picture of north end of museum on the second floor taken in May 2013 | 129 | -- |
| P-24 Pictures of museum taken in thru May 2013 P-26 | 129 | -- |
| Defendant's: | | |
| D- 2 Pagliassotti expert report, dated 7-13-21 | 114 | -- |

iv

EXHIBITS:  (Cont'd.)

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|

Defendant's:

| | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| D- 4 | Google picture of museum property, dated July 2007 | 55 | -- |
| D-11 | First amendment to the lease | 109 | -- |
| D-18 | Picture of exhibition on the ground floor of museum | 121 | 129 |
| D-27 | Video of Banksy removal | 91 | -- |
| D-28 | Blank lease, original version (Section 7.3B only admitted) | 178 | 187 |

*Briggs Reporting Company, Inc.*

66

1  for the building of the building was up in the front office

2  all laid out on big desks, so he was -- he would be able to

3  go and understand what we were doing in the museum for

4  planning his exhibition.  And he would have most --

5  Q    I don't want you to speculate about what he would have

6  -- what he might have done.  I'm asking you what you did.

7  So, are you saying that you left the architectural plans out

8  there specifically for him to review?

9  A    Yes.

10  Q    Did you -- when you gave him access to the building,

11  did you know he was going to -- did you know he was going to

12  paint a painting?

13  A    No.

14  Q    Were you surprised subsequently to find that there was

15  what appeared to be a Banksy on the wall of the building?

16  A    Yes.

17  Q    Why did you remove -- why did you cause the Banksy to

18  be removed?

19  A    Because there was -- (indiscernible) as hired, there

20  was definite possibility of theft, which has happened to

21  Banksys all over the world.  And so we wanted to prevent

22  that from happening, so we put a 24-hour guard on it, but we

23  found that to be very expensive.

24     And then finally one of the guards came up to us and

25  said that he had been accosted that -- that particular night

67

1  by people who wanted to tie him up, and they were willing to

2  give him money for him to allow them to tie him up.  It

3  became crazy and expensive.

4      So I knew that I could go and (indiscernible) to the

5  area that contained the Banksy, and put it back in.  I mean,

6  we're in the business of art, so we know how to do

7  restorative work like that.  And so, it would remove the

8  need for the 24-hour guard service.  That expense would be

9  removed from the museum.  And the moment the glass was in, I

10  could just -- we would simply restore the Banksy to the

11  exact position that it was taken from.

12  Q    Now, you said earlier that you weren't aware that he

13  was going to paint the Banksy.  So when you saw the Banksy,

14  why did you come to the conclusion that you wanted it to be

15  -- when you cut it out, why did you decide that you wanted

16  it be there and be replaced there?

17  A    When I was at lunch with Banksy's people and this -- so

18  Banksy did come in that night, we know that he was there.

19  And then what was interesting is that he did not paint the

20  painting at nighttime.  He waited until we were, all the

21  staff were gone for lunch, because we all left together for

22  lunches, but he still had the key so he got in -- he could

23  get in.  So he got in there and he painted the painting in

24  daylight.

25      So when I came back from my lunch, I'm walking down the

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

1

2

3

4 In Re:                              )   Case No. 2:13-bk-14135-RK
                                      )
5 ART AND ARCHITECTURE BOOKS          )   Chapter 11
  OF THE 21ST CENTURY,                )
6                                     )   Los Angeles, California
              Debtor.                 )   Thursday, January 20, 2022
7 _____ )   1:30 p.m.
                                      )
8 THE OFFICIAL COMMITTEE OF           )   Adv. No. 2:15-ap-01679-RK
  UNSECURED CREDITORS OF THE          )
9 BANKRUPTCY ESTATE OF ART AND        )
  ARCHITECTURE BOOKS OF THE           )
10 21st CENTURY,                      )
                                      )
11            Plaintiff,              )
                                      )
12      vs.                           )
                                      )
13 ACE GALLERY NEW YORK               )
   CORPORATION,                       )
14                                    )
              Defendant.              )
15 _____ )

