1  Victor A. Sahn (CA Bar No. 97299)
    *vsahn@sulmeyerlaw.com*
2  Steven F. Werth (CA Bar No. 205434)
    *swerth@sulmeyerlaw.com*
3  David V. Sack (CA Bar No. 304528)
    *dsack@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
    A Professional Corporation
5  333 South Grand Ave., Suite 3400
    Los Angeles, California 90071
6  Telephone: 213.626.2311
    Facsimile: 213.629.4520
7

8  Attorneys for Sam S. Leslie, Plan Agent

9          **UNITED STATES BANKRUPTCY COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

11              **LOS ANGELES DIVISION**

12  In re:                                  Case No. 2:13-bk-14135-RK

13  ART AND ARCHITECTURE BOOKS OF THE        Adv. No. 2:15-ap-01679-RK
    21ST CENTURY,
14                                           Chapter 11
              Debtor.
15                                           Consolidated with Adv. No. 2:14-ap-01771-
                                             RK and Adv. No. 2:15-ap-01680-RK
16  SAM LESLIE, as Plan Agent for ART &
    ARCHITECTURE BOOKS OF THE 21ST           **PLAN AGENT'S OBJECTIONS TO**
17  CENTURY,                                 **FINDINGS OF FACT AND**
                                             **CONCLUSIONS OF LAW REGARDING**
18              Plaintiff,                   **BANKSY DISPUTE SUBMITTED BY 400**
          vs.                                **S. LA BREA LLC**
19
    ACE GALLERY NEW YORK                     **Trial**:
20  CORPORATION, et al.,
                                             Date:     December 16-17, 2021
21              Defendants.                              January 13-14, 2022
                                             Time:     9:00 a.m.
22  400 S. LA BREA, LLC,                     Place:    Courtroom 1675
                                                       255 East Temple Street
23              Cross-Complainant,                     Los Angeles, CA 90012
          vs.                                          ZoomGov
24                                                     [Hon. Robert N. Kwan]
    SAM LESLIE, et al.,
25
              Cross-Defendants.
26

27

28

1    Sam S. Leslie, Plan Agent for the Post-Confirmation Bankruptcy Estate of Art and

2    Architecture Books of the 21st Century ("Plan Agent"), responds to the "Notice Of Lodging Of

3    [400 S. La Brea, LLC's Proposed] Findings Of Fact And Conclusions Of Law Regarding The

4    "Banksy" Contested Matter" [Docket No. 1258] (the "Notice").  The Notice attaches, as Exhibit 1,

5    proposed findings of fact and conclusions of law which are referred to as the "Proposed Findings".

6    Plan Agent responds to the Proposed Findings as follows:

7    **I.**

8    **EXHIBITS ADMITTED INTO EVIDENCE**

9    Plan Agent has no objection to 400 S. La Brea, LLC's ("400 SLB") characterization of the

10    exhibits admitted into evidence identified in the Proposed Findings, at page 3, lines 2-20.

11    **II.**

12    **DECLARATIONS ADMITTED INTO EVIDENCE AS DIRECT WITNESS TESTIMONY**

13    Plan Agent has no objection to 400 SLB's characterization of the declarations admitted into

14    evidence as direct witness testimony identified in the Proposed Findings at page 3, line 23 to page

15    4, line 10.

16    **III.**

17    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

18    A.    **Findings Of Fact**

19    The below chart identifies each of the 92 proposed findings of fact contained in the

20    Proposed Findings, and Plan Agent's objections to those proposed findings if any.  All emphasis is

21    in the original.  Capitalized terms that are not otherwise defined have the meaning given them in

22    Plan Agent's proposed findings of fact and conclusions of law, submitted on March 15, 2022

23    [Docket No. 1257].

24

| NO. | PROPOSED FINDING OF FACT | OBJECTION IF ANY |
|---|---|---|
| | **General Procedural Background** | |
| 1. | On February 19, 2013 (the "Petition Date"), the Debtor Art & Architecture Books of the 21st Century, dba Ace Gallery (the "Debtor") | No objection.<br>☐    Sustained |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | commenced the underlying chapter 11 bankruptcy case, Case No. 2-13-bk-14135-RK (the "Bankruptcy Case) by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). | ☐ Overruled |
| | 2. | On March 28, 2013, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 3. | On November 26, 2014, the Committee commenced an adversary proceeding against non-debtor Ace Museum, a California nonprofit corporation ("Ace Museum") Adversary Case No. 2:14-ap-01771-RK (the "Museum Adversary") by filing their *Complaint for: (1) Money Had and Received; (2) Money Lent; (3) Open Book Account; (4) Account Stated; (5) Breach of Contract; (6) Avoidance, recovery, and Preservation of Fraudulent Transfers; and (7) Turnover of Property of the Estate.* | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 4. | Ace Museum is not, and never was, a debtor in the Bankruptcy Case. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 5. | On December 12, 2015, the Committee, filed its *Complaint for: (1) Avoidance, Recovery, and Preservation of Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of Preferential Transfers; (3) Turnover of Property; (4) Avoidance and Recovery of Transfers; (5) Avoidance and Recovery of Post-Petition Transfers to Defendant Ace Gallery New York Corporation; and (6) Disallowance of Claims* [Adv. Docket No. 1], commencing the instant adversary proceeding, 2:15-ap-01679-RK (this "Adversary Proceeding"). | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 6. | On March 18, 2016, the Court entered its Order Confirming Second Amended Plan of Reorganization of Official Committee of Unsecured Creditors as Modified (the "Confirmation Order"), which effectively dissolved the Committee and appointed the Plan Agent as successor plaintiff in this Adversary Proceeding and the Museum Adversary. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 7. | On July 8, 2016, 400 SLB commenced an unlawful detainer action against Ace Museum, as | No objection.<br><br>☐ Sustained |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | lessee, and Mr. Chrismas, as guarantor, in the Los Angeles County Superior Court, commencing Case No. BC626437 (the "UD Action") on account of Ace Museum's failure to pay rent due under the Lease (defined below). | ☐ Overruled |
| | 8. | On September 2, 2016, a *Stipulation for Entry of Judgment and Judgment Thereon* (the "UD Judgment") was entered in the UD Action in favor of 400 SLB pursuant to which, among other things, (1) 400 SLB was awarded possession of the La Brea Property (defined below) and (2) the Lease (defined below) was deemed forfeited. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 9. | On January 13, 2017, upon the Plan Agent's Motion, the Court entered an order consolidating the Museum Adversary with this Adversary Proceeding. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 10. | On January 25, 2017, the Committee obtained a writ of attachment against Ace Museum in the Museum Adversary. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 11. | On July 3, 2019, the Court entered in the Adversary Proceeding a *Final Judgment Against Ace Museum on the Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth Claims for Relief in the Fifth Amended Consolidation Complaint* (the "Museum Judgment"), pursuant to which a money judgment in the amount of $3,187,539.80 plus $47,201.04 in fees and costs was entered against Ace Museum in favor of the Plan Agent. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 12. | On March 7, 2020, in the Adversary Proceeding, the Plan Agent filed his *Application of Sam S. Leslie, Plan Agent, for Issuance of Writ of Execution and Appointment of Plaintiff as Substitute Custodian for U.S. Marshal in Furtherance of Execution of Writ and Notice of Levy; and for Order Approving Sale of Artworks Free and Clear of Any Claim of Lien or Interest* ("Application"), commencing this contested matter. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 13. | On April 24, 2020, 400 SLB filed its *400 SLB Defendants': (1) Opposition to Application of Sam S. Leslie, Plan Agent, for Issuance of Writ of Execution and Appointment of Plaintiff as Substitute Custodian for U.S. Marshal in Furtherance of Execution of Writ and Notice of* | No objection.<br>☐ Sustained<br>☐ Overruled |

| | | | |
|---|---|---|---|
| | | *Levy; and for Order Approving Sale of Artworks Free and Clear of Any Claim of Lien or Interest; and (2) Request to Continue Hearing Thereon; and (3) Request for Lease to Conduct Discovery on Contested Matter.* | |
| | | **The Lease** | |
| | 14. | On July 21, 2006, 400 SLB, as lessor, and Douglas Chrismas ("Mr. Chrismas"), as lessee, entered into an "AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease-Net" dated as of July 20, 2006 (as subsequently amended or assigned, the "Lease"). | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 15. | The Lease is a form Lease drafted by AIRCRE, fka AIR Commercial Real Estate Association ("AIRCRE"), Form No. STN-9-3/06E. Certain language from the form lease was deleted and certain exhibits were added as agreed to between the parties thereto. | Plan Agent objects to the statement that the Lease was "drafted" by AIRCRE, as the parties to the Lease drafted it but appear to have used an AIRCRE form of some kind as template. The phrase: "language from *the* form lease" is thus imprecise as no actual form lease was admitted into evidence upon which this statement can be based.  Exhibit D-28 was admitted but only as to paragraph 7.3(b) of that form.  With respect to that, it does appear that language is the base language used for paragraph 7.3(b) of the Lease.<br><br>☐ Sustained<br>☐ Overruled |
| | 16. | The Lease related to certain real property located at 400 S. La Brea Avenue, Los Angeles, California, sometimes also referred to as 420 S. La Brea Avenue (APN #5507-009-025) and 407 S. Sycamore Avenue, Los Angeles, California (APN #5507-009-023) (collectively, the "La Brea Property"). | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 17. | During all times relevant to this contested matter, 400 SLB owned the La Brea Property. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 18. | On August 28, 2009, 400 SLB, Mr. Chrismas, and Ace Museum entered into an "Assignment and First Amendment to Standard Industrial/Commercial Single Tenant Lease-Net" (the "Lease Assignment") pursuant to which Mr. | No objection.<br><br>☐ Sustained<br>☐ Overruled |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | Chrismas assigned his rights as lessee under the Lease to Ace Museum. | |
| 19. | Paragraph 7.3(a) of the Lease states, in part that "[t]he term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion." | No objection.<br>☐ Sustained<br>☐ Overruled |
| 20. | The categories excluded from the definition of "Alterations" under Paragraph 7.3(a) of the Lease, that is "Utility Installations" and "Trade Fixtures", are defined under Paragraph 7.3(a) of the Lease as follows:<br><br>The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. | No objection.<br>☐ Sustained<br>☐ Overruled |
| 21. | The "Premises" under the Lease means the La Brea Property | The term "Premises" is not defined in the Lease. Instead, that terms appears as a heading in Paragraph 1.2 of the Lease, and is followed by a colon and the following:<br><br>"That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as [Property] located in the County of ____, State of ____, and generally described as … Approximately 90,790 sq. ft. of land and all improvements located thereon, including a two-story building containing approximately 59,000 sq. ft. (including outdoor area under the building overhang) (the "Building")."<br><br>As such, Plan Agent objects that this statement is not accurate.<br>☐ Sustained<br>☐ Overruled |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| 22. | "Lessee Owned Alterations" are defined in Paragraph 7.3(a) of the Lease as "Alterations …made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a)." | No objection. ☐ Sustained ☐ Overruled |
|---|---|---|
| 23. | Paragraph 7.4(a) of the Lease, entitled "Ownership" provides, in its entirety:<br><br>(a) **Ownership**. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease become the property of Lessor and be surrendered by Lessee with the Premises. | No objection. ☐ Sustained ☐ Overruled |
| 24. | Paragraph 7.4(b) of the Lease, entitled "Removal" provides, in its entirety:<br><br>(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent. | No objection. ☐ Sustained ☐ Overruled |
| 25. | There is no evidence in the record that 400 SLB exercised its rights under Paragraph 7.4(b) of the Lease and required Ace Museum, under Paragraph 7.4(b) of the Lease, to remove any "Lessee Owned Alterations" or "Utility Installations" from the La Brea Property. | Plan Agent objects to this statement as there is no reference to any document or transcript that supports this broad finding. 400 SLB refers to Mr. Dayan's and Mr. Chrismas's declarations "generally" in support of this factual finding, but the question was never asked of any witness, and there is no specific statement 400 SLB identifies that can be reviewed to confirm or deny statement.<br><br>To the extent this statement is limited solely to the drywall upon which the purported |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | "Banksy" appeared that is the subject of this dispute – the "<u>Drywall</u>"), and is limited in time to the period during which the Drywall existed at the Premises, Plan Agent acknowledges that (1) no witness was asked whether 400 SLB sent a Paragraph 7.4(b) notice, (2) no evidence in the record indicates that 400 SLB sent such a notice, (3) there is no way to fairly conclude from circumstantial evidence that 400 SLB sent such a notice, and (4) Plan Agent has no reason to believe such notice was actually sent. |
| | | | Thus, as to that limited issue, the notion that "absence of evidence is evidence of absence" probably can be applied without compromising the evidentiary record. |
| | | | ☐ Sustained<br>☐ Overruled |
| 26. | Under Paragraphs 1.8 and 8.3 of the Lease, the lessor as the insuring party would be responsible for maintaining insurance against any losses to the La Brea Property, but Lessee Owned Alternations are excluded from the lessor's insurance obligations under Paragraph 8.4(a) of the Lease. | | This is an incomplete summary of paragraph 8.3 of the Lease, which states in part:<br><br>"[…] If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor…."<br><br>☐ Sustained<br>☐ Overruled |
| 27. | Paragraph 7.3(b) of the Lease entitled "Consent" provides:<br><br>(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. [four lines of text deleted from form Lease]. Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written | | Plan Agent objects that this is an incomplete statement. In the Addendum to the Lease, in Section 3, the parties agreed that "The following provisions are hereby added to Paragraph 7.3(b) of the Lease:" and thereafter, there are 37 single-spaced lines of text which will not be re-typed here, but exist in Exhibit D-10, |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make [deleted text from form Lease] shall be presented to lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (ii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications [deleted text from form Lease]. Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting a [deleted word from form Lease] Security Deposit with Lessor. | on page 138 of that Exhibit.<br><br>Further, within those 37 lines are references to additional documents that further modify the statements contained in that text, among them an Exhibit "B" to the Addendum which is found at Plan Agent's Exhibit P-14.<br><br>Further, on August 28, 2009, the Lease was amended by a First Amendment, and that First Amendment specifically referenced Paragraph 7.3 of the Lease.  That document can be found at P-15, and the specific language in Section 3 under "Amendment Terms".  That section contains the statement: "Subject to satisfaction of all of the terms and conditions of Paragraph 7.3 of the Form Lease (as modified by Paragraph 3 of the Addendum) … Lessor hereby agrees that Lessee shall have the right to perform Alterations and/or Utility Installations to the Premises as currently contemplated by Lessee, including, but not limited to, certain structural improvements and improvements affecting the building systems (the "Premises Improvements")<br><br>☐ Sustained<br>☐ Overruled |
| 28. | The language from Paragraph 7.3(b) deleted by the parties from the AIRCRE form lease is reflected below in **bold**:<br><br>(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. **Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls. will not affect the electrical,** | No objection.<br><br>☐ Sustained<br>☐ Overruled |