16                                    CONT'D TRIAL RE: APPLICATION
                                      OF SAM S. LESLIE, PLAN AGENT,
17                                    FOR ISSUANCE OF ORDER
                                      APPROVING THE ISSUANCE OF WRIT
18                                    OF EXECUTION AND APPOINTMENT
                                      OF PLAINTIFF AS SUBSTITUTE
19                                    CUSTODIAN FOR U.S. MARSHAL IN
                                      FURTHERANCE OF EXECUTION OF
20                                    WRIT AND NOTICE OF LEVY; AND
                                      FOR ORDER APPROVING SALE OF
21                                    ARTWORKS FREE AND CLEAR OF ANY
                                      CLAIM OF LIEN OR INTEREST

22

23

24

25 Proceedings produced by electronic sound recording;
   transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT KWAN
2              UNITED STATES BANKRUPTCY JUDGE

3   APPEARANCES:

4   For Plan Agent Sam Leslie:    STEVEN F. WERTH, ESQ.
                                  DAVID V. SACK, ESQ.
5                                 SulmeyerKupetz
                                  333 South Grand Avenue
6                                 Suite 3400
                                  Los Angeles, California 90071
7                                 (213) 626-2311

8   For Defendant 400 South       BRIAN L. DAVIDOFF, ESQ.
      La Brea:                    KEITH P. BANNER, ESQ.
9                                 Greenberg, Glusker, Fields,
                                    Claman & Machtinger
10                                2049 Century Park East
                                  Suite 2600
11                                Los Angeles, California 90067
                                  (310) 201-7530
12

13  Court Recorder:               Wanda Toliver
                                  United States Bankruptcy Court
14                                Edward R. Roybal Federal
                                    Building
15                                255 East Temple Street
                                  Los Angeles, California 90012
16

17  Transcriber:                  Briggs Reporting Company, Inc.
                                  9711 Cactus Street
18                                Suite B
                                  Lakeside, California 92040
19                                (310) 410-4151

20

21

22

23

24

25

1

1  LOS ANGELES, CALIFORNIA  THURSDAY, JANUARY 20, 2022 1:30 PM

2                              --oOo--

3      (Call to order of the Court.)

4          THE CLERK:  Please come to order.  This United

5  States Bankruptcy Court is now in session.  The Honorable

6  Robert Kwan, Bankruptcy Judge, presiding.

7          THE COURT:  The Court will now call its 1:30

8  calendar.  This is a continuation of the trial of the so-

9  called, "Banksy" matter in the Art and Architecture Books of

10 the 21st Century bankruptcy case and the adversary

11 proceeding of Leslie v. Ace Gallery New York, Incorporated

12 -- Ace Gallery New York Corporation, et al.

13         Appearances, please.

14         MR. WERTH (via Zoom):  Yes, thank you, your Honor.

15 Good afternoon.  This is Steve Werth and Dave Sack from

16 SulmeyerKupetez.  And we are here representing the plan

17 agent, Mr. Sam Leslie, who is also here today by Zoom.

18 Thank you.

19         MR. SACK (via Zoom):  Good afternoon, your Honor.

20         MR. DAVIDOFF (via Zoom):  And good afternoon, your

21 Honor.  Brian Davidoff and Keith Banner, Greenberg, Glusker,

22 on behalf of 400 South La Brea.

23         THE COURT:  This is the time for closing

24 arguments.  The Court had discussed with the parties that it

25 would be a two-hour hearing.  And that each party would have

58

1  terms of the lease, which I do want to get to.  But I think

2  (indiscernible) --

3            THE COURT:  Well, you know, it does

4  (indiscernible), then we can argue over -- well, you know,

5  it's debatable as to injury, you know, de minimis injury as

6  opposed to material injury.  I think I used the term,

7  "material damage."  You know, because I was listening for

8  that in the testimony, whether or not there was material

9  damage to the premises.

10           And all I saw was that, yes, there was damage to

11 the drywall, but then the drywall was completely replaced.