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | **plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing,** Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make **and which require the consent of the Lessor** shall be presented to lessor In written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (ii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. **For work which costs an amount in excess of one month's Base Rent,** Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting **an additional** Security Deposit with Lessor. | |
| 29. | The language stricken from the form AIRCRE lease, as noted in FOF No. 25, reflects an agreement between the parties to the Lease to require the consent of lessor as to all "Alterations" and "Utility Installations", without exception, as the stricken language provided a limited exception to the consent requirement. | Plan Agent notes that 400 SLB likely intended to refer here to finding of fact 28, not 25.<br><br>Plan Agent objects to this finding as it is not a statement of fact but a legal conclusion.<br><br>Plan Agent further objects to this statement as 400 SLB urges the Court to reach a legal conclusion – that there was an "agreement between the parties to the Lease to require the consent of lessor as to all "Alterations" and "Utility Installations", without |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | exception…" based solely on the statements contained in FOF No. 27 FOF No. 28. As noted above, FOF No. 27 is an incomplete statement. Further, there are numerous other provisions of the Lease, such as Paragraph 7.1 and 6.2, which modify this right and apply to the circumstances here. |
| | | | Plan Agent further objects to this statement as being unsupported by the actual text of Exhibit D-28. Paragraph 7.3(b) of that exhibit provides a "limited exception" to the consent requirement regarding "Utility Installations" solely – not Utility Installations and Alterations as 400 SLB states. |
| | | | Additionally, Paragraph 7.3(b) of Exhibit D-28 nowhere discusses Alterations, and therefore would not have been an exception to the consent requirement relating to alterations, had it been included in the Lease. |
| | | | ☐ Sustained <br> ☐ Overruled |
| 30. | | Paragraph 7.1(a) of the Lease, which details lessee's maintenance and repair obligations, provides, in relevant part: <br><br> … Lessee shall, at lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to. all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, | No objection. <br><br> ☐ Sustained <br> ☐ Overruled |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises.  Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the Service Contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and an improvement thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building. | |
| | 31. | Concurrent with the execution of the Lease, 400 SLB and Mr. Chrismas entered into an "Addendum to Standard Industrial/Commercial Single-Tenant Lease-Net" (the "Lease Addendum"). | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 32. | Paragraph 3 of the Lease Addendum added certain terms to Paragraph 7.3(b) of the Lease, including the following:<br><br>…Lessee has informed Lessor that in Lessee's art gallery business, it is customary that frequent construction work will be necessary to construct and remove interior, nonstructural walls (and perform related drywall finish and repair) as necessary to accommodate exhibitions and showings.  With respect to such customary work, if permitted by Applicable Requirements (including, without limitation, the California Contractor's State Licensing Law), Lessee shall have the right to have its own employees experienced in such work perform such work.  Subject to Applicable Requirements and all of the other terms and conditions of the Lease pertaining to construction and insurance rules and procedures, Lessor acknowledges that Lessee intends to initially make certain improvements, modifications and alterations to Premises | No objection.<br><br>☐ Sustained<br>☐ Overruled |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | ("Tenant's Work") and Lessor hereby conceptually approves such Tenant's Work as evidenced by the hand-marked plans and specifications attached hereto as Exhibit "B"; provided, however, this approval shall not (i) be deemed to permit Lessee to make any structural modifications or alterations to the Premises, (ii) create any liability on the part of Lessor; or (ii) relieve Lessee of any of its obligations. or duties under the Lease with respect to its duties and obligations regarding construction and insurance, nor waive any requirement or right for the benefit of Lessor pertaining thereto, including without limitation, the provisions of Paragraph 7 of the Lease as modified by this Addendum. | |
| 33. | | The following sentence from Paragraph 3 of the Lease Addendum is a disclosure by the lessee regarding certain work it may perform, and it does not reflect any agreement between the parties that anything therein should supersede the terms of the Lease:<br><br>Lessee has informed Lessor that in Lessee's art gallery business, it is customary that frequent construction work will be necessary to construct and remove interior, nonstructural walls (and perform related drywall finish and repair) as necessary to accommodate exhibitions and showings. With respect to such customary work, if permitted by Applicable Requirements (including, without limitation, the California Contractor's State Licensing Law), Lessee shall have the right to have its own employees experienced in such work perform such work. | Plan Agent objects that this is a conclusion of law, not a statement of fact.<br><br>Regardless, it is an incorrect statement, as the first paragraph of the Addendum states:<br><br>"To the extent that the provisions of this Addendum are inconsistent with the terms and conditions of the Lease, the terms outlined herein shall supersede any contrary provisions in the Lease and prevail and control for all purposes."<br><br>Thus the Addendum by its own terms is an agreement between 400 SLB and Mr. Chrismas that anything contained therein supersedes the terms of the Lease—to the extent such terms are inconsistent with the terms and conditions of the Lease.<br><br>☐ Sustained<br>☐ Overruled |
| 34. | | The copy of the Lease submitted by the Plan Agent, admitted as Exhibit P14 (commencing at page 91), attaches a letter dated July 20, 2006 on Ace Gallery Los Angeles letterhead signed by lessor and lessee (the "July 20, 2006 Letter"), | No objection.<br><br>☐ Sustained<br>☐ Overruled |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | which purports to describe work to be performed at the La Brea Property, which includes the following:<br><br>This written description is to accompany the set of red-lined drawing for the main floor of 400 S. La Brea.<br>All work will be done per the City of Los Angeles requirements with Permits<br><br>Any specialized automobile equipment will be removed<br><br>The red lines on the plans indicate new walls<br>All venting will be removed<br><br>Throughout the 1st and 2nd floors all dropped ceiling will be removed<br><br>All partition walls will be removed …<br><br>Along the La Brea Side of the façade there might be a glass wall from ground to new ceiling height running the entire length of La Brea. Approximately two and a half feet east of that glass wall running parallel to the glass wall could be a wall and/or we might build a stucco wall to run the full length …<br><br>This description, along with the floor plan for the 1st and 2nd floor is a possibility for our immediate development of the property. It is not impossible that we might elect to do a much more comprehensive development with a high level architect. This will be decided in the coming months, as we are able to research the potential of property for our needs. | |
| 35. | The July 20, 2006 Letter does not reflect any agreement between the parties that anything therein should supersede the terms of the Lease. | Plan Agent objects that this is a conclusion of law, not a statement of fact.<br><br>Regardless, it is an incorrect statement.  This letter is Exhibit "B" to the Addendum, and the Addendum states in its first paragraph: |

13

| | | | |
|---|---|---|---|
| | | | "To the extent that the provisions of this Addendum are inconsistent with the terms and conditions of the Lease, the terms outlined herein shall supersede any contrary provisions in the Lease and prevail and control for all purposes."<br><br>Thus the Addendum by its own terms is an agreement between 400 SLB and Mr. Chrismas that anything contained therein—which includes this letter-- supersedes the terms of the Lease.<br><br>☐ Sustained<br>☐ Overruled |
| | 36. | The "hand marked" or "redlined" referenced in the Lease Addendum and the July 20, 2006 Letter have not been submitted into evidence. | This is a reference to the "hand-marked plans" reference in Paragraph 3 of the Addendum mentioned above in FOF #34. Plan Agent has no objection to this statement.<br><br>☐ Sustained<br>☐ Overruled |
| | | **The Renovation Project** | |
| | 37. | The record reflects that it was Mr. Chrismas' intention upon leasing the La Brea Property to renovate the entire space and convert it from a car dealership operated by the previous tenant into a contemporary museum space (the "Renovation Project"). | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 38. | In connection with the Renovation project, Mr. Chrismas obtained a building permit No. 08016-10000-1523 dated September 15, 2009 (the "Building Permit") which described the Renovation Project in the Description of Work as "Proposed change of use from an existing auto dealership to art gallery and addition of ticket booth new walls inside of the existing, new rooftop also." | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 39. | In connection with the Renovation Project, Mr. Chrismas' created or otherwise commissioned the creation of: (1) detailed architectural plans (the "Museum Plans"; Exhibit D12); (2) an illustrated | No objection.<br><br>☐ Sustained<br>☐ Overruled |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX  213.629.4520