12 And there was damage to the studs, but the studs were

13 replaced.  So -- but I didn't see or hear anything about

14 damage otherwise.

15           And then regarding the integral part of the

16 premises.  Well, it's only integral if it had a

17 functionality.  It didn't really have any function, the

18 pilaster didn't have any function, other than to support the

19 light fixture, the Robert Irwin light fixture and the glass

20 wall, which were never put up.

21           So, you know, was it integral because it was

22 fastened?  Well, it's not really -- it doesn't seem to be

23 integral because it wasn't -- it really didn't have any

24 function until those features were put up, and they weren't

25 put up, so.

*Briggs Reporting Company, Inc.*

# EXHIBIT 3

```
 1                   UNITED STATES BANKRUPTCY COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                            --oOo--

 4  In Re:                        )   Case No. 2:13-bk-14135-RK
                                  )
 5  ART AND ARCHITECTURE BOOKS    )   Chapter 11
    OF THE 21ST CENTURY,          )
 6                                )   Los Angeles, California
             Debtor.             )   Thursday, January 13, 2022
 7  _____)   9:00 a.m.
                                  )
 8  THE OFFICIAL COMMITTEE OF     )   Adv. No. 2:15-ap-01679-RK
    UNSECURED CREDITORS OF THE    )
 9  BANKRUPTCY ESTATE OF ART AND  )
    ARCHITECTURE BOOKS OF THE     )
10  21st CENTURY,                 )
                                  )
11           Plaintiff,           )
                                  )
12      vs.                       )
                                  )
13  ACE GALLERY NEW YORK          )
    CORPORATION,                  )
14                                )
             Defendant.           )
15  _____)

16                               CONT'D TRIAL RE: APPLICATION
                                 OF SAM S. LESLIE, PLAN AGENT,
17                               FOR ISSUANCE OF ORDER
                                 APPROVING THE ISSUANCE OF WRIT
18                               OF EXECUTION AND APPOINTMENT
                                 OF PLAINTIFF AS SUBSTITUTE
19                               CUSTODIAN FOR U.S. MARSHAL IN
                                 FURTHERANCE OF EXECUTION OF
20                               WRIT AND NOTICE OF LEVY; AND
                                 FOR ORDER APPROVING SALE OF
21                               ARTWORKS FREE AND CLEAR OF ANY
                                 CLAIM OF LIEN OR INTEREST
22

23

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.
```

ii

1          CONT'D HEARING RE: PLAN
           AGENT'S MOTION TO LIMINE TO
2          EXCLUDE THE EXPERT REPORT
           SUBMITTED BY 400 S. LA BREA
3
           CONT'D HEARING RE: PLAN
4          AGENT'S MOTION IN LIMINE TO
           EXCLUDE THE TESTIMONY OF
5          DOUGLAS CHRISMAS

6                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE ROBERT KWAN
7             UNITED STATES BANKRUPTCY JUDGE

8    APPEARANCES:

9    For Plan Agent Sam Leslie:    STEVEN F. WERTH, ESQ.
                                   DAVID V. SACK, ESQ.
10                                 SulmeyerKupetz
                                   333 South Grand Avenue
11                                 Suite 3400
                                   Los Angeles, California 90071
12                                 (213) 626-2311

13   For Defendant 400 South       BRIAN L. DAVIDOFF, ESQ.
       La Brea:                    KEITH P. BANNER, ESQ.
14                                 Greenberg, Glusker, Fields,
                                     Claman & Machtinger
15                                 2049 Century Park East
                                   Suite 2600
16                                 Los Angeles, California 90067
                                   (310) 201-7530
17

18   Court Recorder:              Wanda Toliver
                                  United States Bankruptcy Court
19                                Edward R. Roybal Federal
                                    Building
20                                255 East Temple Street
                                  Los Angeles, California 90012
21

22   Transcriber:                 Briggs Reporting Company, Inc.
                                   9711 Cactus Street
23                                 Suite B
                                   Lakeside, California 92040
24                                 (310) 410-4151