| | | | |
|---|---|---|---|
| | | brochure containing computer-generated images and floorplans (the "Image Book"; Exhibit D13); and (3) a physical scale model of the La Brea Property (the "Model"; Exhibit D9). | |
| | 40. | Though Mr. Chrismas never completed the Renovation Project, including the installation of a plate glass window and/or the wall which was to hold a Robert Irwin light sculpture (both of which were to be constructed along the first floor of the La Brea Property facing La Brea Avenue) comparing exterior photographs of the La Brea Property from July 2007 (Exhibit D4) and May 2009 (Exhibit D14) indicates that the building underwent substantial renovation, including the removal of the previous car dealership façade and the construction of a uniform grey and white façade facing La Brea Avenue. The Plan Agent's expert similarly testified that the construction progress between July 2007 and May 2009 appeared to reflect a "uniform feeling" of the building. | Plan Agent objects to the part of this statement that the Renovation Project resulted in the construction of "a uniform grey and white façade". <br><br> As to this statement, none of the evidence cited supports this conclusion.  the pictures in support of this statement show that the Premises had no wall, at all, on the western side of the ground floor facing La Brea avenue.  The cited portion of Mr. Chrismas's trial declaration relates to his reasoning for installing the Drywall, not to the extent of construction that occurred at the Premises. <br><br> Nor is this statement a fair summary of Mr. Ottinger's testimony at trial.  Mr. Ottinger stated:  "It does look like there was thought put into making it as a uniform, a uniform feeling to the building."  (Day 3 Transcript, 33:11-13). <br><br> ☐  Sustained <br> ☐  Overruled |
| | 41. | From approximately 2011 until approximately 2017 Alberto Hernandez performed construction work at the La Brea Property relating to the Renovation Project; on a part-time basis from 2011-2014 and on a near-full time basis from 2014-2017. | No objection. <br><br> ☐  Sustained <br> ☐  Overruled |
| | 42. | The evidence indicates that there were interior gallery rooms constructed on the first floor by Mr. Hernandez using metal beams attached to the concrete floor and ceiling, with drywall installed thereon. Such gallery rooms were used during an Andrew Holmes exhibition held in or around October 2016, pictures of which have been admitted into evidence as Exhibit D18. | No objection. <br><br> ☐  Sustained <br> ☐  Overruled |
| | 43. | The evidence indicates that as of May 2013 there | No objection. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | were also large gallery spaces constructed on the second floor using metal beams attached to the concrete floor and ceiling, with drywall installed thereon and there were also unfinished rooms on the second floor consisting of metal beam framing. | ☐ Sustained ☐ Overruled |
| | 44. | Mr. Hernandez testified that after May 2013, he performed further construction work on the second floor of the La Brea property, so that by 2017 many of the unfinished rooms shown in Exhibits P19-26 were fully constructed and approximately 50% of the second floor space was complete, including all drywall and electrical installation. | No objection. ☐ Sustained ☐ Overruled |
| | 45. | There is no evidence in the record of temporary interior walls ever being constructed at the La Brea Property. | Plan Agent objects to this statement as 400 SLB makes a statement without citing to any fact in the record, uses a word ("temporary") which is not defined and has multiple meanings, and thus attempts to place the onus on Plan Agent to prove a negative and further to guess at the meaning of an undefined word in the process.<br><br>Plan Agent refutes this negative statement as follows:<br><br>(1)  The Drywall itself did not appear in any Plans nor the Image Book, and 400 SLB approved of the plans and image book which showed an absence of the Drywall, thus evidence exists that 400 SLB consented to the Drywall being temporary and Ace Museum treated it as either temporary, or not worthy of being identified in the plans for the renovation project.<br><br>(2)  The record indicates that Mr. Chrismas and Ace Museum built numerous walls at the Premises.  Evidence indicates that Mr. Chrismas/Ace Museum did not take down any walls thus built, other than the Drywall which Mr. Chrismas removed in early 2011.<br><br>(3)  The record indicates that the Drywall was built of materials that made it not suited for the |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | location in which it was placed, and its long exposure to the elements, unprotected from wind and rain, meant that it could not permanently remain at that location.  In fact, it was removed after being in place for only approximately three years.<br><br>(4)  The record indicates that Ace Museum built exhibition space (Exhibit D-18) which were constructed solely for use in the exhibition that occurred there.  There is no evidence that such interior walls were intended to be a permanent part of the Premises.<br><br>☐  Sustained<br>☐  Overruled |
| 46. | | Mr. Hernandez testified that no walls constructed by the lessee at the La Brea Property were ever demolished or taken down (other than the Pilaster holding the Banksy, as defined and addressed below) and there is no evidence in the record of any walls, other than the Pilaster, being demolished or taken down by the lessee. | No objection.<br><br>☐  Sustained<br>☐  Overruled |
| | **The Installation of the Pilaster** | | |
| 47. | | Sometime between July 2007 and September 2008, as part of the Renovation Project, Mr. Chrismas, who at the time was the lessee of the La Brea Property under the Lease, directed the installation of a vertical, furred, boxed-out pilaster (the "Pilaster") against a cinderblock wall located on the first floor, northwest corner of the La Brea Property, which is identified by a red-orange vertical rectangle in Exhibit D1. | No objection.<br><br>☐  Sustained<br>☐  Overruled |
| 48. | | The Pilaster was precisely carved into, or "scribed "into the uneven surface of the cinderblock wall to which it was attached so that there are no gaps between the rough surface of the block and even edge of the Pilaster. | No objection.<br><br>☐  Sustained<br>☐  Overruled |
| 49. | | Around the same time the Pilaster was installed, a substantially identical pilaster (the "Opposite Pilaster") was installed against a split face cinderblock wall directly opposite of the Pilaster, on the first floor, southwest corner of the La Brea Property. | Plan Agent objects to the words "Around the same time the Pilaster was installed" as unsupported by the record.  Mr. Chrismas's declaration states only: "A similar pilaster needed to be installed on the southern wall of the Service Corridor so that the look was uniform." |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |  |
|---|---|---|---|
|  |  |  | There is also was no evidence offered as to the composition or nature of that second pilaster, and thus there is no evidence—beyond the picture identified in Exhibit D-1--to support a finding that it was "substantially identical". |
|  |  |  | ☐ Sustained<br>☐ Overruled |
|  | 50. | The Pilaster and the Opposite Pilaster were intended by Mr. Chrismas to function as part of a display running the entire first floor of the La Brea Property visible from La Brea Avenue, and be enclosed on the exterior side closest to La Brea Boulevard by large plate glass window running parallel to La Brea Avenue, and on the interior side of the Pilaster and the Opposite Pilaster by an interior wall running parallel to La Brea Avenue upon which a light sculpture by artist Robert Irwin would be installed. | The evidence indicates that the Robert Irwin light sculpture was a semi-freestanding structure in that it would run the length of the side of the Property, and then be braced against various things. There was no evidence/testimony that the light sculpture would instead be mounted on a wall running parallel with La Brea avenue, several feet inside the plate glass window running the same distance. Mr. Chrismas's trial declaration in ¶11 and ¶12 refers to the Robert Irwin light sculpture, but nowhere mentions that the sculpture itself would be mounted on a separately-built wall.<br><br>For these reasons, Plan Agent objects to the phrases "an interior wall running parallel to La Brea Avenue upon which" and then the words "would be installed" at the end of the passage. |
|  |  |  | ☐ Sustained<br>☐ Overruled |
|  | 51. | Mr. Chrismas testified that he intended that the Pilaster, Opposite Pilaster, the plate glass window, the wall holding the Robert Irwin light sculpture and the Robert Irwin light sculpture itself would be permanent additions to the La Brea Property. Mr. Chrismas testified that he had already acquired the light fixtures required for the Robert Irwin light sculpture. | This statement is inaccurate regarding "the wall holding the Robert Irwin light sculpture" for the reasons stated in the response to FOF #50.<br><br>Regarding the types of things that Mr. Chrismas testified he intended to be permanent, the cited testimony relates only to the Robert Irwin light sculpture itself, and to the "pilaster and the pilaster on the southern end of |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | the property" (Day 4 Transcript, 59:7),<br><br>Plan Agent acknowledges that common sense would indicate that the plate glass window was not intended to be temporary, but notes that no witness testified to that issue. Probably a better evidentiary basis for that statement is the architectural plans, which identify the plate glass window.<br><br>☐ Sustained<br>☐ Overruled |
| 52. | | According to the testimony of Mr. Hernandez, the Pilaster was attached to the La Brea Property in the following manner: (1) metal beams supporting the pilaster were attached by use of power driven nails into the concrete floor and into the underlying split face cinderblock wall; and (2) the metal beams were also connected to the ceiling soffit by bolts. The Plan Agent has not offered evidence to the contrary and his expert Mr. Ottinger conceded that the Pilaster could have been attached to the concrete floor using power driven nails, based on his observations of the Banksy. | Plan Agent objects to the final sentence of this finding. No party testified as to how the Drywall was attached to the Premises, until Mr. Hernandez gave his oral testimony at trial. Prior to this testimony, no one provided Mr. Ottinger or this Court with admissible evidence on this issue. Plan Agent submitted his own proposed findings of fact based upon Mr. Hernandez's testimony which are consistent with these statements.<br><br>☐ Sustained<br>☐ Overruled |
| 53. | | Although not specifically identified in the Museum Plans, the installation of the Pilaster and Opposite Pilaster appears to be consistent with the overall Renovation Project reflected in the Museum Plans, the Image Book and the Model. | Plan Agent objects to this statement as the term "appears to be consistent" is vague and ambiguous.<br><br>There is no dispute that the "Pilaster and Opposite Pilaster" did not show up in the Museum Plans, Image Book, or Model (Exhibits D-9, D-12, and D-13). The Plans show that a door would open onto the cinderblock wall where the Drywall was located, so the Plans as written are inconsistent with the Drywall remaining in place.<br><br>The statements in Mr. Chrismas's declaration, at ¶9 and , ¶10 relate solely to the Plans, Image Book, |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |  |
|---|---|---|---|
|  |  |  | and Model and do not mention the "Pilaster and Opposite Pilaster". |
|  |  |  | Plan Agent has no objection to the pictures admitted at trial that show the location of the Drywall. Plan Agent acknowledges that those pictures can form an evidentiary basis as to the appearance of the Premises. |
|  |  |  | ☐ Sustained<br>☐ Overruled |
|  | 54. | The Plan Agent has failed to present evidence sufficient to demonstrate whether Mr. Chrismas received the consent of 400 SLB to install the Pilaster for the following reasons: (1) there is no document admitted into evidence evidencing 400 SLB's consent to build the Pilaster; (2) neither Mr. Chrismas nor Mr. Dayan could recall whether consent was given to build the Pilaster; (3) "hand marked" or "redlined" referenced in the Lease Addendum and the July 20, 2006 Letter have not been submitted into evidence; (4) the Pilaster does appear to be consistent with the general description of work contained in the July 20, 2006 Letter and the Building Permit; (5) portions of the La Brea Property where the Pilaster would be incorporated can be seen in the Model and Image Book; (6) the Pilaster is not specifically identified in the Museum Plans, although the glass wall and interior wall on which the Robert Irwin light sculpture, which the record reflects would be supported by the Pilaster are identifiable in the Museum Plans. | Plan Agent objects to the entirety of this statement.  Testimony at trial from Mr. Chrismas and Mr. Dayan was that neither could recall either receiving, or giving consent to build the Drywall. Likewise, neither witness could definitively state that consent was not requested/not given.<br><br>Circumstantial evidence of consent to build the Drywall exists:<br><br>(1) 400 SLB never objected to the existence of the Drywall, despite Mr. Dayan stating in his trial declaration that he saw it in 2009, and Fortuna Management being familiar with the Property and thus, being aware of the Drywall;<br><br>(2) the Lease, Addendum, and Exhibit "B" to the Addendum discuss at length all of the activities Mr. Chrismas intended to perform on the Property, many of which he did perform, the Drywall falls within the scope of the work Mr. Chrismas stated he would perform, and Mr. Dayan stated at trial that he agreed with all of the statements contained in the Lease and Addendum;<br><br>(3) the First Amendment to the Lease specifically states, in paragraph 3, that 400 SLB consents to the Alterations Mr. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | Chrismas has made to the Property, and evidence indicates that the Drywall was installed prior to this date;<br><br>(4)  400 SLB states in this Finding of Fact that the Drywall was "consistent with the general description of work contained in the July 20, 2006 Letter and the Building Permit"; and<br><br>(5)  Mr. Dayan testified that he did not see the Model until 2017, so the Model is not relevant to a discussion of consent versus non-consent.<br><br>☐ Sustained<br>☐ Overruled |
| 55. | In early 2010, Mr. Chrismas learned from Pest Control, the organization of the anonymous street artist "Banksy", that Banksy and representatives of Pest Control would be in the Los Angeles area in April 2010 for the Los Angeles premier of Banksy's documentary "Exit Through the Gift Shop". | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 56. | Prior to Banksy' s planned arrival in the Los Angeles area in April 2010, Mr. Chrismas had been working with Pest Control regarding Banksy possibly holding an exhibition at the La Brea Property. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 57. | On or about April 9, 2010, Mr. Chrismas had a key delivered to Pest Control staff so the anonymous artist could discretely access the premises in the evening to assess whether to hold an exhibition at the La Brea Property. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 58. | On or about April 10, 2010, Mr. Chrismas went to lunch with representatives from Pest Control during which they discussed the upcoming movie premier and a potential Banksy exhibition at the La Brea Property.  At no point during lunch did they discuss Banksy spray painting an artwork directly on the La Brea Property. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 59. | Upon Mr. Chrismas's return from lunch on or about April 10, 2010, he discovered that, unbeknownst to him, what appeared to be an artwork created by the anonymous artist Banksy had been spray painted on the Pilaster. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |

| | | |
|---|---|---|
| 60. | Pictures of the Banksy artwork (the "Banksy") spray painted on the Pilaster as of April 11, 2010 are reflected in the online article admitted into evidence as Exhibit D2. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 61. | The appearance of the Banksy created much public interest and Mr. Chrismas became concerned that the Banksy may be stolen, damaged or destroyed. Therefore, Mr. Chrismas hired a 24-hour guard to protect the artwork. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | **The Removal of the Banksy** | |
| 62. | Mr. Chrismas testified that it was expensive and not feasible for a 24-hour guard to protect the artwork on a long term basis. In order to protect the Banksy, on or about April 14, 2010 Mr. Chrismas instructed his staff to cut out that portion of the Pilaster on which the Banksy was painted. | Plan Agent objects to the portion of this statement that states "protect the Banksy". 400 SLB admits that it was expensive to maintain a 24-hour guard, and that a security guard was offered money to allow him to be tied up so the Banksy could be stolen. There is thus evidence of a number of reasons that Ace Museum removed the Banksy from the Drywall. Summarizing those reasons as to "protect the Banksy" is too narrow.<br><br>☐ Sustained<br>☐ Overruled |
| 63. | A video posted to YouTube on April 18, 2010, which has been admitted into evidence as Exhibit D27, shows the process of the Banksy's removal in a destructive manner, which involved the use of a reciprocal saw and other tools to cut through the drywall and underlying metal beams of the Pilaster so that the portion of the Pilaster on which the Banksy was painted could be extracted from the Pilaster. | Plan Agent objects to the inclusion of the phrase "in a destructive manner" as that phrase is ambiguous. As shown in the video, the Banksy was removed from the Drywall very carefully and as 400 SLB urges the Court to find in FOF #62, Mr. Chrismas sought to protect the Banksy. To the extent there was a type of "manner" in which the Banksy was removed, it was a "careful" or "protective" manner.<br><br>☐ Sustained<br>☐ Overruled |
| 64. | Following removal of the Banksy, pictures of the LA Brea Property admitted into evidence show that portions of the Pilaster above and on the sides of where the Banksy was cut out did not collapse | No objection.<br><br>☐ Sustained<br>☐ Overruled |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | or fall due to the Banksy's removal and remained affixed to the La Brea Property. | |
| | 65. | Following removal of the Banksy, it was moved into a storage facility of the Debtor (the "Storage Facility"). | Mr. Chrismas' declaration in paragraph 20 does not identify whose storage facility the Banksy was moved to.  The phrase, "of the Debtor," is not substantiated and it appears that the Banksy was moved to the Cochran Location which was not owned by the Debtor, but by Ace Gallery New York.  See Joint Statement, 8:19.  For this reason, Plan Agent objects to the phrase "of the Debtor" being included in this statement.<br><br>☐ Sustained<br>☐ Overruled |
| | 66. | Neither Mr. Chrismas, nor any other representative of Ace Museum informed Mr. Dayan or any other representative of 400 SLB of the appearance Banksy, the extraction and removal of the Banksy from the La Brea Property and/or the moving of the Banksy to the Storage Facility. | Plan Agent objects to the entirety of this statement, as not supported by the evidentiary record.<br><br>Mr. Chrismas's declaration at paragraph 22 states that he personally did not so inform 400 SLB.  His declaration does not extend to "any other representative of Ace Museum."<br><br>Mr. Dayan's declaration at paragraph 16 states only that at no point was Mr. Dayan aware that Mr. Chrismas had "cut out a portion of the wall on which a painting appeared."<br><br>There is no testimony at trial indicating that no other representative of Ace Museum informed any representative of 400 SLB of the existence or removal of the Banksy.  Further, the evidence is that 400 SLB did know about it, as Mr. Chrismas's testimony at trial was that:<br><br>"It was generally known, by everyone that was associated or close to the art world and the museum, the Premises, and what |