25

iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jesse Ottinger | -- | 23 | 63 | -- |
| Daryoush Dayan | -- | 70 | 172 | 181 |
| Douglas Chrismas | -- | 188 | -- | -- |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Plaintiff's: | | |
| P-14 Lease agreement and addenum, dated 7-20-2006 | 110 | -- |
| P-15 First amendment to the lease | 113 | -- |
| P-34 E-mail from Angela Lee to Mr. Dayan with picture of brick wall (Only picture admitted) | 155 | 159 |
| Defendant's: | | |
| D- 1 Pictures of interior of property | 35 | -- |
| D- 6 Permit | 25 | -- |
| D- 7 Property appraisal 2009 | 30 | -- |
| D- 8 Pictures of property from 2011 appraisal | 37 | -- |
| D-10 Lease agreement | 172 | -- |
| D-12 Plot plan attachment drawing | 40 | -- |
| D-13 Rendering of what museum would look like | 43 | -- |
| D-15 Google picture of property, February 2011 | 56 | -- |
| D-16 E-mail string between Mr. Dayan and Angela Hui of Cathay Bank | 150 | -- |

iv

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Defendant's: | | |
| D-17 E-mail from Mike Smith to Mr. Dayan and Farhad Abolfathi, dated 12-13-2011; e-mail string | 159 | -- |
| D-19 Picture of property dated September 2008 | 31 | -- |
| D-20 Picture of column | 147 | -- |

*Briggs Reporting Company, Inc.*

1

1   LOS ANGELES, CALIFORNIA   THURSDAY, JANUARY 13, 2022   9:00 AM

2   --oOo--

3   (Call to order of the Court.)

4   THE CLERK:  Please come to order.  This United

5   States Bankruptcy Court is now in session.  The Honorable

6   Robert Kwan, Bankruptcy Judge, presiding.

7   THE COURT:  The Court will call the matter on the

8   9:00 o'clock calendar, the continuation of the trial in the

9   Art and Architecture Books of the 21st Century matter,

10  regarding the Banksy, alleged Banksy artwork.  And we're

11  proceeding in the adversary proceeding of Leslie v. Ace

12  Gallery New York Corporation, et al.

13  Appearances, please.

14  MR. WERTH (via Zoom):  Yes.  Good morning, your

15  Honor.  This is Steve Werth, and I have my colleague, Dave

16  Sack from SulmeyerKupetz, for the plan agent.  And to give

17  the courtroom a visual of what's going on, is Mr. Sack and I

18  are in a room alone in the offices of SulmeyerKupetz.  Thank

19  you.

20  MR. SACK (via Zoom):  Good morning, your Honor.

21  MR. DAVIDOFF (via Zoom):  Good morning, your

22  Honor.  Brian Davidoff and Keith Banner on behalf of 400

23  South La Brea.  And we are both in a conference room at our

24  offices.

25  THE COURT:  All right.  Are both sides ready to

211

1  glass wall.

2  　　　　THE COURT:  Yeah.  It would support the glass

3  wall, right?

4  　　　　THE WITNESS:  Well, there's the glass wall, your

5  Honor, and then right two feet away from the glass wall

6  there is the wall that has the Irwin light sculpture on it,

7  which had -- which is a very complex wall with all the

8  electricity that goes in it to run over 200, four-foot long

9  light fixtures.  So that that was a real, in a sense,

10 structure that was supporting the front end of that

11 building.

12 　　　　THE COURT:  Well, what was the -- so, what --

13 you're saying it's a lateral, so it's not the glass wall it

14 was supporting, it was some other wall?

15 　　　　THE WITNESS:  No.  The glass wall was supported by

16 the original building.  And right behind that --

17 　　　　THE COURT:  Okay.  The glass wall was supported by

18 the concrete column?

19 　　　　THE WITNESS:  Yes, sir.

20 　　　　THE COURT:  All right.  And then the pilaster was

21 to support something else, right?