| | | | |
|---|---|---|---|
| | | | Ace Museum was doing at the Premises, that the Banksy existed." |
| | | | Day 4 Transcript, 34:3. |
| | | | Evidence at trial also indicates that it was well known that the Drywall had a portion removed from it, as the Drywall remained in its cut condition from April 2010 to early 2011, the Drywall was openly viewable from La Brea Avenue, and Fortuna Management, which was 400 SLB's representative at the Premises, was on the Premises regularly.<br><br>☐ Sustained<br>☐ Overruled |
| 67. | The Plan Agent has failed to present sufficient evidence demonstrating that 400 SLB ever knew about the Banksy prior to the Plan Agent's filing of the Application. Mr. Dayan has testified that he never knew about the Banksy and the emails the Plan Agent has submitted into evidence in this regard (Exhibits P32-P34) reflect only that Mr. Dayan was confused and did not show a clear understanding that the Banksy had appeared at the La Brea Property | | Plan Agent objects to this statement in its entirety.<br><br>Mr. Chrismas's testimony at trial was that:<br><br>"It was generally known, by everyone that was associated or close to the art world and the museum, the Premises, and what Ace Museum was doing at the Premises, that the Banksy existed."<br><br>Day 4 Transcript, 34:3.<br><br>Evidence at trial also indicates that it was well known that the Drywall had a portion removed from it, as the Drywall remained in its cut condition from April 2010 to early 2011, the Drywall was openly viewable from La Brea Avenue, and Fortuna Management, which was 400 SLB's representative at the Premises, was on the Premises regularly.<br><br>Additionally, on August 4, 2010, Mr. Dayan received an email from Angela Hui from Cathay |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | bank, in which she recommended Mr. Dayan check out a link that "talks about your property at 400 S. La Brea."  Mr. Dayan briefly reviewed the linked article, which mentioned that the Banksy appeared at the Premises. Exhibit D-16.<br><br>Further, on December 13, 2011, Mr. Dayan received an email from Mike Smith—a principal of 400 SLB--in which Mr. Smith forwarded an article regarding a large Vladimir Lenin head that appeared at the Premises, that also stated that a Banksy appeared and was removed from the Premises.  Mr. Dayan read that email as well.  Exhibit P-33.<br><br>☐    Sustained<br>☐    Overruled |
| 68. | The record reflects that no consent was obtained from 400 SLB to remove either the Pilaster or the Banksy. | | Mr. Chrismas's declaration at paragraph 22 does not address this issue at all.  Instead, it states that Mr. Chrismas did not inform 400 SLB the Banksy had been removed.  Likewise, Mr. Dayan's declaration at paragraph 16 does not support this statement. Instead, it states that "At no point in time was I aware that Mr. Chrismas removed anything of value…"<br><br>Evidence exists that Ace Museum had consent to remove the Banksy:<br><br>(1)  Paragraph 6.2(c) of the Lease permitted Ace Museum to remove the Banksy from as a Hazardous Substance.<br><br>(2)  Paragraph 7.1(a) of the Lease permitted Ace Museum to remove the Banksy because it was graffiti.<br><br>(3)  400 SLB consented to removal of the Drywall by consenting to the Plans, which |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | showed the Drywall as not existing at the Premises. |
| | | | (4)  400 SLB consented to removal of the Drywall by stating in the Addendum that it consented to removal of interior, non-structural walls to the extent that removal is consistent with plans submitted to 400 SLB. |
| | | | (5)  400 SLB consented to removal of the Drywall by not objecting to its removal at any time after April 14, 2010. |
| | | | ☐   Sustained<br>☐   Overruled |
| | 69. | Sometime after the removal of the Banksy from the La Brea Property, Mr. Chrismas had a "Press Release" prepared, on which he made handwritten notations. Among other things, the Press Release indicated that: (1) the Banksy would be reinstalled in the exact place from whence it was removed; and (2) the reason the Banksy was removed was to protect it. | Plan Agent objects to the phrase "the reason the Banksy was removed was to protect it" as an inaccurate summary of the words contained in Exhibit P-9 relating to that issue which includes:<br><br>"It became apparent that we would need a security guard to guard the security guard who was hired to protect Banksy's security Guard on Duty,"<br><br>and<br><br>"The security of the empty lot was a major concern – for theft, vandalism or other.  Ace Museum decided that it should not repair the wall where it had been cut out but leave it for the return of Banksy's security guard under adequate protection."<br><br>Thus, it is more accurate to say that "one reason" the Banksy was removed was to protect it.<br><br>☐   Sustained<br>☐   Overruled |
| | 70. | In the Press Release, there is no claim that Ace Museum owned the Banksy. | Plan Agent objects as this is a misstatement of the Press Release, which contains both text |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | and handwritten markings. The Press Release, in text, states that the Banksy "is now technically owned by Ace Museum" Its handwritten notes from Mr. Chrismas indicate he considered stating "under the watch of" or "under the care of" Ace Museum.<br><br>☐ Sustained<br>☐ Overruled |
| | 71. | The Press Release contained the following: "[the] Banksy, is now ~~technically owned~~ by Ace Museum" In place of "~~technically owned~~" there is a handwritten note by Mr. Chrismas with the phrase "under the ~~care~~ of" with "~~care~~" replaced by "~~watch~~", which was also deleted and as to which no further notation was made. The Press Release also stated that it was Ace Museum's responsibility to "protect, care and preserve the work." | Plan Agent has no objection to any but the final sentence, which is an imprecise summary of the statement contained in the Press Release. That sentence in the Press Release states: "Since it was created on Ace Museum's property, it became the responsibility of the museum to protect, care and preserve the artwork."<br><br>☐ Sustained<br>☐ Overruled |
| | 72. | There is no evidence in the record indicating whether or not the Press Release was disseminated to the public, and Mr. Chrismas testified that he did not know whether it was disseminated to the public. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 73. | There is no evidence in the record that Mr. Chrismas or Ace Museum claimed any ownership over the Banksy. Rather the evidence indicates only that Mr. Chrismas intended to protect the Banksy through removal and safekeeping. | Plan Agent objects to this statement in its entirety, for the following reasons:<br><br>(1) The phrase "claimed any ownership over the Banksy" is vague and ambiguous, and can be narrowly read to relate to Mr. Chrismas's written or oral communications, or broadly read to mean actions.<br><br>(2) The evidence indicates that Ace Museum removed the Banksy and placed it in storage controlled by Mr. Chrismas. That indicates a claim of ownership by Mr. Chrismas.<br><br>(3) The evidence indicates that Mr. Chrismas did not return the Banksy to 400 SLB upon Ace |

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | Museum vacating the Premises. That indicates ownership of the Banksy. |
| | | | (4)  The Press Release states that the Banksy is "technically owned" by Ace Museum and that the Banksy was "created on Ace Museum's property". |
| | | | (5)  Mr. Chrismas stated at trial that the Banksy was painted on Ace Museum's property.  Day 4 Transcript, 73:9-74:6. |
| | | | (6)  The Lease itself states that Trade Fixtures, Lessee-Owned Utility Installations, and Lessee-Owned Alterations, are property of the tenant, |
| | | | (7)  Mr. Chrismas testified at trial that after removing the Banksy, he had no belief that the Banksy belonged to 400 SLB.  Day 4 Transcript, 30:8. |
| | | | (8)  Mr. Chrismas testified at trial that he believed the appearance of the Banksy was wonderful for him.  Day 4 Transcript, 68:6 |
| | | | ☐ Sustained<br>☐ Overruled |
| | 74. | As to the removal of the Banksy, Mr. Chrismas further testified that the "Banksy was put in a safe zone, so that it could be replaced where it was removed the moment the window was put in and the building was secure". | No objection.<br><br>Note:  There is a missing "to" between the words "replaced" and "where."<br><br>☐ Sustained<br>☐ Overruled |
| | 75. | Graffiti was a regular occurrence at the La Brea Property and, in each instance, it was cleaned from the surface of the property or painted over. Graffiti was never removed through the removal, destruction or the cutting away of the improvements of the La Brea Property and replacing them. | Plan Agent objects to the entirety of this statement.  The Banksy was graffiti, and it was removed from the Premises.  Thus, it is incorrect to say that graffiti was never removed from the Premises.<br><br>Further, this statement mischaracterizes the cited testimony of the witnesses. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | It is correct that Mr. Hernandez stated at trial he did not cut away structures or parts of walls, however Mr. Hernandez did not begin working at the Premises until 2011.  He also stated that he would "scrub it off the wall somehow".  Day 2 Transcript, 78:4. |
| | | | Mr. Dayan testified only that he recalled seeing graffiti at the Premises, and that when he did see graffiti, he contacted Fortuna Management to take care of it. |
| | | | Mr. Chrismas testified that the tenant would clean graffiti "every single day" and that every landlord in the area "had to go and remove graffiti". |
| | | | Thus, the only witness as to the issue stated is Mr. Hernandez, who stated that he did not cut away structures or parts of walls, to remove graffiti. |
| | | | ☐    Sustained<br>☐    Overruled |
| 76. | | The Banksy was never treated by Mr. Chrismas, Ace Museum, or any employee of Mr. Chrismas or Ace Museum in the same way as the graffiti which regularly appeared at the La Brea Property, in that it was never cleaned up or painted over. Instead, it was removed and moved into the Storage Facility at the direction of Mr. Chrismas. | This statement is not supported by any statement of Mr. Chrismas, including paragraph 20 of his trial declaration which is the only citation to the evidentiary record in support. |
| | | | As stated above more fully in response to FOF #75,, Mr. Hernandez is the only witness to testify as to how graffiti was removed at the Premises. |
| | | | Plan Agent objects to the entirety of this finding. |
| | | | ☐    Sustained<br>☐    Overruled |
| 77. | | Mr. Chrismas testified that he never considered the Banksy to be defacing graffiti, but considered the Banksy to be a "wonderful artwork". | Plan Agent objects to the inclusion of the phrase "never considered the Banksy to be |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | defacing artwork, but" |
| | | | The evidence indicates that Mr. Chrismas wrote the Press Release which is Exhibit P-9. In the Press Release, Mr. Chrismas uses the word "graffiti" numerous times in his discussion of the Banksy. |
| | | | Moreover, in his testimony at trial, Mr. Chrismas described the Banksy as graffiti, but "wonderful artwork", by stating: |
| | | | "Graffiti that you usually see on the street, 95-percent of it is usually very low-level art, or attempts at art, if not 98-percent." Day 4 Transcript, 72:5-7 |
| | | | ☐ Sustained<br>☐ Overruled |
| | 78. | Mr. Chrismas testified that he never attempted to, nor did he ever intend to sell the Banksy. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 79. | Sometime between February 2011 and July 2011, Mr. Chrismas directed Mr. Hernandez to repair the Pilaster, which had a large hole in it where the Banksy had been cut out. | No objection.<br>☐ Sustained<br>☐ Overruled |
| | 80. | Mr. Hernandez decided, based on his observations of the remaining portions of the Pilaster, that he could not repair the Pilaster, but needed to rebuild it, as all the underlying metal support beams of the Pilaster had been cut out and thus the Pilaster was too damaged to repair. | Plan Agent objects to the restatement of paragraph 9 of Mr. Hernandez's statement in his trial declaration, to which Plan Agent does not object other than to the phrase "all the underlying metal support beams".<br><br>While Mr. Hernandez did state in his trial declaration that "all metal support beams were cut out", at trial Mr. Hernandez stated that studs remained that ran along the cinderblock wall. Day 4 Transcript, 119:2.<br><br>Regarding the balance of this finding, Plan Agent notes that this is a summary of Mr. Hernandez's trial declaration that is almost wholly unnecessary, given the brevity and clarity of |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | Mr. Hernandez's trial declaration in which he states, almost word for word, the findings here. Yet 400 SLB has changed certain words in a way that makes it not precisely accurate.<br><br>For instance, the statement "he could not repair the Pilaster" is not technically correct, as Mr. Hernandez instead states in his trial declaration that "I did not believe it could be repaired." Additionally, the statement that Mr. Hernandez "needed to rebuilt it" is also not precisely correct, as Mr. Hernandez stated in his trial declaration that he believed it could not be repaired at all, without being rebuilt.<br><br>Plan Agent acknowledges that these slight changes probably do no harm to the evidentiary record, but their lack of importance serves to underscore that it is probably better to simply use Mr. Hernandez's own words on the issue.<br><br>☐ Sustained<br>☐ Overruled |
| 81. | Mr. Hernandez removed the entire remaining Pilaster from floor to ceiling, including all remaining metal beams, and constructed a new pilaster (the "Replacement Pilaster") in the same manner as the Pilaster, including that (1) metal beams supporting the pilaster were attached by use of power driven nails into the concrete floor and into the underlying split face cinderblock wall; (2) the 17 ft. tall metal beams were connected to the ceiling soffit by bolts; and (3) every three feet lateral steel beams were installed to support the Replacement Pilaster. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 82. | Mr. Hernandez testified that he attached the Replacement Pilaster to the La Brea Property in a similar manner as the Pilaster, but that he used stronger gauge steel beams. | | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 83. | According to the record, the Banksy was never attached to Replacement Pilaster and was not | | No objection. |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | otherwise reinstalled at the La Bea Property. | ☐ Sustained<br>☐ Overruled |
| | 84. | While the Replacement Pilaster may have remedied the physical damage from the removal of the Pilaster, the Replacement Pilaster did not include the Banksy. | Plan Agent objects to this statement in its entirety.  There is no evidence of material damage to the Premises from Mr. Chrismas (1) constructing the Drywall, (2) removing the Banksy, or (3) removing the remainder of the Drywall in early 2011.  There is also no evidence that rebuilding a new pilaster "remedied the physical damage."<br><br>☐ Sustained<br>☐ Overruled |
| | 85. | The Pilaster and the Replacement Pilaster remained as part of the La Brea Property until approximately 2021. | Plan Agent objects to the words "Pilaster And the" in this statement.  As reflected in FOF #81, Mr. Hernandez "removed the entire remaining Pilaster" some time in 2011, thus the "Pilaster" could not remain on the property until 2021.<br><br>☐ Sustained<br>☐ Overruled |
| | | **The Plan Agent's Custody of the Banksy** | |
| | 86. | Upon the Plan Agent's appointment in April 2016, he took control of the Storage Facility and thus took possession of the Banksy stored therein. Thereafter, the Plan Agent moved the Banksy to a storage location secured by him. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 87. | While in possession of the Banksy, the Plan Agent attempted to authenticate the Banksy artwork. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 88. | While in possession of the Banksy, the Plan Agent also attempted to value the Banksy with an appraiser. | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| | 89. | Although never obtaining an appraisal of the Banksy, Mr. Leslie testified that he believed the Banksy is worth somewhere between $10,000 to $250,000. | Plan Agent objects as this is a mischaracterization of Plan Agent's testimony.<br><br>Plan Agent testified that he spoke with an auction house and (in response to a question as to whether he received an indication of the value of the Banksy) stated " … I believe the range was, you know, from |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | $10,000 to $250,000." <br><br> ☐ Sustained <br> ☐ Overruled |
| 90. | | While in possession of the Banksy, the Plan Agent directed his staff to prepare a detailed "Condition Report" dated May 8, 2019, which has been admitted into evidence as Exhibit P6, describing the Banksy and containing numerous pictures of the artwork. The Plan Agent testified that the preparation of the Condition Report was "standard operating procedure" and prepared for all artworks in his possession. | No objection. <br><br> ☐ Sustained <br> ☐ Overruled |
| 91. | | The Banksy remains in the custody of the Plan Agent at a storage location located in Vernon, California as of the date of the Evidentiary Hearing. | No objection. <br><br> ☐ Sustained <br> ☐ Overruled |
| 92. | | The record does not indicate that the Plan Agent ever informed 400 SLB of his custody of the Banksy until the filing of his Application and the Plan Agent's testimony does not otherwise indicate that he informed 400 SLB that the Banksy was in his custody prior to the filing of his Application. | Plan Agent objects as 400 SLB directs the Court to review the entire adversary proceeding docket, and bankruptcy docket, in support of this statement, and cites 110 consecutive pages of testimony without directing the Court's attention to any particular one. <br><br> ☐ Sustained <br> ☐ Overruled |