22 　　　　THE WITNESS:  Three hundred light fixtures.

23 　　　　THE COURT:  Okay.

24 　　　　THE WITNESS:  And we also had the problem, because

25 we did not want any pylons supporting the glass, that there

# EXHIBIT 4

207

1  A    That wall would not be removed.

2  Q    My question is, was it -- I guess I'll break it down.

3  Was the wall upon which the Banksy was painted an interior

4  wall?

5  A    It was a part of what encased the front window and gave

6  security to the building.  And it would -- once it was in

7  there, it would never be changed unless they tore down the

8  building.

9  Q    I'm only asking --

10          THE COURT:  Well, his question was -- you need to

11  answer his question, Mr. Chrismas.  Was that an -- was that

12  intended to be an interior wall?  I thought your testimony

13  was that there was going to be a glass wall outside of that,

14  and so it'd be interior.

15          THE WITNESS:  There was -- if I can -- there was a

16  glass wall --

17          THE COURT:  Your testimony in your declaration was

18  that there was going to be a glass wall out --

19          THE WITNESS:  I read my -- what I said in my

20  testimony was absolutely correct.

21          THE COURT:  Right.

22          THE WITNESS:  (Indiscernible.)

23          THE COURT:  So, this would have been inside of the

24  glass wall, right, this drywall?

25          THE WITNESS:  Yes, but it had to support a wall

*Briggs Reporting Company, Inc.*

208

1  that was --

2          THE COURT:  No, no, no.  Well, Mr. Werth was

3  absolutely right.  He's just taking a step at a time.

4          THE WITNESS:  Okay.

5          THE COURT:  You're trying to advocate, and that's

6  not a good idea, all right?  Just answer the questions.

7  Your job as a witness is to answer the question.

8          THE WITNESS:  I'll be taking more --

9          THE COURT:  We're taking it step by step.  You

10 know, I'm sure that --

11         THE WITNESS:  Okay.

12         THE COURT:  -- Mr. Werth is going to ask you about

13 whether it's structural or not, but we're just asking you,

14 was this interior or exterior?  I understood it was interior

15 because it's behind -- it was going to be behind the glass

16 wall that was going to be put in.

17         THE WITNESS:  You're correct.

18         THE COURT:  All right.  So it's interior.

19         Okay.  Next question --

20         THE WITNESS:  Yes.

21         THE COURT:  -- Mr. Werth.

22 BY MR. WERTH:

23 Q   Mr. Chrismas, we're still talking about the same wall.

24 Is the wall -- was the wall upon which the Banksy is painted

25 a non-structural wall?

211

1   glass wall.

2          THE COURT:  Yeah.  It would support the glass

3   wall, right?

4          THE WITNESS:  Well, there's the glass wall, your

5   Honor, and then right two feet away from the glass wall

6   there is the wall that has the Irwin light sculpture on it,

7   which had -- which is a very complex wall with all the

8   electricity that goes in it to run over 200, four-foot long

9   light fixtures.  So that that was a real, in a sense,

10  structure that was supporting the front end of that

11  building.

12         THE COURT:  Well, what was the -- so, what --

13  you're saying it's a lateral, so it's not the glass wall it

14  was supporting, it was some other wall?

15         THE WITNESS:  No.  The glass wall was supported by

16  the original building.  And right behind that --

17         THE COURT:  Okay.  The glass wall was supported by

18  the concrete column?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  All right.  And then the pilaster was

21  to support something else, right?

22         THE WITNESS:  Three hundred light fixtures.

23         THE COURT:  Okay.

24         THE WITNESS:  And we also had the problem, because

25  we did not want any pylons supporting the glass, that there

# EXHIBIT 5

58

1  Do you remember when approximately those were built, if you

2  recall?

3  A    No, I don't remember the exact date of -- you know, it

4  was an ongoing project, so -- and the next step from what

5  you're showing me here, was we were getting bids for the

6  glass wall.

7  Q    Had you received any bids for the glass wall?

8  A    Yes.

9  Q    And you'd actually received the fixtures for the Irwin

10 light installation?

11 A    We had them custom made, paid for them, and they were

12 in storage in the back of the museum space.