## B.    CONCLUSIONS OF LAW

The below chart identifies each of the 52 proposed conclusions of law contained in the Proposed Findings, and Plan Agent's responses to those conclusion. All emphasis is in the original. Capitalized terms that are not otherwise defined have the meaning given them in Plan Agent's proposed findings of fact and conclusions of law, submitted on March 15, 2022 [Docket No. 1257].

| NO. | CONCLUSIONS OF LAW | RESPONSE |
|---|---|---|
| | **General Procedure** | |
| 1. | The Plan Agent's filing of the Application initiated this contested matter governed by Bankruptcy | There must be an actual dispute for there to be a contested matter. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | Rule 9014. | Thus, filing an application is not sufficient to initiate a contested matter, though an opposition to an application may initiate one. |
| | 2. | Given that the Plan Agent, through his Application, is asserting a right to execute on the Banksy as property of Ace Museum, and that 400 SLB, through their 400 SLB Opposition, asserts an adverse claim to the Banksy, the Court finds that this matter should proceed as an action to quiet title under California Code of Civil Procedure § 760.010, *et seq.* | No objection.<br><br>☐   Sustained<br>☐   Overruled |
| | 3. | As the Plan Agent commenced this contested matter through the filing of his Application, he holds the burden of proof by a preponderance of evidence. | No objection.<br><br>☐   Sustained<br>☐   Overruled |
| | | **The Lease and the Pilaster** | |
| | 4. | The terms of the Lease govern the respective rights of lessor 400 SLB and lessee Ace Museum and/or Mr. Chrismas (as applicable) over the Pilaster. | Plan Agent agrees that the Lease governs disputes as to issues that fall within the scope of its terms. |
| | 5. | The Pilaster does not constitute a "Trade Fixture" under Paragraph 7.3(a) of the Lease, as it cannot be reasonably viewed as "machinery or equipment", as required under the Lease for Trade Fixtures. The Pilaster was: (1) consistent with, and appeared integrated into the Renovation Project; (2) lost any individual identity outside of such purpose when attached to the real property; and (3) did not actively perform any function or service other than serving as an element of the real property's construction. | The Drywall meets the definition of a Trade Fixture as that term is used in Paragraph 7.3(a) of the Lease because it was an object built by Mr. Chrismas using goods he owned or controlled, for the purpose of conducting his business at the Premises, and thus meets the California Commercial Code definition of equipment as "all goods used for business purposes, except for inventory and farm products." Cal. Com. Code § 9102(a)(33).<br><br>Further, the Drywall had all the characteristics that Mr. Pagliassotti identified were relevant to determining whether an object is a trade fixture, as it was:  (1) brought in by a tenant and placed at a leased location, (2) used so long as the building is occupied, then removed when the tenant leaves, (3) bolted to something, but could be removed without damage to the premises. Day 4 Transcript, 169:20-171:2. |

| 6. | The Pilaster does not constitute a "Utility Installation" under Paragraph 7.3(a) of the Lease, as it does not constitute "floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing" as defined under the Lease. | The Drywall meets the definition of a "Utility Installation" as that term is used in Paragraph 7.3(a) because it was installed to be part of an electrical distribution system that would hold electrical cables and provide electricity to a Robert Irwin light sculpture. |
|---|---|---|
| 7. | The Pilaster was an Alteration defined under Paragraph 7.3(a) of the Lease, as it not a "Trade Fixture" or "Utility Installation" as defined under Paragraph 7.3(a) of the Lease, and because the Pilaster was a "modification of the improvements [of the La Brea Property]… whether by addition or deletion". | To the extent the Drywall does not meet the definition of a Utility Installation or a Trade Fixture under the Lease, then it met the definition of an Alteration. |
| 8. | Pursuant to Paragraph 7.3(a) of the Lease, the Pilaster was a "Lessee Owned Alteration" as it was an "Alteration" made by the lessee. | To the extent the Drywall does not meet the definition of a Utility Installation or a Trade Fixture under the Lease, then it was a "Lessee Owned Alteration" during its existence at the Premises until it was removed in 2011. |
| 9. | Pursuant Paragraph 7.4(a) of the Lease, although the lessee held certain ownership rights to the Pilaster as a "Lessee Owned Alteration", it was at all times contractually deemed "part of the Premises", i.e., part of the La Brea Property. | Paragraph 7.4(a) of the Lease states in part that Lessee Owned Alterations "shall be the property of Lessee, but considered a part of the Premises." |
| 10. | Because, under Paragraph 7.4(a) of the Lease, the Pilaster was considered part of the La Brea Property, any ownership rights of the lessee in the Pilaster as a "Lessee Owned Alteration" were subject to 400 SLB's ownership rights in the real property. | Paragraph 7.4(a) of the Lease states that prior to termination of the Lease, the ownership right of tenant to Lessee Owned Alterations is subject only to "Lessor's right to require removal or elect ownership as hereafter provided." |
| 11. | When the Lease terminated, which occurred no later than the date that the UD Judgment was entered (i.e. September 2, 2016), pursuant to Paragraph 7.4(a) of the Lease, any rights the lessee may have held in "Lessee Owned Alterations" were forfeited and all "Lessee Owned Alterations" became the sole property of the lessor 400 SLB. | This is not necessarily true, as Paragraph 7.4 of the Lease states that such transfer of Lessee Owned Alterations occurs "Unless otherwise instructed per paragraph 7.4(b) hereof". |
| | **The Lease and the Banksy** | |
| 12. | Pursuant to Paragraph 7.3(a) of the Lease, the | 400 SLB uses term "Banksy" in |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | Banksy when painted on to the Pilaster, was an "Alteration", as it was a "modification of the improvements [of the La Brea Property]… whether by addition or deletion". | this context to mean the particles of spray paint that were sprayed upon the Drywall, creating the art object that is now referred to as the "Banksy". Pursuant to California law of Accession, that spray paint did not keep its own separate legal existence, but became the property of Ace Museum, which owned the Drywall upon which it was placed.<br><br>400 SLB cites no law for the proposition that spray paint that appears on leased premises can qualify as an "Alteration" as that term is used in this case. Further, treating such spray paint as an "Alteration" which would require consent to modify, is contrary to Paragraph 7.1 of the Lease which requires the tenant to remove graffiti which appears on the premises. |
| 13. | Pursuant to Paragraph 7.3(a) of the Lease, the Banksy did not constitute a "Lessee Owned Alteration" as it was not affixed to the La Brea Property by the lessee. | The spray paint particles that formulate the art referred to in this case as the "Banksy" became owned by the owner of the Drywall, upon its appearance, pursuant to California law regarding accession. |
| 14. | Because the Pilaster was deemed part of the La Brea Property pursuant to Paragraph 7.4(a) of the Lease, the Banksy, which was affixed to the Pilaster via spray paint, was, in turn, deemed part of the La Brea Property upon affixation. | The art known as the "Banksy" was not "affixed to the Pilaster via spray paint" as the particles of spray paint are the only thing that the "Banksy" artwork is comprised of. As the Drywall was owned by Ace Museum at the time, California accession law provides that the those particles of spray paint became owned by Ace Museum as well. |
| | **The Applicable Industry Standards** | |
| 15. | 400 SLB's expert, Mr. Pagliassotti is sufficiently qualified to testify as an expert on industry standards ("Industry Standards") relating to the use and application of the Lease in the applicable industry, based on, among other things, the following: (1) since 2006, Mr. Pagliassotti has been a lead member of the AIRCRE contracts committee which drafted the subject form Lease, (2) Mr. Pagliassotti has written two books and | 400 SLB conflates two separate concepts in this statement: (1) that the parties used some form of a lease the AIRCRE Committee prepared at some point, as a base document which the parties then modified, and (2) the "Lease" includes not only changes to the base document, but an Addendum of significant length, and an Exhibit "B" to the |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |
|---|---|---|
|  | conducted seminars and other educational programs regarding the commercial leases; (3) Mr. Pagliassotti has over 35 years' experience regarding commercial lease transactions; and (4) Mr. Pagliassotti has overseen and/or managed construction projects, including tenant improvements, worth tens of millions of dollars. The Plan Agent has not objected to the qualifications of Mr. Pagliassotti as an expert. | Addendum, as well as a First Amendment to the Lease which is not made on an AIRCRE form.<br><br>Thus Mr. Pagliassotti is not qualified to testify to industry standards as to the "Lease" as that term is defined in this case, but is qualified to testify as to form leases drafted by the AIRCRE Committee. |
| 16. | According to Industry Standards, a principal purpose of Paragraph 7.4(a) of the Lease, which deems Lessee Owned Alterations "property of the Lessee, but considered a part of the Premises" was to shift the insurance obligation for Lessee Owned Alterations from the lessor (under Paragraphs 1.8 and 8.3) to the lessee (under Paragraph 8.4). | Mr. Pagliassotti testified that the purpose was to make clear who owned the alteration. See Day 4 Transcript, 174:5:<br><br>"And I said, had the tenant built the wall and you hadn't declared ownership of that wall, that tenant, along with the computer equipment, would be making a claim for the wall and paying for the – the insurance company would be repairing the wall on the tenant's premium – or on the tenant's policy. |
| 17. | According to Industry Standards, the Lease did not intend that Paragraph 7.3(a) would give the lessee a right of possession for any Alterations | This sentence is unintelligible as the "Lease" cannot intend anything. Further, the Lease specifically states that Lessee-Owned Alterations are owned by the tenant. Thus it is false that the Lease is silent as to ownership or right of possession as to Alterations. |
| 18. | According to Industry Standards, improvement such as walls considered a permanent part of the real property. | There is no dispute that Mr. Pagliassotti states this in his report. However, the parties bargained for specific treatment of walls in the Lease, as evidenced in the Addendum Section 3 and Exhibit "B" to the Addendum, and as such the Industry Standard is not relevant here. California Civil Code 1019 shows that "permanence" is not a relevant consideration in determining whether a tenant can remove things built on leased property, and the relevant consideration is (1) damage that would be occasioned on an object's removal, and (2) whether |

| | | | |
|---|---|---|---|
| | | | the thing has become an integral part of the premises |
| | 19. | It is not within Industry Standards for a lessee to remove drywall from real property; drywall is considered a permanent improvement (i.e. a fixture). | The Lease contains specific statements as to the treatment of drywall under the Lease, specifically in Section 3 of the Addendum in which the tenant notifies 400 SLB that it will be regularly erecting and taking down interior, nonstructural walls and performing related drywall finish and repair. |
| | 20. | According to Industry Standards, furnishings, equipment and trade fixtures have a stand-alone value and retain an intrinsic value separate and apart from the real property and can be reinstalled in other locations to be used again. | Mr. Pagliassotti's report states: "Typically, Furnishings & Equipment have a stand-alone value." Mr. Pagliassotti does not include "trade fixtures" in this discussion.<br><br>The cited portion of Mr. Pagliassotti's testimony is that Mr. Pagliassotti views an object that can be removed without damage to the premises to be a trade fixture. Day 4 Transcript, 170:21. No portion of the transcript citation discusses "stand-alone value" and "intrinsic value". |
| | 21. | According to Industry Standards, removal of a permanent improvement cannot be done without damage to the improvement itself. | Mr. Pagliassotti's report does not contain this statement, nor does the statement make logical sense.<br><br>Further, the cited portion of the hearing transcript nowhere contains this statement. |
| | 22. | According to Industry Standards, drywall has no intrinsic value; once it is removed, it cannot be reused. | Mr. Pagliassotti's report does contain this statement, However, he makes this statement only in the context of determining whether an object is "Furnishings & Equipment" – not a trade fixture. |
| | 23. | Applying the applicable Industry Standards, the Pilaster was a permanent improvement of the real property, based on the following: (1) the Pilaster, which is substantially similar to a wall, is considered a permanent part of real property; (2) it is not customary for a lessee to remove an alteration such as the Pilaster;. (3) the Pilaster, made of drywall and steel beams, did not have a stand-alone value separate and apart from the real property; (4) the Pilaster could not be removed | The term "permanent improvement" is not a relevant term in the Lease, nor is it relevant to California law relating to accession and removal of tenant improvements on property. The term, even if it had a precise definition which it does not, thus does not assist the Court in the determination of any relevant issue. The Lease |