13 Q    And the purpose of the pilaster on the right-hand side

14 of this picture, and the left-hand side of the upper picture

15 was what?  Why were those installed?

16 A    It -- well, there's four sides to the glass window.  It

17 was a top, bottom, and there's the two ends.  And the

18 pilasters were the two ends.

19 Q    So the pilaster would have been the ends of the glass

20 window, or the ends of the Robert Irwin fixture, if you

21 recall?

22 A    It's between the two, starting at the window and going

23 to the Irwin.

24 Q    It would have been between the two.  Okay.  Thank you.

25 You were asked by Mr. Werth whether the wall on which the

# EXHIBIT 6

81

1      And, also, I am very trained to be able to perceive and

2 look at art and make an analysis.  And that in my analysis,

3 it is definitely a Banksy.

4 Q    My final question is about the pilaster.  And I'd like

5 to bring up a picture, or at least direct everyone's

6 attention back again to Exhibit D-1.

7              THE COURT:  "D-1."

8              MR. WERTH:  D-1.

9              THE COURT:  All right.  Defendant's 1.

10 BY MR. WERTH:

11 Q    So, Mr. Chrismas, I'm asking you now about the top

12 picture and the pilaster.  The goal was to have a Robert

13 Irwin sculpture adjacent to this pilaster.  And I want to

14 know, would it have run straight into the pilaster?

15 A    Yes.  To the right-hand side of the pilaster.  So you

16 can see it.  They have already removed all the other

17 materials.  It was -- it was in preparation to receive the

18 Robert Irwin wall.  It was the next thing to be installed,

19 along with the plate glass window.

20 Q    So, the Robert Irwin sculpture would have run straight

21 into the stone wall, which also would have touched the

22 right-hand side of the pilaster?

23 A    Yes, that's correct.

24              MR. WERTH:  No further questions, your Honor.

25              THE COURT:  All right.

# EXHIBIT 7

214

1 red triangle, I'm going to --

2 A    Yes, I got it.

3 Q    -- refer to as "the pilaster."  I think I understood

4 you to say that the Robert Irwin light sculpture needed

5 electrical cords.  And so my question to you is, were some

6 of them to run inside the pilaster?

7 A    I'm sure the -- to fire the 250 fixtures of the Robert

8 Irwin, that wall would have had a lot of electricity, that

9 end wall would have had electricity in it to light the

10 extent of -- the fixtures were the entire length of the

11 front window.  So -- and you can see above that the -- that

12 that section is identical to the section above, which you

13 can see on the photograph underneath, the second photograph,

14 the lower one.  That whole section basically is the front

15 window.  There is a, we'll call it the sculpture wall and

16 then the glass wall, were all contained within that area.

17 And so that was a framing device that was there.  What's

18 interesting to me --

19 Q    Mr. Chrismas, I have to stop you, just because we're --

20 it's 4:20 in the afternoon, and we're going to be done --

21 A    Okay.

22 Q    -- soon for the day, and I just need to move forward.

23 Thank you though.  If we were sitting at a table doing --

24 talking, I wouldn't --

25         THE COURT:  All right.  Why don't you ask your

19

1 hollow area behind the drywall, right, to hold it up?

2          THE WITNESS:  Correct.  Yes.

3          THE COURT:  All right.  So there was a hollow

4 space because the metal studs were there to hold up the

5 drywall, right?

6          THE WITNESS:  Yeah.

7          THE COURT:  All right.

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  So the answer is, yes.

10 BY MR. WERTH:

11 Q   Mr. Chrismas, was your intent that some day there would

12 be electrical cords running down through the pilaster that

13 would power the Robert Irwin light sculpture?

14 A   That's up to the electrical contractor where he runs

15 the wires, but he would have to do whatever he'd have to do.

16 But I would suspect that there would be -- they would

17 penetrate that wall to get cords in, because you're -- you

18 were lighting 250 light fixtures, big light fixtures.