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |
|---|---|---|
|  | without damaging the Pilaster itself; and (5) once removed, the components of the Pilaster could not be, and was not, reused. | contained terms regarding the installation and removal of Utility Installations, Trade Fixtures, and Alterations, and the concept of "permanence" is not relevant to any of the numerous terms relating to that, including paragraph 7.1 which specifically allows removal of Alterations.<br><br>It is also incorrect that "the components of the Pilaster could not be, and was not, reused." as the components of the Pilaster include the Banksy, which is now an art object with material value. |
|  | **The Lease and the Removal of the Pilaster and Banksy** |  |
| 24. | The removal of the Banksy (along with a portion of the Pilaster) separately constitutes an "Alteration" under the Lease, as it was a "modification of the improvements [on the La Brea Property]… whether by addition or deletion" as defined under Paragraph 7.3(a) of the Lease. | To the extent the Drywall is a Lessee Owned Alteration, this statement is correct. |
| 25. | Ace Museum was contractually prohibited from removing either the Pilaster and/or the Banksy from the La Brea Property and such unauthorized removal did not impact 400 SLB's rights to the Pilaster and/or the Banksy based on the following: (1) Paragraph 7.3(b) of the Lease requires, without exception, that lessee obtain the consent of lessor prior to the making of any Alterations to the La Brea Property; (2) certain exceptions to the consent requirement provided under Paragraph 7.3(b) contained in the form AIRCRE lease were specifically struck by agreement between the parties; (3) neither Paragraph 3 of the Lease Addendum nor the July 20, 2006 Letter explicitly supersede or carve out any exceptions to the consent requirement provided under Paragraph 7.3(b) of the Lease; and (4) the record reflects that no consent was obtained from 400 SLB to remove either the Pilaster or the Banksy, | Ace Museum was authorized to remove the Banksy pursuant to Paragraph 7.1(a) of the Lease, as it was graffiti, and pursuant to Section 6.2 of the Lease, as it was a Hazardous Substance. Those are exceptions to Paragraph 7.3(b) of the Lease which requires consent to make Alterations.<br><br>Unless the Court deems the Drywall to be a Utility Installation, the changes from the form Paragraph 7.3(b) are irrelevant as that language relates only to Utility Installations.<br><br>The Addendum states, on its face, that it explicitly supersedes the Lease and that also includes Exhibit "B" to the Addendum.<br><br>Additionally, 400 SLB consented to removal of the Drywall by consenting to the Plans, which showed the Drywall as not existing at the Premises. |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |  |
|---|---|---|---|
| 1 | | | Additionally, circumstantial evidence of consent exists due to the fact that 400 SLB did not object to a portion of the Drywall being removed any time after April 14, 2010—a fact which was open and knowable to any person who visited the Property or who walked past the Property on La Brea Avenue, from April 2010 until the remainder of the Drywall was removed and replaced some time in 2011. |
| 9 | | **The Value of the Banksy is a Relevant Consideration** | |
| 10 | 26. | The Court finds that the Banksy has, and at all times relevant, had substantial value, both economic and aesthetic, as is reflected in the record, as follows: (1) Mr. Leslie testified that the Banksy had an appraised value of between $10,000-$250,000 (2) Banksy is a world-renowned street artist; (3) Mr. Chrismas chose not to simply paint over or remove the Banksy, as was common with defacing graffiti, but instructed his staff to extract the Banksy from the La Brea Property for safekeeping; (4) Mr. Chrismas hired a 24-hour guard to protect the Banksy shortly after it appeared; (5) Mr. Chrismas drafted a press release explaining that Ace Museum was protecting Banksy and the artwork would be returned to the La Brea Property; (6) Mr. Chrismas moved the Banksy to the Storage Facility, rather than discard it; (7) Mr. Chrismas never intended to sell the Banksy; (8) after the Plan Agent took possession of the Banksy, he treated it as any other artwork under his care, including obtaining a Condition Report regarding the same; (9) Mr. Leslie sought to authenticate and appraise the Banksy and offer it for sale; and (10) Mr. Leslie and 400 SLB are now locked in contentious litigation over the artwork. | Plan Agent does not object to the Court finding that the evidence indicates that the Banksy has a value of between $10,000 and $250,000.  No other evidence of value was given.<br><br>Plan Agent disagrees with the conclusory statements in support of this finding, as follows:<br><br>Regarding (1), this is not correct, as Plan Agent testified that an auctioneer informed him that the Banksy could have a value of between $10,000 to $250,000.<br><br>Regarding (2), that is a correct statement.<br><br>Regarding (3), this statement is actually incorrect as Mr. Chrismas did choose to remove the Banksy from the Premises.<br><br>Regarding (4), that is a correct statement.<br><br>Regarding (5), the press release was drafted, and states numerous things, but there is no evidence that he was "explaining" anything as there is no evidence that the press release was to be distributed to anybody, or if so, who. |

| | | | |
|---|---|---|---|
| 1 | | | Regarding (6), that is a correct statement. |
| 2 | | | |
| 3 | | | Regarding (7), that is a correct statement which also shows Mr. Chrismas understood that he had the power to determine whether the Banksy was sold, or not. |
| 4 | | | |
| 5 | | | |
| 6 | | | Regarding (8), that is a correct statement. |
| 7 | | | Regarding (9), Plan Agent sought to authenticate and appraise the Banksy, and he filed the Application that gave rise to this contested matter. The remaining statements contained in this point are not correct. |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | Regarding (10), that is a correct statement. |
| 12 | | | |
| 13 | 27. | The Court's finding that the Banksy has substantial value, both aesthetic and economic, is an important consideration in this contested matter. | This statement is incorrect. The *Dreamland* court did discuss value, but in a different context. There, a lease stated, essentially, that all things at the premises were owned by the Landlord. The *Dreamland* court recognized an exception in the law for things of no material value, such as dirt, that would allow tenants to remove items even though the lease states they do not own them. The *Dreamland* court stated that that narrow exception could not apply in that case, because the removed object had value. Thus, the lease terms applied. |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | Here, the Lease applies to this dispute, and value of "Utility Installations," "Trade Fixtures", and "Lessee Owned Alterations" is irrelevant. |
| 24 | | | |
| 25 | | **The Banksy Does Not Constitute Graffiti Contemplated Under the Lease and Does not Fall under the Repair Obligations of the Lease** | |
| 26 | | | |
| 27 | 28. | Banksy is a world-renowned street artist, as recognized by the Second Circuit Court of Appeals as "appearing alongside President Barack Obama | No objection. |
| 28 | | | ☐  Sustained<br>     Overruled |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX  213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |
|---|---|---|
|  | and Apple founder Steve Jobs on Time magazine's list of the world's 100 most influential people" and his works have sold for hundreds of thousands, if not millions of dollars, including a "Girl with Balloon" painting which sold for $1.4 million, after which the work partially "self-destructed" via a hidden paper shredder insider the frame. |  |
| 29. | In California, graffiti is a form of vandalism punishable under California Penal Code § 594, which provides that one is guilty of vandalism if, with respect to personal or real property, he or she "defaces [that property] with graffiti or other inscribed material". | This is not a precise statement of the law, as other elements must also exist for "vandalism" to occur, including a mental state of being "malicious", and that the act cannot be allowed by other law.<br><br>California Penal Code Section 594 states in relevant part:<br><br>(a) Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism:<br><br>(1) Defaces with graffiti or other inscribed material.<br><br>(2) Damages.<br><br>(3) Destroys. |
| 30. | Under California common law, to "deface" is "[t]o mar the face, features, or appearance of; to spoil or ruin the figure, form, or beauty of; to disfigure. | This is an inaccurate statement from In re Nicholas Y., 85 Cal. App. 4th 941, 944 (2000). There, the question was whether defacing property by a marker pen which marker could be easily rubbed away, qualified as defacement. The Court did cite to the Oxford English Dictionary for a definition of the term, which is the language 400 SLB cites to, but did not adopt that definition of the term "deface", as that was not necessary to its holding. Its holding was limited to stating that the term "deface" did *not* include a concept of permanence or difficulty of erasure. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

31. The maintenance and repair obligations under Paragraph 7.1(a) of the Lease were not implicated when the Banksy appeared on the La Brea Property based on the following findings and conclusions: (1) the Banksy has, and at all times relevant, had substantial value, both economic and aesthetic; (2) the affixation of the Banksy did not "deface" the La Brea Property and did not adversely affect the repair or condition of the improvements thereon, but rather enhanced the value of such improvements; (3) Mr. Chrismas never considered the Banksy defacing graffiti, but considered it a "wonderful artwork"; (4) the actions of Mr. Chrismas and/or Ace Museum reflect that the Banksy was never treated as defacing graffiti, which would be traditionally painted over or cleansed from the La Brea Property; and (5) the Banksy was at all times relevant treated as a work of art by Mr. Chrismas, Ace Museum and/or the Plan Agent, the latter of which has secured the Banksy in storage and treated the Banksy as any other artwork in his possession.

Paragraph 7.1(a) required Ace Museum to remove graffiti, and that included the Banksy.  Plan Agent further responds to 400 SLB's numbered points as follows:

(1)  Correct that the Banksy has value, but incorrect that that is a relevant issue when it comes to (a) any term of the Lease, (b) any relevant aspect of California law including the California Penal Code.

(2)  When spray paint was applied to the Drywall, that constituted defacement as that term is used in the California Penal Code, and falls within the Oxford English Dictionary use of the term, as noted in In re Nicholas Y., 85 Cal. App. 4th 941, 944 (2000).  There is no discussion in In re Nicholas Y as to the value of the defacement, and that is because no part of that definition looks to value.  This Court heard repeated testimony from numerous witnesses as to the Drywall being made of materials, and being painted a certain way, in order for it to look a certain way regarding the objects around it such as ceilings, floors, and other walls.  Spray paint on the Drywall changed that.  Yes, Mr. Chrismas viewed that new item as valuable, but he also recognized that the Drywall was irrevocably altered.

(3)  Mr. Chrismas did testify that he viewed graffiti as artwork, but that most of it was "usually very low-level art, or attempts at art" Day 4 Transcript, 72:6".  Further, he referred to the Banksy as graffiti numerous times in the Press Release (Exhibit P-9) and when discussing the Banksy at trial, did not deny it was graffiti, instead denying only that it was "graffiti that needed to be removed".  Day 4 Transcript,

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| 1 | | | 72:3. |
| 2 | | | (4)  The term "defacing graffiti" is incorrect here, as all graffiti is defacing for the reasons 400 SLB points out in its citation to the California Penal Code and <u>In re Nicholas Y.</u>, 85 Cal. App. 4th 941, 944 (2000).  It is true that Mr. Chrismas treated the Banksy as graffiti which had value as a stand-alone art object. |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | (5)  This is a correct statement. Graffiti is art, as stated by Mr. Chrismas, albeit most graffiti is usually very low-level art, or attempts at art. |
| 9 | | | |
| 10 | 32. | Alternatively, even if the appearance of the Banksy implicated the repair obligations under Paragraph 7.1(a) of the Lease, the actions of Mr. Chrismas and/or Ace Museum fell outside of the scope of such repair obligations, as the destruction and removal of an underlying wall (i.e. the Pilaster) was not a reasonable means by which to clean up graffiti, based on the following findings and conclusions: (1) graffiti was a regular occurrence at the La Brea Property; (2) in each case, graffiti was cleaned from the surface on which it was painted, or painted over; (3) improvements constructed on the La Brea Property were never removed in order to clean up graffiti; (4) the Banksy itself was affixed to the La Brea Property using spray paint and could have reasonably been removed via use of paint to cover up the artwork; (5) there is no evidence in the record that, in order to "repair" the Pilaster after affixation of the Banksy, it was necessary for the Pilaster to be destroyed by way of cutting out the Banksy therefrom; (6) there is no evidence in the record that Mr. Chrismas and/or Ace Museum considered the act of removing the Banksy as a necessary "repair" of the La Brea Property; and (7) following extraction of the Banksy from the Pilaster, the Banksy was not discarded, but moved to a secure storage, in order to "protect" the Banksy. | Paragraph 7.1(a) specifically permits removal of Alterations in order to comply with its provisions, and there is no "reasonableness" component stated in that paragraph. Certainly there is a good faith component to the terms of a contract, and Mr. Chrismas's removal of the Banksy complied with that good faith requirement, as follows:

(1)  Mr. Chrismas did not hide the fact that he removed a portion of the Drywall.  That fact was immediately apparent to anyone who visited the Premises, or walked past the Premises, and the cut in the Drywall for a period of approximately one year.