19     And so, I'm certain that we would -- that's another

20 reason having that space on the metal studs, what have you,

21 is that they could run your conduit in there, which is

22 basically done in every situation.  And you can see the

23 space on the right is open, so they have the access to go

24 and put conduit in there, to go and hook up for any

25 electrical connections they might need.  But I -- I didn't

# EXHIBIT 8

23

1  BY MR. WERTH:

2  Q    Mr. Chrismas, was the pilaster ever spray painted with

3  graffiti before the Banksy was put on it?

4  A    Not that I remember.

5  Q    Did you ever tell anyone to spray paint the pilaster?

6  A    When you say, "spray paint," what are you talking

7  about?

8  Q    Did you ever tell anyone to spray paint upon the

9  pilaster at any time?

10         MR. DAVIDOFF:  Mr. Werth, are you talking about

11  before or after the Banksy, or while the Banksy was on

12  there?  Can you be specific as to time, please?

13         MR. WERTH:  I said, "at any time."

14         THE WITNESS:  All right.  When you say spray

15  paint, are you talking about spraying out the white color on

16  or rolling it on with a roller?  I don't understand --

17         THE COURT:  Yeah.  That's a fair question you ask.

18  BY MR. WERTH:

19  Q    I -- other than white paint that would go on with a

20  roller, did you ever tell anyone at any time to spray paint

21  the pilaster?

22  A    I do not believe so.

23  Q    Do you think the artist known as Banksy is the one who

24  created the art that we are talking about in this trial?

25  That we've been referring to as the Banksy, but I now have

# EXHIBIT 9

218

1          MR. WERTH:  Your Honor, we see it on our system.

2    Keith, you may need to use like a Google Chrome

3    (indiscernible) --

4          THE COURT:  Yeah, yeah.  I learned that, that you

5    might have to refresh your browser or I think -- what do you

6    call it, to dump your browsing history and clean out your

7    browsing history.

8          MR. BANNER:  We'll do that, your Honor.  Thank

9    you.

10         THE COURT:  Yeah.

11         MR. BANNER:  Thank you, your Honor.

12         THE COURT:  Yeah, I don't -- yeah.  Yeah.  Yeah, I

13   did post it earlier this morning, and then I -- my law clerk

14   indicated I had some typos, so I had to -- I refreshed it

15   this afternoon.

16         So, you know, street art apparently is something

17   new generally in the law, and ownership of street art.  And

18   there are apparently various theories that haven't, I think,

19   really congealed in the case law as to how -- you know, who

20   owns it.  But, you know, the theories may or may not be

21   dispositive, but -- so, you know, I haven't decided either

22   way as to how -- you know, because I wanted to get the

23   benefit of your arguments, but I wanted to tell you what I

24   was looking at and thinking about.

25         I do have to come up I think with some sort of

219

1  rationale of ownership by either party.  And, you know, one

2  is, you know, how is owner -- you know, basically, I -- you

3  know, the issue is, the street art created by the artist is

4  probably not owned by the artist for various reasons.  And

5  so, it comes down to who has ownership rights in the

6  premises.  And the lease indicates that, as I asked Mr.

7  Pagliassotti, the tenant does have some ownership rights,

8  subject to restrictions, in tenant-created alterations.  So,

9  what does that mean?

10        And does he have a right to remove -- you know,

11 Mr. Pagliassotti's testimony was, no, based on the industry

12 standards and the form lease and the consent.  And I think

13 the issue of consent here is that I -- it doesn't appear the

14 evidence -- from the evidence, it doesn't indicate that Mr.

15 Chrismas or Ace Museum ever obtained consent for

16 installation of the pilaster or removal of the pilaster, and

17 the rebuilding of the pilaster.  So, what does that mean,

18 based on application of the lease?

19        And I'll probably hear from counsel for the

20 landlord on that, based on interpretation of specific

21 provisions of the lease that govern.  And so I don't

22 anticipate saying that.

23        And then on the other side is the graffiti

24 removal.  So -- and the reasonableness of the removal.  Mr.