(2)  Mr. Chrismas testified that he did attempt to keep the Banksy in place for a while, but the danger was too great.  In the Press Release (Exhibit P-9), he stated he would need to hire a security guard for his security guard.  At trial, he provided more information as to what he meant precisely by that:  one of his security guards reported being approached by a person or persons wanting to tie him up in exchange for a payment of |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   $10,000.  The Banksy became too dangerous to remain in its existing location.  Had it remained, it would have increased the liability of 400 SLB by being an attractive nuisance—a crime magnet.  Mr. Chrismas was not required to wait until a security guard was actually tied up, or worse, to solve the problem.  He did it in a way which preserved the Banksy.

Further, the evidence indicates that removing the Banksy did not even ruin the Drywall—at least, not initially.  Mr. Chrismas stated that he intended to return the Banksy to its same location – this would have restored the Drywall to its original condition, and meant that the original Drywall still had significant value, or perhaps even greater value now as a future frame that would hold the Banksy.  Mr. Chrismas stated in the Press Release that this is precisely what he intended to do, and would do, as soon as the plate glass window and other security features were in place.

The only reason the remaining Drywall was removed at all was because in early 2011 Mr. Chrismas instructed Mr. Hernandez to repair it, and Mr. Hernandez concluded he could not do so, without taking it down and rebuilding it, which is what he did.

(3)  This is addressed in response to FOF #75, above.  Briefly, Mr. Hernandez stated that he never cut out graffiti, but no other witness testified as to that issue, and Mr. Hernandez began working at the Premises only in 2011.

(4)  Covering up the spray paint with more paint would not have removed the spray paint, but

probably would have complied with the maintenance requirement of Paragraph 7.1. The artwork, in that situation would be permanently destroyed.

Whether or not that would have been "reasonable" is the subject of the articles this Court directed the parties to in the Court's tentative ruling posted before the hearing on January 14, 2022. The general takeaway from those articles is that for certain types of art, which the Banksy falls into, the law should consider whether there is a better way to balance the public good of having nice art, versus restrictions on personal rights such as the right to have no graffiti on one's property.  Plan Agent submits that it is reasonable to attempt to preserve such art, rather than destroy it, especially here as there are no conflicting rights implicated and Ace Museum owned the Drywall.

(5)  The reason there is no evidence on this is because it is common knowledge that spray paint is so sticky, that when it appears on a surface, there is no way to remove it from that surface without destroying the paint.  The concept of "stickiness" is discussed at length in the articles referenced by this Court in its January 14, 2022 tentative ruling.

(6)  The evidence indicates that the appearance of the Banksy caused an immediate crime problem and within days raised the robbery/assault threat at the Premises.  Mr. Chrismas described this in the Press Release as needing a security guard for his security guard. Thus, removal of the Banksy (or destruction of the Banksy) was necessary to fix this problem and maintain the Premises.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

|  |  |  |  |
|---|---|---|---|
| | | | (7)  This is a true statement, though there are other reasons besides "protecting the Banksy" that the Banksy was removed—as stated above. |
| | **Right of 400 SLB to Banksy and Pilaster Upon Removal** | | |
| 33. | Because the Pilaster and the Banksy were considered part of the La Brea Property pursuant to the terms of the Lease, and that they were removed without the consent of 400 SLB, 400 SLB maintains a right for immediate possession of the wrongfully removed Pilaster and Banksy under the common law doctrine of replevin. | | The Drywall at all times was owned by Ace Museum.  The doctrine of replevin applies when the removed chattel (here, the Banksy) is the property of someone other than the party who removed it.  Here, the removing party, Ace Museum, owned the Drywall.<br><br>Any cause of action would also fail due to application of Paragraph 7.1 of the Lease and 6.2 to the extent the Drywall became a hazardous substance, which did occur as Mr. Chrismas testified at trial that criminals approached his security guard and offered to tie him up.<br><br>Further, to the extent any such right did exist, 400 SLB failed to exercise that right as it became aware, or should have been aware, that a portion of the Drywall was removed in April 2010, but took no action and for that reason, to the extent any cause of action did exist, the statute of limitations on that cause of action ran, at the earliest, four years after the remainder of the Drywall was completely removed and replaced with a new pilaster. |
| 34. | Under California law, "[r]eal or immovable property consists of: (1) land; (2) that which is affixed to land; and (3) that which is incidental or appurtenant to land". | | This citation is not complete, as there is a fourth category of property identified in CC 658 that relates to growing crops (not a relevant issue here).  For that reason, the cited text is correct with the change of the word "consists of" to "includes" or, |

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | | | alternatively, ending the statement with an ellipses instead of a period. |
| 35. | Pursuant to California Civil Code § 660, something is "affixed to land", otherwise known as a "fixture", if "it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws…." | | This is another incorrect cite, as the word "fixture" appears in the title of CC 660, but not in the actual text of the statute.  Thus, to correct this statement, the statement should be that Pursuant to CC 660:<br><br>"A thing is deemed to be affixed to land when it is attached to it by roots … [insert remainder of cited language]" |
| 36. | In determining whether or not something is a fixture, California courts consider three criteria: (1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation. | | In the Court's tentative ruling posted before the January 14, 2022 hearing, the Court directed the parties to 3 Miller and Starr California Real Estate 4th, Section 9.42 (tests for whether an item is a fixture).<br><br>That section of Miller and Starr identifies six tests for when something is a fixture:<br><br>(1)  the manner in which the item is annexed to the underlying realty;<br>(2) its adaptability to the use and purpose for which the realty is used;<br>(3)  the intention of the party annexing the item;<br>(4)  the difficulty of removal of the item;<br>(5)  the destruction caused by the realty by its removal; and<br>(6)  the relationship between the parties. |
| 37. | Even if the Court were to disregard the provisions of the Lease and alternatively apply California law on fixtures, the Pilaster (and therefore the Banksy, which was later affixed thereto via spray paint) would constitute a fixture by meeting the California three part test, as follows: (1) it was attached to the La Brea Property via power driven nails into the concrete floor and into the underlying split face cinderblock wall and by bolts into the ceiling soffit; (2) the Pilaster was part of the Renovation Project and was constructed to | | Plan Agent agrees that the Drywall probably would meet the definition of a fixture, though not for the reasons stated by 400 SLB.<br><br>(1) there is no dispute as to how the Drywall was attached, and its method of attachment weighs in favor of it being a fixture;<br><br>(2) the Drywall was not |

48

serve a specific purpose with respect thereto, that is, it would be integrated into the façade of the building and be enclosed by a plate glass window and would also support an interior wall on which the Robert Irwin light sculpture would be installed; and (3) the record reflects that it was Mr. Chrismas' intention that the Pilaster would serve the specific purpose heretofore described in (2).

particularly adapted to its location, and did not even appear in Ace Museum's plans for the Renovation Project, however it was constructed to frame a Robert Irwin light sculpture and appears to have been reasonably adapted for that use.

There is no evidence that the Robert Irwin light sculpture would hang upon a wall, and there is no evidence that the Drywall would support such second wall. Testimony at trial was that the Robert Irwin light sculpture would run directly into the cinderblock wall, and the Drywall would either remain between the sculpture and the plate glass (Mr. Chrismas's testimony) or removed entirely (all diagrams contained in the Plans and Image Book).

(3) the intent of Mr. Chrismas when he constructed the Drywall was to frame a Robert Irwin light sculpture and look aesthetically pleasing. As such, his intent was to use the Drywall in connection with the business he ran at the Property.

(4) and (5): The Drywall was easily removed by Mr. Hernandez without damage to the Premises, which weighs against treating the Drywall as a fixture,

(6) Mr. Chrismas's relationship with 400 SLB was a standard landlord/tenant relationship. To the extent California law would be looked to, to determine whether Mr. Chrismas could remove the Drywall, courts would look to CC 1019, which states:

"A tenant may remove from the demised premises, any time during the continuance of his term, anything affixed thereto for

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | purposes of trade, manufacture, ornament, or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises."<br><br>Plan Agent notes, again, that the Banksy was not "affixed" to the Drywall by spray paint.  Rather, the art object is the spray paint itself, which bonded to the underlying Drywall and, as per California law regarding accession, became owned by the owner of the Drywall. |
| 38. | Given that the Lease sufficiently addresses "trade fixtures", California Civil Code § 1019 does not apply to the Pilaster. | | Plan Agent agrees that the Lease address all issues within the scope of its terms.  To the extent there is an issue that does not fall squarely within the scope of the terms of the Lease, then California law can be applied to interpret the terms of the Lease.<br><br>Here, should the Court determine the Drywall to fall within the definition of "Trade Fixture," then that controls this dispute, as Ace Museum had the ability under the Lease to remove Trade Fixtures at any time – there would be no need to look to CC 1019.  Should the Court determine the Drywall to be an Alteration, then CC 1019 might have applicability to the extent there is an issue that is not directly addressed by the Lease.  Plan Agent submits that one issue not directly addressed by the Lease is this:  the rights of 400 SLB should Ace Museum make an alteration "by deletion" without the power under the Lease, or consent, to do so (400 SLB's rights if the alteration is "by addition" are addressed in the Lease, which is the right to demand the alteration be removed).<br><br>As to that issue alone, reference |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL  213.626.2311  •  FAX  213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| 1 2 3 4 5 | | | to CC 1019 may be helpful as an indication of California public policy: that tenants may attach business-related things to property they lease, and can remove them later, provided that there's no material harm to the landlord in doing so. |
| 6 7 8 9 | 39. | Given that Banksy was not painted by, or at the direction of the lessee of the La Brea Property, California Civil Code § 1019 does not apply to the Banksy, as the statute only applies to activities of a lessee. | This is not correct, as CC 1019 applies to the Drywall, and the spray paint that appeared on the Drywall on April 10, 2010, by the California doctrine of accession under CC 1025, became owned by the owner of the Drywall. |
| 10 11 12 13 14 15 16 17 18 | 40. | Alternatively, even if the terms of the Lease did not supersede California Civil Code California Civil Code § 1019, the statute would not apply to the Banksy as the Banksy was not affixed by the lessee, and was affixed without the knowledge or consent of the lessee. Therefore, the Banksy could not be something affixed to the La Brea Property for the purposes of a lessee's "trade, manufacture, ornament, or domestic use" as required by the statute. | The Drywall itself was built for the purpose of "trade, manufacture, ornament, or domestic use" and thus could be removed by tenant under CC 1019 provided that no exceptions to that apply. The spray paint upon the Drywall did not have separate ownership and instead became owned by the owner of the Drywall pursuant to CC 1025, as soon as it appeared.<br><br>Again, Plan Agent's position is that the terms of the Lease do apply to any dispute within the scope of its terms. |
| 19 20 21 22 23 24 25 26 27 28 | 41. | Alternatively, even if the terms of the Lease did not supersede California Civil Code California Civil Code § 1019, the statute would not apply to the Pilaster based on the following: (1) the installation of Pilaster is consistent with the Renovation Project and it fits within the overall design of the façade of the building and therefore became an integral party of the La Brea Property; (2) the Pilaster served no specific purpose relating to the lessee's "trade", as it was not intended to hold any art when installed but was intended to be an element of construction – that is, a pilaster covering a split face cinderblock wall and integrated with the building's general architectural design; (3) Mr. Chrismas intended that the Pilaster would remain on the La Brea Property permanently; (4) even if the Pilaster had a loose relationship to the lessee's trade, it was an element | This is the first time 400 SLB has asserted that the Drywall "was not intended to hold any art when installed" and directly contradicts Mr. Chrismas's testimony that the purpose of building the Drywall was to frame the Robert Irwin light sculpture. 400 SLB's admission—now--that the Drywall had no artistic purpose when built is consistent with the Plans which showed the Drywall as not existing at the Premises.<br><br>Plan Agent submits that 400 SLB's statement that the Drywall had no artistic purpose when built should be rejected as not supported by the evidence. In |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | of construction and did not serve any specialized or specific purpose with respect to lessee's trade. | this particular case, according to Mr. Chrismas's trial declaration, Robert Irwin himself had specifications as to how his art was to be displayed, and the Drywall was part of that display.

The Drywall was constructed for purposes of trade, manufacture, ornament, or domestic use, as it was designed to frame the Robert Irwin light sculpture and built according to Mr. Irwin's specifications.  It held no weight other than its own.  After it was attached to the floor, ceiling, and cinderblock wall, nothing was ever attached to it again, at any time.  It was designed to have an aesthetically pleasing look because that is how art galleries run their business.

Regarding element (3), CC 1019 does not draw a distinction between fixtures built which are intended to remain on the site, versus fixtures which are not. |
| | **California Law on Accession** | |
| 42. | California Civil Code § 1013 does not apply to the Pilaster as the Lease sufficiently addresses ownership rights relating to improvements made by the lessee. | Plan Agent agrees the Lease controls as to any issues within the scope of its terms.  CC 1013 is the Civil Code section relating to fixtures made to "Land".  It appears unlikely that the Drywall was affixed to "Land" and thus, Plan Agent agrees that other provisions of the California Civil Code are more likely to apply in the event the Lease does not address a particular issue directly.