25 Pagliassotti didn't really expound on that, but it wasn't

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):  **PLAN AGENT'S RESPONSE TO BRIEF FILED BY 400 S. LA BREA ADDRESSING ISSUES RAISED IN JANUARY 21, 2022 SCHEDULING ORDER**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 17. 2022  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Simon Aron**    saron@wrslawyers.com, eweiman@wrslawyers.com
- **Jason Balitzer**    jbalitzer@sulmeyerlaw.com, jbalitzer@ecf.inforuptcy.com;dwalker@ecf.inforuptcy.com;kmccamey@sulmeyerlaw.com
- **Keith Patrick Banner**    kbanner@greenbergglusker.com, sharper@greenbergglusker.com;calendar@greenbergglusker.com
- **Brian L Davidoff**    bdavidoff@greenbergglusker.com, calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Carolyn A Dye**    trustee@cadye.com
- **Fahim Farivar**    fahim@farivarlaw.com, catherine@farivarlaw.com;lisa@farivarlaw.com
- **Alan W Forsley**    alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy.flores@flpllp.com
- **J. Bennett Friedman**    jfriedman@flg-law.com, msobkowiak@flg-law.com;jmartinez@flg-law.com
- **Michael I. Gottfried**    mgottfried@elkinskalt.com
- **Asa S Hami**    ahami@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;ahami@ecf.inforuptcy.com
- **Elliot C Harvey Schatmeier**    ehs@birdmarella.com, dthrockmorton@birdmarella.com
- **Matthew P Kelly**    mkelly@sulmeyerlaw.com
- **Daniel A Lev**    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- **Krikor J Meshefejian**    kjm@lnbyg.com
- **Susan I Montgomery**    susan@simontgomerylaw.com, assistant@simontgomerylaw.com;simontgomerylawecf.com@gmail.com;montgomerysr71631@notify.bestcase.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbnlawyers.com
- **Kurt Ramlo**    kr@lnbyg.com, kr@ecf.inforuptcy.com
- **Ekwan E Rhow**    eer@birdmarella.com, blee@birdmarella.com
- **David J Richardson**    drichardson@bakerlaw.com, aagonzalez@bakerlaw.com
- **Ronald Rus**    rrus@brownrudnick.com, tlangford@brownrudnick.com
- **David V Sack**    dsack@sulmeyerlaw.com, dvsack@gmail.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com; cblair@ecf.inforuptcy.com
- **Michael C Schneidereit**    mschneidereit@jonesday.com, scollymore@jonesday.com;tckowalski@jonesday.com
- **David B Shemano**    dshemano@shemanolaw.com
- **Jonathan Seligman Shenson**    jshenson@shensonlawgroup.com
- **Mark Shinderman**    mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com
- **Michael D Sobkowiak**    msobkowiak@flg-law.com, jfriedman@flg-law.com;jmartinez@flg-law.com
- **Stephen Sorensen**    , joseperez@tafsattorneys.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Michael W Vivoli**    mvivoli@vivolilaw.com, sbrown@vivolilaw.com
- **Jessica Vogel**    Jvogel@sulmeyerlaw.com, jvogel@ecf.inforuptcy.com;mviramontes@sulmeyerlaw.com

DAP 2733420v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

- **Howard J Weg**    hweg@robinskaplan.com
- **Steven F. Werth**  swerth@sulmeyerlaw.com, cblair@sulmeyerlaw.com; mviramontes@sulmeyerlaw.com; dperez@sulmeyerlaw.com; swerth@ecf.inforuptcy.com
- **Beth Ann R. Young**    bry@lnbyg.com, bry@lnbyb.com
- **Roye Zur**    rzur@elkinskalt.com, cavila@elkinskalt.com;myuen@elkinskalt.com

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 17, 2022 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Via Personal Delivery**
The Honorable Robert Kwan
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Bin outside of Suite 1682
Los Angeles, CA 90012

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| February 17, 2022 | Debbie A. Perez | */s/Debbie A. Perez* |
| *Date* | *Printed Name* | *Signature* |

DAP 2733420v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**