Plan Agent agrees that the Lease does directly address ownership of "Trade Fixtures" as well as "Lessee-Owned Alterations" and "Lessee-Owned Utility Installations".  As to those three categories, the Lease states that the tenant owns those objects. |
| 43. | California Civil Code § 1013.5 is inapplicable to | The question is whether Ace Museum had the right to remove |

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | this contested matter, as it creates a private right of action which can be exercised only by an improver of real property, provided that certain conditions precedent are met and (1) the Plan Agent is not an improver of the La Brea Property; (2) the Plan Agent has no legal basis to assert any right Ace Museum may have previously held under California Civil Code § 1013.5; (3) Ace Museum never satisfied the conditions precedent under California Civil Code § 1013.5 that payment be made to 400 SLB, prior to the removal of the improvement, and for all damages relating to the installation and removal of such improvement; and (4) the Plan Agent has made no offer to compensate 400 SLB for its attorneys' fees and costs, as required under California Civil Code § 1013.5(b). | the Banksy, and as to that CC 1013.5 could apply to the dispute to the extent the Lease does not address a particular issue directly.  In that instance, CC 1013.5 could apply only if the Drywall is deemed to be affixed to "land".

Further, CC 1013.5 speaks both in terms of the "rights" of a party that constructs something, which are relevant to this discussion, and "rights of action" that party could assert.  "Rights of action" are relevant to this discussion only as evidence that the policy in California is to give protection to parties that build things on the property of another "erroneously believing because of a mistake either of law or fact that he has a right to do so,"  CC 1013.5(a), and as further statutory support for finding that Ace Museum had the right to remove the Banksy under certain conditions identified in that Code section. |
| 44. | California Civil Code § 1013.5 could not apply to the Banksy. California Civil Code § 1013.5 provides a private right of action only to a party making an improvement to real property who does so under a mistaken belief they have the right to do so, and the record reflects that the Banksy was not installed by the lessee and there is no evidence that the party responsible for attaching the Banksy to the La Brea Property acted under any good faith belief that they had the right to do so. Further, the party responsible for attaching the Banksy is not a party to this proceeding, and the Plan Agent has no legal basis to assert any right such party may have had under California Civil Code § 1013.5. | The issue is the right to remove the underlying Drywall.  The Banksy became owned by the owner of the Drywall as soon as the spray paint touched the Drywall.

Evidence indicates that Banksy was given a key to the Property, and thus had "consent" to at least visit the Property.  Whether or not that would support a good faith belief that the invitee could spray graffiti on the property, is not discussed in the record and not relevant anyway.  The issue—to the extent CC 1013 is relevant to the analysis at all--is whether Mr. Chrismas built the Drywall "erroneously believing because of a mistake of law or fact that he has a right to do so".  As to that issue, the evidence supports a finding that Mr. Chrismas built the Drywall in |

| | | | |
|---|---|---|---|
| | | | good faith. |
| | 45. | The three-year statute of limitations under California Code of Civil Procedure § 338(e) applicable to actions based on mistake applies to any private right of action created under Civil Code § 1013.5. | Plan Agent agrees that the Court should apply the statute of limitations to this dispute, and find that the time period for 400 SLB to assert rights with respect to the removed portion of the Drywall lapsed, at the very latest, four years after Mr. Hernandez removed the remainder of the Drywall and rebuilt a pilaster in its place. |
| | 46. | As to the Pilaster, to the extent the lessee previously held any right under Civil Code § 1013.5, it was required to bring an action to remove it sometime between July 2011 and September 2012, as the record reflects that the Pilaster was installed sometime between July 2007 and September 2008. | Plan Agent agrees that the Court should apply the statute of limitations to this dispute,<br><br>Here, CC 1013.5, to the extent it applies at all, gave Ace Museum the right to remove the Drywall at any time—with no need to commence litigation to do so. |
| | 47. | Although the Banksy is considered part of the La Brea Property under the terms of the Lease, as it is an "Alteration" as defined thereunder, it may also be deemed part of the La Brea Property under California Civil Code § 1013 because: (1) it was affixed to the Pilaster, which was contractually considered part of the La Brea Property pursuant to Paragraph 7.4(a) of the Lease; and (2) there is no evidence of any agreement between 400 SLB and the artist Banksy regarding affixation or removal of the Banksy. As such, the Banksy, "belongs to the owner of the land" pursuant to California Civil Code § 1013. | The legal analysis 400 SLB suggests is this:<br><br>(1)  If the Lease does not otherwise apply, and<br>(2)  If the Drywall is considered land, and<br>(3)  If CC 1013 applies, and<br>(4)  If the exception in CC 1013 and 1013.5 does not apply, then<br>(5)  Upon the Banksy's appearance, it became owned by the owner of the "Land".<br><br>There are numerous problems with this analysis, which are summarized briefly as:<br><br>(1)  If the Lease does not apply, then there is no California law that would treat the Drywall as "land".  400 SLB can point only to Paragraph 7.4(a) of the Lease which identifies Lessee Owned Alterations are "considered a part of the Premises" – an argument that disappears if the premise is that the Lease does not apply to the dispute.<br><br>(2)  There is no California law that would treat the Drywall as land.  At best, California law might state that the Drywall was |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX  213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 11 12 13 | | | itself attached to "land".  CC 1013, however, does not address things that are attached to things that are themselves attached to land.<br><br>(3)  CC 1013 thus would not apply to spray paint being sprayed onto a wall which is part of a building which is resting on land.<br><br>(4)  Conceded that the exception in 1013 and 1013.5 would not apply to whoever spray painted the Drywall, but the result of that is that the spray paint would become owned by the owner of the Drywall.<br><br>(5)  Conceded that upon the Banksy's appearance, it became owned by the owner of the Drywall. |
| 14 | | **400 SLB Did not Waive Any Rights to the Banksy** | |
| 15 16 17 18 19 | 48. | "Waiver is the intentional relinquishment of a known right after knowledge of the facts." (emphasis added). Specifically, "[t]here can be no waiver where the one against whom it is asserted has acted without full knowledge of the facts. It cannot be presumed, in the absence of such knowledge, that there was an intention to waive an existing right." | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 20 21 22 23 | 49. | "The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver'." | No objection.<br><br>☐ Sustained<br>☐ Overruled |
| 24 25 26 27 28 | 50. | The Plan Agent has failed to demonstrate, by clear and convincing evidence that 400 SLB had any knowledge of the Banksy prior to the Plan Agent's filing of his Application. Mr. Dayan has testified that he had no knowledge of the Banksy until the Application was filed; Mr. Chrismas has testified that he never informed 400 SLB of the Banksy or its removal; and the evidence submitted by the Plan Agent in this regard shows only that Mr. | The issue is whether 400 SLB had knowledge that the Drywall had a portion of it removed. That is the event that, if 400 SLB had any rights it could assert under the Lease, triggered its deadline to assert those rights. The evidence indicates that the Drywall had a hole cut out of it for approximately 1 year, that such knowledge as openly |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| | Dayan was confused and did not fully understand that a Banksy had been painted at the La Brea Property. | known to anyone on the Premises, and that 400 SLB's management company Fortuna Management was regularly on the Premises. |
| 51. | Soon after the Plan Agent filed the Application, 400 SLB timely opposed the relief requested as to the Banksy. | 400 SLB's right to assert that Ace Museum improperly removed a portion of the Drywall expired due to application of the statute of limitations long ago. California law creates a three-year statute of limitations for "An action for relief on the ground of fraud or mistake" (Code of Civ. Proc. §338, subd. (d)), and has a four-year statute of limitations for "An action upon any contract" (§ 337, subd. (a)).

The Delayed discovery rule does not apply as 400 SLB cannot demonstrate that a reasonable investigation would not have revealed, during the one year period after April 14, 2010, that a portion of the Drywall had been removed.  Claimants are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (Id. at p. 808.) "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, . . . it is clear that the plaintiff must go find the facts; she [or he] cannot wait for the facts to find her [or him]." (Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1111, 245 Cal. Rptr. 658, 751 P.2d 923.). |
| 52. | Given 400 SLB's lack of knowledge regarding the Banksy's installation or removal, and its prompt action taken after the Application was filed, 400 SLB did not intentionally relinquish any rights it has to the Banksy and therefore 400 SLB has not waived any rights to the Banksy. | The evidence indicates that 400 SLB knew that a portion of the Drywall was removed. It did nothing in response to that knowledge.  Its rights with respect to the removed portion of the Drywall—if it had any such rights—expired long ago. |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

Additionally, the doctrine of laches applies here.  This doctrine bars legal claims that have been surrendered through inaction or acquiescence.  "'Laches is based on the principle that those who neglect their rights may be barred, in equity, from obtaining relief. . . . The elements required to support a defense of laches include unreasonable delay and either acquiescence in the matter at issue or prejudice to the defendant resulting from the delay. . . . Generally, laches is a question of fact, but where the relevant facts are undisputed, it may be decided as a matter of law.' City of Oakland v. Oakland Police & Fire Ret. Sys., 224 Cal. App. 4th 210, 248, 169 Cal. Rptr. 3d 51 (2014); see also Johnson v. City of Loma Linda 24 Cal.4th 61, 67, 99 Cal. Rptr. 2d 316 (2000).  Here 400 SLB never after April 14, 2010, asserted that it possessed an interest in the removed portion of the Drywall, despite it being openly known that a portion of the Drywall was removed.

18
19
20    Dated:  March 29, 2022                **Sulmeyer**Kupetz
                                           A Professional Corporation
21
22                                         By:  _____
23                                              Victor A. Sahn
24                                              Steven F. Werth
25                                              David V. Sack
                                                Attorneys for Sam S. Leslie
26
27
28

57

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):  **PLAN AGENT'S OBJECTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING BANKSY DISPUTE SUBMITTED BY 400 S. LA BREA LLC**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 29, 2022  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Simon Aron**    saron@wrslawyers.com, eweiman@wrslawyers.com
- **Jason Balitzer**    jbalitzer@sulmeyerlaw.com,
  jbalitzer@ecf.inforuptcy.com;dwalker@ecf.inforuptcy.com;kmccamey@sulmeyerlaw.com
- **Keith Patrick Banner**    kbanner@greenbergglusker.com,
  sharper@greenbergglusker.com;calendar@greenbergglusker.com
- **Brian L Davidoff**    bdavidoff@greenbergglusker.com,
  calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Carolyn A Dye**    trustee@cadye.com
- **Fahim Farivar**    fahim@farivarlaw.com, catherine@farivarlaw.com;lisa@farivarlaw.com
- **Alan W Forsley**    alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy.flores@flpllp.com
- **J. Bennett Friedman**    jfriedman@flg-law.com, msobkowiak@flg-law.com;jmartinez@flg-law.com
- **Michael I. Gottfried**    mgottfried@elkinskalt.com
- **Asa S Hami**    ahami@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;ahami@ecf.inforuptcy.com
- **Elliot C Harvey Schatmeier**    ehs@birdmarella.com, dthrockmorton@birdmarella.com
- **Matthew P Kelly**    mkelly@sulmeyerlaw.com
- **Daniel A Lev**    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- **Krikor J Meshefejian**    kjm@lnbyg.com
- **Susan I Montgomery**    susan@simontgomerylaw.com,
  assistant@simontgomerylaw.com;simontgomerylawecf@gmail.com;montgomerysr71631@notify.bestcase.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbnlawyers.com
- **Kurt Ramlo**    kr@lnbyg.com, kr@ecf.inforuptcy.com
- **Ekwan E Rhow**    eer@birdmarella.com, blee@birdmarella.com
- **David J Richardson**    drichardson@bakerlaw.com, aagonzalez@bakerlaw.com
- **Ronald Rus**    rrus@brownrudnick.com, tlangford@brownrudnick.com
- **David V Sack**    dsack@sulmeyerlaw.com, dvsack@gmail.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;
  cblair@ecf.inforuptcy.com
- **Michael C Schneidereit**    mschneidereit@jonesday.com, scollymore@jonesday.com;tckowalski@jonesday.com
- **David B Shemano**    dshemano@shemanolaw.com
- **Jonathan Seligmann Shenson**    jshenson@shensonlawgroup.com
- **Mark Shinderman**    mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com
- **Michael D Sobkowiak**    msobkowiak@flg-law.com, jfriedman@flg-law.com;jmartinez@flg-law.com
- **Stephen Sorensen**    , joseperez@tafsattorneys.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Michael W Vivoli**    mvivoli@vivolilaw.com, sbrown@vivolilaw.com
- **Jessica Vogel**    Jvogel@sulmeyerlaw.com, jvogel@ecf.inforuptcy.com;mviramontes@sulmeyerlaw.com
- **Howard J Weg**    hweg@robinskaplan.com

DAP 2734041v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

- **Steven F. Werth**  swerth@sulmeyerlaw.com, cblair@sulmeyerlaw.com; mviramontes@sulmeyerlaw.com; dperez@sulmeyerlaw.com; swerth@ecf.inforuptcy.com
- **Beth Ann R. Young**    bry@lnbyg.com, bry@lnbyb.com
- **Roye Zur**  rzur@elkinskalt.com, cavila@elkinskalt.com;myuen@elkinskalt.com

☐ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>March 29, 2022</u> , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**<u>Via Personal Delivery</u>**
The Honorable Robert Kwan
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Bin outside of Suite 1682
Los Angeles, CA 90012

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| March 29, 2022 | Debbie A. Perez | /s/Debbie A. Perez |
| *Date* | *Printed Name* | *Signature* |

DAP 2734041v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                        **F 9013-3.1.PROOF.SERVICE**